FILED

2004 Nov-17  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
#### SOUTHERN DIVISION

| | | |
|---|---|---|
| TIECO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 01-RRA-1372-S |
| | ) | |
| USX CORPORATION, ROBERT E. | ) | |
| HILTON, JAMES B. WAGER, AND | ) | |
| KENNETH FALLS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF USS'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, TO STAY**

United States Steel Corporation ("USS") submits this memorandum of law in support of its Motion for Judgment on the Pleadings or, in the Alternative, to Stay.

### INTRODUCTION AND STATEMENT OF FACTS

The present action is but another attempt by TIECO to re-litigate issues already adjudicated in a prior action, *USX Corporation, et al. v. Tieco, Inc., et al.*, CV-95-HS-3237-S ("TIECO I"). Indeed, the sole subject of plaintiff's complaint – the alleged discovery abuses and their impact on TIECO's ability to prosecute its counterclaims in TIECO I, was squarely addressed by the Eleventh Circuit, which held that even if TIECO could show that USS later found some of the disputed items at its tractor shop, this "would not alter [its] legal analysis" that probable cause existed on the face of the accounting scheme. *U.S. Steel, LLC v. TIECO, Inc.*, 261 F. 3d 1275, 1291 n. 8. TIECO's campaign to relitigate these issues was most recently addressed and rejected by this court in resolving TIECO's Motion for New Trial in TIECO I.

There, Judge Hopkins correctly observed that no amount of additional discovery would change the outcome -- TIECO's claims failed because probable cause existed as a matter of law.  (*See* CV-95-HS-3237-S, Memorandum Opinion and Order, Hopkins, J., attached hereto as Exh. A.)[1]  TIECO has filed an appeal of Judge Hopkins' order, the success of which would require the Eleventh Circuit to reverse itself.  Undaunted by these rulings, TIECO has asked this Court to ignore the Eleventh Circuit mandate, ignore this Court's denial of its motion for new trial and the appeal of that denial, and let it have yet another chance to relitigate what has already been conclusively decided.

In TIECO I, USS filed suit against TIECO on December 15, 1995.  (Complaint, ¶ 9.) USS's claims were based on the fact that TIECO, a supplier to USS, secretly kept double books on USS's accounts and billed USS for items not received.  (*Id.*)  TIECO counterclaimed alleging civil conspiracy, violation of 42 U.S.C. § 1983, malicious prosecution, abuse of process, interference with business relations, and defamation.  (*Id.*, ¶¶ 10, 17.)

The claims and counterclaims in TIECO I were tried before a jury in October 1999, with the Honorable U. W. Clemon presiding.  During jury deliberations, TIECO accused USS of discovery abuse, specifically of withholding certain documents.  (Trial Transcript, pp. 1833-60, attached hereto as Exh. B.)  Although USS denied any misconduct, the court entered an order dismissing USS's claims as a sanction for the non-production.  *See* 189 F.R.D. 674 (N.D. Ala. 1999), attached hereto as Exh. C.  The judge then interrupted the jury deliberations and

---

[1]  The Court can take judicial notice of the record of the prior proceedings in TIECO I. Fed. R. Evid. 201 (court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Briggs v. Newberry Co. Sch. Dist.*, 838 F.Supp. 232, 233-34 (D. S.C. 1992)("When entertaining a motion to dismiss on the ground of res judicata or collateral estoppel, a court may judicially notice facts from a prior judicial proceeding. ... The record of the prior administrative and state court hearings ... is a source whose accuracy cannot reasonably be questioned.")

instructed the jury to consider only TIECO's counterclaims. (Trial Transcript, p. 1863.) The following day, the jury returned a verdict for TIECO on its counterclaims in the amount of $7,175,000. (Final Judgment, attached hereto as Exh. D.)

On April 28, 2000, the court awarded TIECO attorneys' fees and costs in the amount of $1,442,769.27. (Memorandum Opinion, attached hereto as Exh. E.) The court also enhanced the lodestar by one-third "as a further sanction for Plaintiffs' contumacious conduct." (*Id.*)

USS filed a timely notice of appeal as to both the sanction of dismissal of the complaint and as to the jury verdict on TIECO's counterclaims. (Notice of Appeal, attached hereto as Exh. F.) TIECO did not file a cross appeal. USS filed a second appeal in response to the award of attorneys' fees. (Notice of Appeal, attached hereto as Exh. G.)

Following trial, USS produced additional documents. TIECO moved to supplement the record, and on June 6, 2000, the district court ordered that the record be supplemented to include the additional records produced. (Order, attached hereto as Exh. H.)

On August 17, 2001, the Eleventh Circuit Court of Appeals issued its opinion in both appeals, sustaining the dismissal of USS's claims as a discovery sanction, reversing the judgment for TIECO on its counterclaims, and directing that judgment be entered in favor of USS on those counterclaims. *U.S. Steel, LLC v. TIECO, Inc.*, 261 F.3d 1275, 1291 (11th Cir. 2001), attached hereto as Exh. I. The Eleventh Circuit held, as a matter of law, that TIECO's accounting system, on its face, provided probable cause and thus TIECO's §1983 and malicious prosecution claims failed as a matter of law. *Id.* at 1290-91. Additionally, the Eleventh Circuit held that TIECO's remaining claims, including abuse of process, tortious interference with business relations, defamation, and conspiracy, also failed as a matter of law. *Id.* at 1292-94.

3

TIECO moved for rehearing en banc on September 7, 2001, which was denied on November 8, 2001.  The Eleventh Circuit mandate, issued November 16, 2001, remanded only the question of whether TIECO was the prevailing party for purposes of recovering its costs.  On October 24, 2002, the court entered an order awarding costs to TIECO as the prevailing party.  (Order on Motion for Costs and Attorneys' Fees, attached hereto as Exh. J.)

On October 25, 2002, TIECO filed a motion for new trial, pursuant to Fed. R. Civ. P. 60(b), in which it contended, as it does in this matter, that documents not produced by USS prior to, during and after trial prevented TIECO from conducting full and fair discovery and fully and fairly presenting its counterclaims.  (Rule 60(b) Motion for New Trial, attached hereto as Exh. K.)  After thorough briefing and argument, on September 2, 2004, the Honorable Virginia E. Hopkins denied TIECO's motion for new trial, explaining that the court "cannot substitute its judgment for that of the Court of Appeals."  (Exh. A at 17.)  "The Eleventh Circuit ruled that the accounting/billing scheme described in its opinion supplied sufficient probable cause for USS's actions."  (*Id.*)  In the court's view, "additional documents or deposition testimony ... would not change the Court of Appeals' mind on the probable cause point."  (*Id.* at 16.)[2]

Judge Hopkins said it best when she noted that TIECO's Rule 60 motion for new trial was simply "a continuation of the dialogue between it and the [Eleventh] Circuit initiated by TIECO in its *Petition For Rehearing En Banc* and answered by [the Eleventh Circuit] in its denial thereof.  Put another way, TIECO disagreed with [the Eleventh] Circuit, and still does, about whether it proved a lack of probable cause in its federal and state claims against USS."

---

[2] Judge Hopkins denied TIECO's requests for discovery in aid of the motion and noted that "[i]f the court were ruling on the TIECO Motion For New Trial using only the discretion vested in the court under Rule 60 or 60(b)(3), it would reach the same result as, in the court's view, the 11th Circuit decision in this action requires:  it would deny the Motion" (Exh. A at 19, 22).

(*Id.* at 21.)  TIECO has appealed the denial of its Rule 60(b) motion.  (Notice of Appeal, attached hereto as Exh. L.)

TIECO commenced the present action (referred to herein as "TIECO II") in the Circuit Court of Jefferson County, Alabama, Bessemer Division on April 25, 2001, while TIECO I was still on appeal to the Eleventh Circuit.  (*See* Complaint.)

## ARGUMENT

## I.   TIECO'S CLAIMS ARE BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL.

The present action is but one more attempt by TIECO to re-litigate what has already been decided by the Eleventh Circuit and this very court.  (*See* Exhs. I and A.)  The Eleventh Circuit held, as a matter of law, that USS had probable cause to suspect TIECO of fraud.  *U.S. Steel, LLC v. TIECO, Inc.,* 261 F.3d 1275, 1291 (11th Cir. 2001).  The court based this finding on the face of the accounting scheme set up by TIECO – facts that were not in dispute between the parties.  *Id.*  As Judge Hopkins concluded, no amount of discovery or additional documents can change this outcome; it has already been litigated and decided by the Eleventh Circuit.  (Exh. A, p. 16.)  It is time for this to put a stop to the plaintiff's two-year effort to collaterally attack the Eleventh Circuit's mandate.  Doing so at this point would promote judicial economy as it would likely permit the Eleventh Circuit to review this Court's and the district court's ruling on this dispositive motion at the same time it is considering this court's denial of TIECO's Rule 60(b) motion in TIECO I.  This controversy has gone on long enough.

A party may file a motion for judgment on the pleadings after the pleadings are closed but within such time as not to delay trial.  Fed. R. Civ. P. 12(c).  Judgment on the pleadings is appropriate "when there are no material facts in dispute, and judgment may be rendered by

5

considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). Even if this Court accepts the facts in the complaint as true, and views them in the light most favorable to TIECO, as a matter of law, TIECO's claims are barred by the doctrine of collateral estoppel.

Collateral estoppel bars a party from re-litigating an issue decided in a prior action when the following criteria are satisfied: "(1) the issue at stake is identical to the one involved in the prior proceeding; (2) the determination of the issue in the prior litigation must have been 'a critical and necessary part' of the judgment in the first action; (3) the issue was actually litigated in the prior proceeding; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding." *Dailide v. U.S. Attorney General*, 2004 WL 2335206 (11th Cir., Oct. 18, 2004).

The essence of TIECO's current lawsuit is its claim that were it not for USS's discovery abuses during TIECO I, it would have prevailed on its counterclaims in TIECO I. (Complaint, ¶ 69.) TIECO complains that the discovery abuses "materially affected the presentation of TIECO's defenses and counterclaims… TIECO was prevented from presenting to the jury a full and complete defense to USX's claims and a full and complete prosecution of TIECO's counterclaims." (Complaint, ¶¶ 68, 69, 75, 76, 83, 95, 100, 104.)[3] However, the Eleventh Circuit has already decided that TIECO's counterclaims fail *as a matter of law*, 261 F.3d at 1294, and the district court has already concluded that the Eleventh Circuit's mandate, regardless

---

[3]   Although TIECO claims as a part of its damages that it was prevented from providing a full defense to USS's claims, the court dismissed USS's claims as a sanction, and thus no damages were awarded against TIECO in TIECO I.

of what may be disclosed in additional discovery, must be honored (Exh. A).  Allowing TIECO

to pursue the present action would permit a collateral attack on the Eleventh Circuit's judgment.[4]


### 1.    Identity of Issues.

The issue of whether TIECO would have prevailed on its counterclaims in TIECO I, but

for the discovery abuses and "wrongful conduct of USX and others" is necessary to the

resolution of the present action.  It is not an open question, but one that has already been

answered by the Eleventh Circuit.  In TIECO I, the Eleventh Circuit held, as a matter of law, that

probable cause existed based on *undisputed* evidence in the record relating to TIECO's own

accounting system, thus defeating TIECO's claims of a violation of 42 U.S.C. §1983 and

malicious prosecution.  261 F.3d 1275, 190-91.  In the words of the Eleventh Circuit, "[a]lthough

TIECO may have had an innocent explanation for this accounting system, the system, **on its**

**face**, gave USX a reasonable ground for suspecting TIECO of fraud. ... Therefore, the district

court should have granted USX judgment as a matter of law." *Id*. at 1291 (emphasis added).  In

fact, the court held that even if TIECO could show that USS later found some of the disputed

items at its tractor shop, this "would not alter [its] legal analysis" that probable cause existed on

the face of the accounting scheme.  *Id*. at n. 8.  Furthermore, the Eleventh Circuit held that

TIECO's claims of abuse of process, tortious interference with business relations, defamation,

and civil conspiracy also failed as a matter of law.  *Id*. at 1292-94.  TIECO's petition for

rehearing was denied.

### 2.    Actually Litigated and Necessary to the Judgment.

---

[4]   USS notes that the Eleventh Circuit mandate also operates as res judicata to bar
plaintiff's present claims of discovery misconduct, which could have been (and in fact were)
raised in the prior lawsuit.

There can be no dispute that the issue of whether USS was entitled to judgment as a matter of law on TIECO's counterclaims was (a) actually litigated and (b) necessary to the judgment. The district court's denial of USS's renewed motion for judgment as a matter of law in TIECO I was one of the central issues appealed to the Eleventh Circuit. 261 F.3d at 1280.

### 3.     Full and Fair Opportunity to Litigate.

TIECO had a full and fair opportunity to litigate the issue of whether USS was entitled to judgment as a matter of law as to TIECO's counterclaims. Although TIECO's complaint alleges that USS's conduct prevented it from presenting "a full and complete prosecution of TIECO's counterclaims," the Eleventh Circuit's decision rested on TIECO's *own evidence* of its own accounting system. 261 F.3d 1275, 1291. The court held that "the system, on its face, gave USX a reasonable ground for suspecting TIECO of fraud" and thus, USS was entitled to judgment as a matter of law.

The Eleventh Circuit's ruling that TIECO's counterclaims fail as a matter of law bars re-litigation of that issue in TIECO II. In fact, this court has previously held that the Eleventh Circuit's mandate precludes re-litigation of TIECO's counterclaims, regardless of TIECO's allegations of discovery misconduct. In TIECO I, TIECO sought relief from the judgment pursuant to Rule 60(b), alleging as its basis the same discovery abuses claimed here. Judge Hopkins denied TIECO's motion, holding that to do otherwise would be to "substitute its judgment for that of the Court of Appeals." (Exh. A, p. 17.) The situation here is no different. Permitting this case to proceed would be to substitute this Court's judgment for that of the Eleventh Circuit, which has already spoken to the pivotal issue in this case.

8

Wherefore, USS respectfully requests that this Court enter an order granting judgment on the pleadings in its favor.

## II.   TIECO'S CLAIMS ARE BARRED BY THE DOCTRINE OF RES JUDICATA.

TIECO's present action (TIECO II), though disguised as state law claims of fraud, deception, and perjury, is in fact an action for relief from the federal court judgment entered in TIECO I.  Federal Rule of Civil Procedure 60(b) is "[t]he proper avenue of redress for a party seeking relief from a judgment claiming fraud as grounds for relief." *Villarreal v. Brown Exp., Inc.*, 529 F.2d 1219, 1221 (5th Cir. 1976).

Similar is the case of *Palkow v. CSX Transportation, Inc.*, 331 F. Supp. 2d  594 (N.D. Ohio 2004).  Following an adverse federal court judgment, the plaintiff in *Palkow* re-filed in state court.  Upon removal, the federal district court noted that "notwithstanding her protestations to the contrary and her unsuccessful attempts to craft her complaint as solely a state law claim, Ms. Polkow's complaint is really an independent action seeking relief from this Court's judgment in *Polkow I*." *Id.* at 598.[5]  *See also, Black v. Niagara Mohawk Power Corp.*, 641 F.Supp. 799, 801 (N.D. N.Y. 1986)(plaintiff's complaint, which sounded in fraud and alleged that summary judgment in prior case was obtained by means of false statements, re-characterized by the court as an attack on validity of the judgment pursuant to Rule 60(b)).

TIECO's latest attempt to seek relief from the judgment in TIECO I is precluded not only by the Eleventh Circuit's judgment, but also by this court's denial of TIECO's motion for new

---

[5]   The *Palkow* court went on to dismiss plaintiff's complaint on the ground that "[a]llegations of perjury, like those advanced by Ms. Polkow, are insufficient to support an independent action for relief from judgment." *Id.* at 598; *accord Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985); *see also United States v. Beggerly*, 524 U.S. 38, 47 (1998)(defendant's failure to produce documents during discovery was insufficient to meet the stringent standard necessary to support an independent action for relief from judgment).

trial pursuant to Rule 60(b). (Hopkins, J.; Exh. A.) These issues have already been ruled on. The doctrine of res judicata "'will bar a subsequent action if: (1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same.'" *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2004)(quoting *Israel Disc. Bank, Ltd. v. Entin*, 951 F.2d 311, 314 (11th Cir. 1992)).

There can be no dispute that the prior judgment was rendered by a court of competent jurisdiction. The fact that the court's order is on appeal to the Eleventh Circuit does not affect its finality for res judicata purposes. *Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988). USS and TIECO were parties to both lawsuits. Finally, TIECO's claim is the same in both suits: that it is entitled to relief from the judgment in TIECO I due to the allegedly fraudulent conduct of USS. This court's prior decision in TIECO I, denying TIECO's request for relief from the judgment, precludes TIECO from re-litigating the same claim in the present action. Wherefore, USS is entitled to a judgment on the pleadings in its favor.

## III.   ALTERNATIVELY, USS IS ENTITLED TO A STAY PENDING RESOLUTION OF TIECO I.

Alternatively, should the Court decide to postpone a ruling on USS's Motion for Judgment on the Pleadings or should the Court deny that motion, USS requests that this Court stay the present action. On September 2, 2004, the Honorable Judge Virginia E. Hopkins entered a Memorandum Opinion and Order denying TIECO's motion for new trial. Exh. A. On September 10, 2004, TIECO filed a notice of appeal to the United States Court of Appeals for the Eleventh Circuit from the Memorandum Opinion and Order. Exh. L.

10

The power to stay a proceeding is incidental to the power inherent in every court to control the disposition of the causes on its docket. *See Landis v. North American Co.*, 299 U.S. 248, 254 (1936). A stay pending the outcome of litigation between the same parties involving the same or controlling issues is an acceptable means of avoiding unnecessary duplication of judicial machinery. *See id.*; *Ortega Trujillo v. Conover & Company Communications, Inc.*; 221 F.3d 1262, 1264 (11th Cir. 2000); *Blinder, Robinson & Co., Inc. v. United States Securities and Exchange Commission*, 692 F.2d 102, 105-6 (10th Cir. 1982) ("court may, in its discretion, defer or abate proceedings when another suit, involving the identical issues, is pending in either state or federal court, and it would be duplicative, uneconomical and vexatious to proceed"); *ACF Industries, Inc. v. Guinn*, 384 F.2d 15 (5th Cir. 1967).

TIECO's motion for new trial addressed the same alleged discovery conduct which is the sole subject of TIECO's instant complaint. TIECO is appealing the denial of that motion. Because TIECO's claims in the present action are based on the same claimed conduct, a stay is necessary to protect the Eleventh Circuit's and this Court's jurisdiction over the alleged conduct, to prevent frustration of the orders previously entered by this Court, and to avoid duplicative and inconsistent results.

This action is nothing more than an attempt to circumvent the decisions of this court and the Eleventh Circuit in TIECO I. The doctrines of collateral estoppel and res judicata preclude such re-litigation and entitle USS to a judgment on the pleadings in this action. Alternatively, a stay in this case is necessary to protect the jurisdiction and the efficacy of the prior orders of the Eleventh Circuit and this Court, to prevent the specter of inconsistent results from duplicative litigation, and to avoid irreparable harm and prejudice to USS.

Finally, entry of a stay pending the conclusion of TIECO I is a practical, commonsense approach: this nine-year dispute is likely to be conclusively terminated by the next Eleventh Circuit order. It will have made no sense for the parties and the Court to have been involved in expensive, time-consuming and unnecessary discovery between now and then.

**WHEREFORE,** USS requests that this Court enter a judgment on the pleadings in its favor, or alternatively, that all proceedings in this case be stayed pending the conclusion of TIECO I.

                                               One of the Attorneys for Defendant
                                               United States Steel Corporation

OF COUNSEL:
Sam C. Pointer, Jr. (POINS4729)
Jere F. White, Jr. (WHITJ1759)
Sara Anne Ford (FORDS5509)
Sarah O. Warburton (WARBS1598)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that I have on this _12ᵗᴴ_ day of _Nov._, 2004, served the foregoing upon counsel of record for all parties to this proceeding, by placing a copy thereof in the United States Mail, first-class postage thereon prepaid and properly addressed as follows:

J. Mark White, Esq.
Linda G. Flippo, Esq.
Steve Arnold, Esquire
WHITE, DUNN & BOOKER
290 21st Street North
Suite 600
Birmingham, AL 35203

Ralph D. Cook, Esq.
James R. Pratt, III, Esq.
HARE, WYNN, NEWELL & NEWTON
2025 Third Avenue North
Suite 800
Birmingham, AL 35203

H. Thomas Wells, Jr., Esq.
John A. Earnhardt, Esq.
Maynard Cooper & Gale PC
AmSouth Harbert Plaza, Suite 2400
1901 6ᵗʰ Avenue North
Birmingham, AL 35203-2618

Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

USX CORPORATION, et al.,                 )
                                          )
    **Plaintiffs/Counter Defendants,**      )
                                          )       **Civil Action No.**
v.                                        )
                                          )       **CV-95-HS-3237-S**
TIECO, INC., et al.                       )
                                          )
    **Defendants/Counter Plaintiffs.**      )

**ENTERED**

### <u>MEMORANDUM OPINION AND ORDER</u>        SEP - 2 2004

    The Plaintiff/Counter Defendant, United States Steel Corporation ("USS")[1] and the

Defendants/Counter Plaintiffs, TIECO, Inc., ATOZ Management, Inc., and Fletcher Yeilding

(collectively "TIECO"), are in their ninth (9th) year of litigation arising from the discovery by USS

that the USS's Heatherwood golf course and its tractor shop (the "USS local facilities") were,

through the actions of some local USS employees with TIECO's assistance, performing an end

around USS's corporate procurement system. The billing scheme is described in the 11th Circuit

Court of Appeals opinion in this case, <u>United States Steel v. TIECO, Inc.</u>, 261 F.3d 1275 (11th Cir.

2001)[2], and to the extent that the following description differs from that described by the Court of

Appeals, the Court of Appeals' description controls.[3]

---

[1] At the time the Complaint was filed in this action, the named Plaintiff was USX Corporation, and the caption of this case and earlier pleadings and briefs therefore refer to Plaintiff as "USX." The current party before the court is United States Steel Corporation, a Delaware corporation and successor by merger to USX Corporation and United States Steel LLC.

[2] A copy of the 11th Circuit's decision is attached as Exhibit A to this Opinion and Order.

[3] The court, like the Court of Appeals, portrays the facts in the light most favorable to TIECO.

1



TIECO was a vendor of parts and equipment to the local USS facilities.  The local USS facilities wanted vehicles, particularly Cushman vehicles, for its operations, but budget constraints imposed by USS's corporate purchasing department in Pittsburgh, Pennsylvania did not permit the local facilities to issue purchase order(s) in the amount(s) required to buy the desired vehicle(s). TIECO and the local facilities devised a scheme where the local facilities would issue purchase orders, which did not exceed the local facilities' purchasing authority, for parts and other goods from TIECO.  TIECO would not deliver the purchase order item(s) to the local facilities.  TIECO would, however, bill USS for the items.  TIECO would debit its inventory as though the goods had been delivered, and would credit a separate, and extraordinary USS ledger account,[4] for the amount of goods "sold" and the amount(s) of payments received from USS.  When the USS local facilities' credit balance reached a point where a desired vehicle could be purchased, the vehicle would be delivered, TIECO's inventory and the extraordinary USS ledger would be credited and debited respectively, and the cycle would begin anew.

USS learned of these events through a disgruntled former TIECO employee's assertions of various wrongdoings by TIECO to his attorney.  The attorney's firm was also one of USS's outside counsel. From these revelations came an investigation by USS and the Alabama Attorney General's office, a state court indictment of TIECO that was eventually dismissed (before trial), this lawsuit, and a related lawsuit sought to be consolidated with this action, Case Number CV-01-RRA-1372-S, ("TIECO II").  While not entirely free of debate, the USS investigation was initially fueled, at least in part, by a suspicion or belief that TIECO was not delivering any goods to USS.  TIECO's

---

[4] Extraordinary because it was created solely for the local facilities, or the tractor shop, and done so without the knowledge and consent of USS purchasing headquarters in Pittsburgh.

2

SEP.02'2004 20:07 RECEIVED FROM:      205-278-1772USDC        #1268-003

position, then and now, was that it delivered goods equivalent in value to the amounts of the purchase orders, and that USS, through its agents, acquiesced in the procurement and billing scheme.

**I.     Nature of the Case and Procedural Posture**

Much of this section, as well as III and IV., is drawn from the October 24, 2003 Joint Status Report filed by the parties. Doc. 399. USS filed this action on December 15, 1995 (Doc. 1), asserting claims pursuant to 28 U.S.C. §§ 1331, 1367 and 18 U.S.C. § 1964 against TIECO; ATOZ Management, Inc. ("ATOZ"), a TIECO affiliate that maintains TIECO's accounting records; Fletcher Yeilding ("Yeilding"), TIECO's President; and six TIECO employees, who were later dismissed. (Doc.95, 151). On June 4, 1996, Defendants TIECO, ATOZ and Yeilding filed an Answer and Counterclaim (Doc.38), and subsequently filed an Amended Counterclaim. TIECO asserted causes of action for civil conspiracy, violation of 42 U.S.C. § 1983, conspiracy to violate §1985, malicious prosecution, abuse of process, interference with business relations, interference with employee relations, misrepresentation, defamation, and selective prosecution. (Doc.81).

During trial, the court dismissed all of USS's claims as a sanction for discovery abuse (in particular the failure to produce requested documents dealing with Cushman vehicles and the local facilities' "tractor shop").     The dismissal of USS's claims took place while the jury was deliberating, and on November 9, 1999, in accordance with the jury verdict, the court entered its Final Judgment and Order (Doc. 309), awarding TIECO $7,175,000 on the counterclaims. USS filed a timely Notice of Appeal as to both the sanction of dismissal of the Complaint and as to the jury verdict on TIECO's counterclaims. (Doc. 337; Eleventh Circuit Case No. 00-11309). TIECO did not file a cross appeal. The court subsequently awarded TIECO attorneys' fees and costs (Doc. 350); in response, USS filed a second appeal. (Doc. 352; Eleventh Circuit Case No. 00-12842).

3

On August 17, 2001, the Eleventh Circuit Court of Appeals issued its opinion in both appeals, sustaining the dismissal of USS's claims as a discovery sanction[5] and reversing the court's entry of judgment on TIECO's jury verdict on its counterclaims and remanding for entry of judgment for USS on TIECO's counterclaims. TIECO moved for rehearing en banc on September 7, 2001, which was denied on November 8, 2001. The Eleventh Circuit mandate, issued November 16, 2001, remanded only the question of whether TIECO was the prevailing party under Fed. R. Civ. P. 54 (d) for purposes of recovering its costs and directed the court to determine whether TIECO was entitled to its costs pursuant to Fed. R. Civ. P. 54(d) and, if so, to reevaluate the amount of costs awarded consistent with 28 U.S.C. § 1920. 261 F.3d at 1294. On October 24, 2002, the court entered its Order on costs as directed by the Eleventh Circuit in Appeal No. 00-12842.

## II.  **Pending Motions**

TIECO filed a Motion for New Trial on October 25, 2002, pursuant to Fed R. Civ. P. 60(b) ("the Rule 60(b)(3) Motion For New Trial", unless referring to a pleading, where the pleading's title is used instead), contending that documents not produced by USS prior to or during trial prevented TIECO from conducting full and fair discovery and fully and fairly presenting its counterclaims. TIECO makes similar claims regarding documents produced after trial. TIECO also has requested discovery in aid of the Rule 60(b)(3) motion. USS opposes the Rule 60 Motion and the request for

---

[5] USS asserts that the Eleventh Circuit's affirmance of the dismissal of USS's claims as a sanction was pursuant to 11th Cir. R. 36-1 and has no precedential value. USS v. TIECO, 261 F.3d 1275, 1280. Resolution of this contention is not necessary for resolution of the Rule 60(b)(3) Motion For New Trial, and the court expresses no opinion on it.

4

discovery.[6]

Also pending before the court is TIECO's Motion to Consolidate this case with Case Number CV-01-RRA-1372-S, which has been referred to as "TIECO II".[7]  USS opposes this motion but would consent to consolidation if the Rule 60(b)(3) Motion For New Trial were granted.

A Motions hearing was held on April 25, 2003 by Chief Judge Clemons, who originally tried the case and who entered the November 9, 1999 Memorandum Opinion Striking The Claims Of The Plaintiff, doc. 310.  No rulings on the pending motions have been made.  After the file was reassigned to this Judge, a status conference was held and on August 26, 2004, the court held a Motions hearing to hear the parties' argument on the pending motions.

### III.    TIECO's Position On The Pending Motions

TIECO contends that it is entitled to a new trial under F.R.Civ.P. 60(b) asserting that as a result of discovery abuses by USS before, during and after trial, TIECO was denied the opportunity to conduct full and fair discovery in this case and to fully and completely present its counterclaims.  TIECO contends that the actions of USS constituted a fraud upon the trial court and that the circumstances of this case are of such an extraordinary nature as to warrant a new trial. (See discussion and case authority in TIECO's Rule 60(b)(3) Motion for New Trial (Doc. 369); TIECO's

---

[6] Certain filings made by each of the parties did not appear on the Court's Docket Sheet, but have now been received pursuant to an Order entered July 7, 2004.  Doc. 407.

[7] On April 25, 2001, while this case was on appeal to the Eleventh Circuit, TIECO filed an action in the Circuit Court of Jefferson County, Alabama, Bessemer Division, against USS, Robert E. Hilton, James B. Wager, and Kenneth Falls.  That action asserts claims of misrepresentation, deceit, suppression, negligence, and perjury.  USS subsequently removed that action to the United States District Court for the Northern District of Alabama, Southern Division, where it has been assigned Civil Action Number CV-01-RRA-1372-S.

5

Reply to USS's Response to TIECO's Supplemental Response and Clarification (Doc. 382); TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 377).

TIECO contends that USS documentary evidence, and the resulting witness examination or cross examination that flowed from those documents, was not available to TIECO prior to trial. This documentary and oral evidence was not considered by the jury, the trial court[8], or the Eleventh Circuit in relation to the effect of the evidence on TIECO's counterclaims. TIECO contends that documents produced by USS months after the trial of this case were relevant to TIECO's counterclaims and constitute newly discovered evidence. (See discussion and case authority in TIECO's Reply to Plaintiff's Response in Opposition to Defendant's Rule 60(b)(3) Motion For New Trial ; TIECO's Supplemental Response and Clarification (Doc. 379); TIECO's Reply to USS's Response to TIECO's Supplemental Response and Clarification (Doc. 382)).

TIECO contends that statements former Attorney General Investigator Larry Miller provided to TIECO in August of 2002 regarding USS's failure to disclose exculpatory evidence to the Attorney General's Office for purposes of its criminal investigation constitute newly discovered evidence. TIECO contends that the newly discovered evidence warrants a new trial on TIECO's counterclaims. (See discussion and case authority in TIECO's Reply to Plaintiff's Response in Opposition to Defendant's Rule 60(b)(3) Motion For New Trial ; TIECO's Supplemental Response and Clarification (Doc. 379); TIECO's Reply to USS's Response to TIECO's Supplemental Response and Clarification (Doc. 382)).

TIECO contends that its Rule 60(b)(3) Motion for New Trial was timely filed. TIECO stated,

---

[8] TIECO means as it relates to its counterclaims, since the non-production of the USS documents cost USS its entire affirmative case.

SEP.02'2004 20:10 RECEIVED FROM:      205-278-1772USDC      #1268-007

at the (on the record) status conference held August 17, 2004, that the 11th Circuit's mandate, issued November 16, 2001, was the "triggering" event for determining the timeliness of its motion. TIECO's Rule 60(b)(3) Motion For New Trial was filed on October 25, 2002.  TIECO has also requested discovery in aid of its Rule 60(b)(3) motion.  (See discussion and case authority in TIECO's Reply to Plaintiff's Response in Opposition to Defendant's Rule 60(b)(3) Motion For New Trial; TIECO's Supplemental Response and Clarification (Doc. 379); TIECO's Reply to USS's Response to TIECO's Supplemental Response and Clarification (Doc. 382); TIECO's Supplement to Rule 60 Motion (Doc. 388)).

TIECO contends that its Motion to Consolidate is only relevant to the issues pending in TIECO II before Magistrate Armstrong.  TIECO contends that it filed the Motion to Consolidate TIECO II because all three of the individual defendants were both deposition and trial witnesses in the instant case and were integral participants in USS's production of documents and other evidence before, during, and after the trial of this case.  TIECO contends that the only matter currently at issue in TIECO II is whether that case should be remanded because there has been no fraudulent joinder and no complete diversity of the parties in that action.  TIECO contends that its request to consolidate the instant case with TIECO II was based on the fact that the trial court had heard the testimony of these witnesses regarding their involvement in the discovery process and, therefore, the trial court had been in the best position to determine whether Ken Falls was a proper defendant in TIECO II.  (See discussion and case authority in TIECO's Motion to Consolidate; TIECO's Reply to USX's Response to TIECO's Motion to Consolidate, filed November 22, 2002.)

IV.  **USS's Position On The Pending Motions**

USS contends that TIECO's Rule 60(b)(3) Motion For New Trial is an impermissible

7

collateral attack on the Eleventh Circuit's ruling in <u>United States Steel v. TIECO</u>, 261 F. 3d 1275 (11th Cir. 2001), and the Eleventh Circuit mandate and the law of the case rule render this Court without jurisdiction to alter or amend the mandate. (See discussion and case authority in USS's Response in Opposition to TIECO's Rule 60 (b) Motion For New Trial, filed November 8, 2002; USS's Response to TIECO's Supplemental Response and Clarification (Doc. 380); USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)).

USS contends that the documents to which TIECO points in support of its Rule 60(b)(3) motion were before the Court and before the Eleventh Circuit, and thus do not constitute new evidence as required by Rule 60(b)(3). (See discussion and case authority in USS's Response in Opposition to TIECO's Rule 60(b)(3) Motion for New Trial, filed November 8, 2002; USS's Response to TIECO's Supplemental Response and Clarification (Doc. 380); USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)). Moreover, to the extent there was any discovery abuse, TIECO obtained the exact relief it requested on this issue when USS's Complaint was dismissed, a sanction affirmed by the Eleventh Circuit.

USS contends that TIECO's Motion for New Trial was not timely. (See discussion and case authority in USS's Response in Opposition to TIECO's Motion for New Trial, filed November 8, 2002 at p. 10-11).

USS contends that TIECO waived its right to raise the issues in its Rule 60(b)(3) motion by its failure to raise these issues before the Court during the trial. (See discussion and case authority in USS's Response in Opposition to TIECO's Motion for New Trial, filed November 8, 2002; USS's

8

Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)).

For purposes of this opinion, the court will treat TIECO's Motion as timely.  Further, the court will treat TIECO's "after added grounds" (newly discovered evidence) as though they had been asserted in the original Rule 60 (b) Motion For New Trial, including both Larry Miller affidavits.[9]

USS further contends that TIECO waived its right to raise the issues in its Rule 60(b)(3) motion by its failure to raise these issues before the Eleventh Circuit in its Petition for Rehearing En Banc. (See discussion and case authority in USS's Response to TIECO's Supplemental Response and Clarification (Doc. 380); USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)).  This court, assuming *arguendo* that it and not the 11th Circuit  is the appropriate body to say what was and wasn't raised before the 11th Circuit, declines to overrule TIECO's Rule 60(b)(3) Motion For New Trial on that basis.  This argument is discussed in Section V., *infra*.

USS contends that TIECO has not offered any newly discovered evidence sufficient to support its Rule 60(b)(3) motion as required by Fed. R. Civ. P. 60(b)(2).  (See discussion and case authority in USS's Response to TIECO's Supplemental Response and Clarification (Doc. 380); USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)).

USS contends that the evidence offered by TIECO in support of its Rule 60(b)(3) motion

---

[9] The reasons for doing so are discussed in Section V.

SEP.02'2004 20:13 RECEIVED FROM:      205-278-1772USDC       #1268-010

does not qualify as an exception to the law of the case rule. (See discussion and case authority in USS's Response in Opposition to TIECO's Motion for New Trial, filed November 8, 2002; USS's Response to TIECO's Supplemental Response and Clarification (Doc. 380); USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)).

USS contends that TIECO has not offered any newly discovered evidence sufficient to support its Rule 60(b)(3) motion under the grounds provided in Fed. R. Civ. P. 60(b)(6). (See discussion and case authority in USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)).

USS contends that the Affidavits of Larry Miller were not timely filed as required by Fed. R. Civ. P. 59(c). Further, even if the Court deems them timely filed, USS contends that none of Mr. Miller's testimony constitutes "new evidence" relevant to TIECO's current motions. USS contends that even if Mr. Miller's testimony were relevant, TIECO has not shown the diligence in obtaining it required by Fed. R. Civ. P. 60(b)(2). (See discussion and case authority in USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement to Motion for New Trial (Doc. 389)). Again, for the reasons stated above, the court treats the (second) Miller affidavit as timely filed and has considered both Miller Affidavits in its review of the Rule 60 (b) Motion For New Trial.

USS contends that TIECO is not entitled to conduct discovery in aid of its Rule 60(b)(3) motion. (See discussion and case authority in USS's Reply to TIECO's Supplemental Response to Motion to Disqualify and Waudby Affidavit (Doc. 381); USS's Response to TIECO's Supplement

10

to Motion for New Trial (Doc. 389)).  In its most current form (Doc. 388, TIECO Supplement To Motion For New Trial), the heart of the newly discovered evidence claim relates to the relationship between the Alabama Attorney General's office and USS.  TIECO says it has now come to light that former Attorney General (now 11th Circuit Judge) Pryor, may have been involved in fund raising involving USS.  TIECO says [2003] proceedings before the United States Senate Judiciary Committee contained allegations that former Attorney General Pryor may have been involved, as a member of the Republican Attorneys General Association, in solicitations of companies being investigated by the Attorney General's office, and that this may also have been the case with companies (like USS) whose causes TIECO alleges were being championed by the Alabama Attorney General's office.  TIECO says a USS PAC made campaign contributions to then Attorney General Sessions and Mr. Pryor for their campaigns (Pryor was Deputy Attorney General under Attorney General Sessions and succeeded him in that office), and afterwards, and that this activity encompassed the period of time involved in the case and the "bad acts" of USS and the Attorney General's office.  TIECO seeks as part of its discovery an Order directing that  all the documents relating to these activities be produced, along with documents relating to the Republican Attorneys General Association dealings with USS, and similar documents from the files of Senator Sessions and former Attorneys General Sessions and Pryor.

In light of the court's ruling on the Rule 60 (b) Motion For New Trial, any TIECO discovery requests are moot.  In the alternative, for the reasons stated *infra*, the court does not believe that any discovery TIECO could obtain could change in any meaningful or relevant way the core rulings of the 11th Circuit Court of Appeals in this action or persuade the Court of Appeals to revisit those rulings.  Put another way, it is for the Court of Appeals, not this court, to say that the issues

11

regarding the Alabama Attorney General's office are to be revisited a third time.

USS contends that the instant case is not pending within the meaning of Rule 42(a), and the Eleventh Circuit mandate therefore precludes this case from being consolidated with another proceeding, *i.e.*, *TIECO II.* (See discussion and case authority in USS's Response in Opposition to Defendants'/Counter Plaintiffs' Motion to Consolidate, filed November 15, 2002.) This argument is also moot.

## V.   Discussion: Timeliness and Merits of TIECO's Rule 60(b)(3) Motion For New Trial

In its review of TIECO's Rule 60(b)(3) Motion For New Trial Motion, the court accepts, for purposes of discussion, what it understands to be TIECO's core contention: "neither the jury nor the 11th Circuit has ever had an opportunity to fully consider all the evidence supporting TIECO's claims".

This acceptance does not eliminate or render moot in any way the threshold question of this court's jurisdiction, or power to hear TIECO's Rule 60(b)(3) Motion For New Trial Motion. The court is a court of limited jurisdiction. Because the mandate of the 11th Circuit only remanded the issue of prevailing party costs, the court has substantial doubts about its own jurisdiction to hear, except as to issues directly related to prevailing party costs, TIECO's Rule 60(b)(3) Motion For New Trial, and therefore its power to grant any other relief under Rule 60 to TIECO.

The court will nonetheless discuss the merits of TIECO's Rule 60(b)(3) Motion For New Trial. The court does so for a couple of reasons.

First and primarily, if there is further appellate review of this action, the court wishes the review to be on the merits of the TIECO's Rule 60(b)(3) Motion For New Trial allegations, and not

12

whether or not some or all of the allegations were properly made or timely filed. If the Court of Appeals subsequently rules there were no procedural or time bars to any of the relief sought in the Motion, the Court of Appeals will hopefully not have to remand the action to this court to rule on the merits of the Motion.

In TIECO's defense, its counsel pointed out at oral argument that the District Court never entered an Order following the receipt of the mandate from the Court of Appeals, and under F.R.Civ.P. 58, an additional one hundred fifty (150) days is tacked onto the one (1) year maximum permitted under Rule60(b)(3). Using that time measure, the court believes all of TIECO's filings save the second Larry Miller affidavit were filed within that time period.

By the same token, court can see the argument these are maximum time limits and a Rule 60 movant should have to explain why the motion was filed at or near the end of the maximum allowable time period. TIECO's presentation on this point is not particularly strong. Were the motion one under Rule 15, a pretrial rule designed to ensure that trials are held on the merits and which directs that relief be granted freely in the interests of justice, timeliness would be of little concern. Rule 60 motions are post trial motions that, other than in the context of default (discussed below), arise after a trial on the merits, after a substantial investment of time and resources by the parties and the judicial system, and, as here, after a jury verdict and appellate review. Rule 60 has a finality component not present in Rule 15. In the ordinary course the court might have denied TIECO's Motion under the increased scrutiny brought to bear on post trial Rule 60 motions.

It is in the interest of finality arriving sooner rather than later that the court treats all of TIECO's allegations as though made in the original Rule 60 (b) Motion For New Trial, and that Motion as timely filed.

13

Second, the nature of the allegations (fraud on the court, malfeasance by the Office of Attorney General), are sufficiently serious that the court resolves the doubts in favor of TIECO.[10]

Common sense would say that the level of scrutiny would go higher, not lower, when the allegations, or at least substantially similar allegations, were made to and rejected by the Court of Appeals in the direct appeal of the case. TIECO strenuously says this did not happen, although it is clear that some of the USS documents produced during and after trial were made a part of the record on appeal. More to the point, it is clear that a core component of TIECO's case, the absence of probable cause, was argued to the 11th Circuit in the direct appeal, *see, e.g.*, [TIECO] *Petition For Rehearing En Banc*, Argument B.

The cases governing Rule 60(b)(3) motions are Janus-like with their opposing approaches and concomitant outcomes. When relief is sought from a default judgment, the cases call for great liberality because of the law's policy that cases be decided on the merits; when relief is sought after trial on the merits, the strong interest of finality carries weight. See, e.g. Wright, Miller & Kane, *Federal Practice and Procedure Civil 2d* § 2857 at 253 - 257 and cases cited therein. "The cases show that although the courts have sought to accomplish justice, they have administered Rule 60(b)(3) with a scrupulous regard for the aims of finality." The courts are said to have been unyielding in requiring that a party show good reason for the failure to take appropriate action sooner than the expiration of the stated time limit, here one (1) year. *Id.*, 260, fn. 17 & 18.

The Court of Appeals, should it be asked to revisit this matter, may well say that TIECO made a deliberate and informed choice at trial when, knowing that it did not have all the evidence

---

[10] The operative word in this sentence is "nature". The court is not saying that the allegations are true, only that TIECO makes them. *See fn. 3, supra.*

14

it was entitled to have regarding USS's actions or interactions with the Attorney General's office, it elected to let the jury deliberate to verdict rather than seek a mistrial and a new trial. In TIECO's defense, the record suggests the trial court would have looked unfavorably on anything that meant another trial. In any event, TIECO was represented by able and experienced trial counsel, and the court is unwilling to say it would have done things any differently were it in the position TIECO and its counsel found themselves in at that point in the trial. Events were breaking TIECO's way. The jury, after having begun deliberations, was instructed by the trial court to ignore USS's claims against TIECO and deliberate only on TIECO's claims against USS. To give up that advantage, before or after verdict, would have been a much riskier tactic for TIECO than letting the case go to verdict.

Once the verdict was in, TIECO could have filed a Rule 60(b)(3) Motion seeking relief from the judgment, which may or may not have included a new trial.

Once the case was on appeal, TIECO could have filed a Rule 60(b)(3) Motion. The trial court could have denied it, leaving TIECO free to appeal (as USS did the attorney's fees and costs award), or, had the trial court been inclined to grant a Rule 60(b)(3) Motion, it could have sought recall of the case from the 11th Circuit.

In any event, the court does not believe TIECO's Rule 60(b)(3) Motion For New Trial should be denied for any reason other than those arising out of the 11th Circuit's decision in this case. The reason is that the court believes that the 11th Circuit ruled that the accounting/billing scheme described in its opinion supplied sufficient probable cause for USS's actions. In order to deny the TIECO Rule 60(b)(3) Motion For New Trial, this court must, and does, say that in its opinion the documents produced by USS after trial (and made part of the appellate record), or evidence derived

15

therefrom by way of additional documents or deposition testimony, would not change the Court of Appeals' mind on the probable cause point.  Such evidence may well portray USS in a more unfavorable light than as depicted in the record reviewed by the Court of Appeals, but the court does not see how any such evidence would negate that court's probable cause determination arising from the TIECO billing/accounting scheme.

Similarly, the court believes that any evidence that may be subsequently developed  by TIECO about what USS knew about the truth of the allegations made to the Attorney General's Office and when it knew it[11], or USS's level of participation in the Attorney General's Office's decision to seek the search warrant for TIECO's premises, or the decision to indict TIECO,  or the financial or political interactions between USS and the Attorney General's Office (or any former holder of that office) would not change this probable cause analysis.[12]

Taking as true, as the court does, TIECO's assertions that USS did not lose any money as a result of the billing scheme, assuming as true that USS personnel at the local facilities were involved in the creation and execution of the billing scheme, the fact remains that TIECO sent to USS, using channels of interstate commerce, false invoices, specifically, invoices seeking payment for goods that were not delivered.  The fact that different goods of equal value may have been delivered later was, in the 11th Circuit's view, irrelevant.  USS purchasing headquarters thought it

---

[11]  The most important of which to TIECO, in the court's view, involved Marty Colby, the former TIECO employee whose statements to his attorney, Victor Hayslip, began the chain reaction resulting in this action and TIECO II.  Colby told Hayslip he had stolen some property from TIECO.  In later testimony before the Alabama Ethics Commission, USX's lead auditor, who knew of Colby's thefts, did not mention it.

[12]  While legally irrelevant, the Judge that tried this case said at one hearing before he recused himself that "I have no doubt whatever that if I, after the Eleventh Circuit opinion, granted a new trial on 1983 conspiracy, the Eleventh Circuit would - - would reverse almost as soon as the notice of appeal was filed".  April 25, 2003 Motions Hearing, p. 22, lines 10 -13.

16

was buying, and that its local facilities were taking delivery of, goods that in fact were not being purchased or delivered.

The court reads TIECO's motion as originally asserting fraud on the court, then newly discovered evidence, combined with an absence of probable cause. The court views TIECO's probable cause analysis as shifting from probable cause to believe TIECO had committed fraud to probable cause to believe that USS knew, or should have known, that TIECO had supplied value for the monies received from USS, and that USS agents at the local facilities participated in and acquiesced in the TIECO billing scheme. The court doesn't think this made any difference to the 11th Circuit. The court cannot substitute its judgment for that of the Court of Appeals.

Were the decision on the TIECO Rule 60 Motion For New Trial the court's alone to make, the result would be unchanged. TIECO's argument strikes the court as essentially saying "we may not have dotted all our i's and crossed our t's, but what we did we did as an accommodation to the local USS customer, and what USS corporate did to us when they learned of the local scheme was really bad". That may be, but the test applied by the court is that set forth in the 11th Circuit's opinion, discussing the malicious prosecution claim:

> . . . the jury . . . could not have reasonably found a constitutional violation. In arguing the Due Process Clause was violated, Appellees point to much of the same evidence they rely on for the state law malicious prosecution claim. [FN15] But TIECO has no right under the substantive component of the Due Process Clause to be free from criminal prosecution without probable clause. *See Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 810, 127 L.Ed.2d 114 (1994); *Whiting,* 85 F.3d at 584 nn. 3 & 4.
>
> FN15. While relying on the same evidence, Appellees state in their brief, "There is no assertion of a malicious prosecution claim under 42 U.S.C. § 1983." Appellees' Br. 33. This statement highlights the perplexing nature of Appellees' § 1983 claim. When asked at oral

17

argument to articulate the heart of the constitutional claim, Appellees' counsel was unable to do so.

261 F. 3d 1275, 1289. The Court of Appeals went on to discuss probable cause:

> *1291 [26][27][28] Probable cause is "a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *Simpson v. Life Ins. Co. of Ga.,* 614 So.2d 994, 996 (Ala.1993) (internal quotations omitted); *accord Eidson v. Olin Corp.,* 527 So.2d 1283, 1285 (Ala.1988); *see also Delchamps, Inc. v. Bryant,* 738 So.2d 824, 832 (Ala.1999); *S.S. Kresge* 348 So.2d at 488.   In determining whether probable cause existed, the facts should not be viewed in hindsight, but rather at the time the prosecution is instituted.   *See Nat'l Sec. Fire & Cas. Co. v. Bowen,* 447 So.2d 133, 139 (Ala.1984).   Where material facts are disputed, the issue of probable cause is for the jury;  however, where the material facts are not disputed, the issue is one of law for the court. *See S.S. Kresge,* 348 So.2d at 488.   Put another way, if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution. *See Eidson,* 527 So.2d at 1285.

> [29] In this case, undisputed facts establish that, at the time of the grand jury's investigation, USX reasonably suspected TIECO of criminal activity.   As mentioned previously, TIECO's description of its accounting system essentially comported with the description given by USX to the grand jury.   Mr. Wager, USX's lead auditor, told the grand jury that TIECO billed USX in Pittsburgh for items not delivered to USX's tractor shop or golf course.    Similarly, Ms. Hackbarth, TIECO's employee in charge of accounting, testified at trial that TIECO was billing USX in Pittsburgh for one item while delivering a different item to the tractor shop and golf course.   In other words, the item being billed was not being delivered. Although TIECO may have had an innocent explanation for this accounting system, the system, on its face, gave USX a reasonable ground for suspecting TIECO of fraud.   Furthermore, even though USX may have had reason to question the credibility of TIECO's principal accuser (Mr. Colby), that did not denigrate the probable cause created by TIECO's accounting system.   Therefore, the district court should have granted USX judgment as a matter of law on the malicious prosecution counterclaim.

18

TIECO says in its Supplement To Motion For New Trial that it needs discovery in support of its Motion so that it may endeavor to demonstrate that the evidentiary basis for the 11th Circuit's ruling in this case, "[i]n sum, there is no evidence in the record to support a finding that Appellees' federal constitutional rights were violated.  The district court should have granted USX judgment as a matter of law on the § 1983 counterclaim", 261 F.3d at 1290, is because USS and the Attorney General's Office conspired together to violate TIECO's rights.  In the court's view, the allegations raised in TIECO's Supplement are simply too weak to justify setting aside the final decision in this case.  It is legal for businesses (through PAC's, as USS apparently did here) and individuals to give money to political candidates and to support their campaigns, so evidence of such contributions does not raise even an inference of wrongdoing by the Attorney General's Office, or any holder of that office from 1995 until the present.  The suggestion that the Attorney General's Office "championed" the USS cause is speculative argument.  TIECO's allegations of USS - AG Sessions and/or AG Pryor are said to have taken place in 1996, 1997 and 1998.  The search warrant in question was issued on August 30, 1995, and executed on August 31, 1995.  The 11th Circuit explicitly found probable cause for the issuance of the warrant.

TIECO says that USS was in possession of exculpatory evidence[13], which should have been given to the Attorney General's office.  This evidence would have been Brady/Giglio material that would have been used by TIECO to impeach USS witnesses.  Brady v. Maryland, 373 U.S. 83, 83

---

[13] "During the hearings USX admitted that at no time prior to November 1, 1996, had anyone from USX ever looked for the property the Attorney General charged TIECO with stealing. USX admitted that some of the property charged in the indictments had actually been located at USX." TIECO Supplement To Motion For New Trial, discussing 1996 hearings before state Circuit Judge James Garrett. The court also includes the involvement between USX and the Attorney's General's office as arguable impeachment, and therefore exculpatory, evidence.

19

S.Ct. 1194 (1963) (due process requires the prosecution to disclose evidence favorable to accused upon request whether evidence is material to guilt or punishment); United States v. Agurs, 427 U.S. 97, 107 - 11 (1976) (prosecution duty to disclose governed by materiality standard and not limited to situations where the defendant has requested favorable evidence); Giglio v. U.S., 405 US. 150, 154 (1972) (failure to disclose government promise of immunity to co-defendant where government's case "depended almost entirely" on co-defendant's testimony violated due process and required reversal of conviction). While not trivializing USS's discovery conduct, the court does not read Brady as controlling the evidentiary obligations of private actors. And, even if it did, TIECO would have a difficult time surmounting the numerous procedural defaults that now face a defendant mounting a post-trial Brady/Agurs/Giglio challenge. See, e.g., Strickler v. Green, 527 US. 263, 292 (1999) (undisclosed documents impeaching eyewitness testimony as to circumstances of abduction of victim were favorable to the defendant for purposes of Brady but defendant could not show either materiality under Brady or prejudice that would excuse his procedural default).

The court sees TIECO's assertions as essentially Brady violation allegations. Brady and its progeny are anchored in the constitutional law of criminal due process, and have no applicability to civil pretrial discovery. Compared to civil actions, where discovery all too often takes on a life of its own, criminal discovery is severely limited. Further, because TIECO won dismissal of the state criminal prosecution and dismissal of USS's civil claims raising, inter alia, the failure of the State of Alabama to turn over exculpatory material, it is difficult to see any prejudice accruing to TIECO from not obtaining yet more exculpatory evidence regarding Colby, Wager or the involvement between USS and the Attorney General's Office.

Factually speaking, the court, based on its review of the file, is far more inclined to say that

20

the whole imbroglio is more fairly characterized as overreaction by all parties that, once begun, no one knew how to stop. USS's initial suspicions of widespread theft, had USS's claims ever gone to trial, may have turned out to be erroneous, and its turning to the government for criminal investigation may have been an excessive response to a situation that it did not fully have its arms around. These things happen, and are not the stuff of constitutional violations. TIECO's reaction, while understandable, was not appreciably different: it, too, assumed the existence of a conspiracy, in this case to take its property and violate its constitutionally protected right(s).

Legally speaking, the court views the TIECO Rule 60 Motion For New Trial as a continuation of the dialogue between it and the 11th Circuit initiated by TIECO in its *Petition For Rehearing En Banc* and answered by the Court in its denial thereof. Put another way, TIECO disagreed with 11th Circuit, and still does, about whether it proved a lack of probable cause in its federal and state claims against USS. With the Court's opinion in hand, TIECO asserts it can, if granted a new trial and discovery, satisfy its evidentiary burden on the absence of probable cause. As already noted, the court believes the 11th Circuit said the billing scheme sufficed for probable cause:

> Furthermore, even though USX may have had reason to question the credibility of TIECO's principal accuser (Mr. Colby), that did not denigrate the probable cause created by TIECO's accounting system.

United States Steel v. TIECO, Inc., *supra*, 261 F.3d at 1291.

In the alternative, the court believes that TIECO's best arguments are the *Brady* arguments discussed above. Those arguments are neither persuasive nor compelling in a civil action at this action's procedural posture.

> . . . TIECO maintains that at the request of, and as an accommodation

21

> to USX agents and employees, it delivered to the Tractor shop
> equivalent parts and entire Cushman vehicles having a value equal to
> that of the parts listed on the invoices, as ordered by USX purchasing
> managers and expediters possessing the requisite purchasing
> authority.

November 9, 1999 Memorandum Opinion Striking The Claims Of The Plaintiff, doc. 310, p. 2. This court, like the Eleventh Circuit, cannot give credence to this argument. The facts, as set forth by the Court, were that the billing and accounting scheme was designed for the purpose of evading and avoiding USS's purchasing controls in Pittsburgh. The fact that local USS employees helped with the scheme, or even thought it up, is irrelevant. TIECO's participation was voluntary and intentional, and it knew that the scheme violated USS purchasing policy. The local USS employees' knowledge and participation obviously detracted from the jury appeal of USS's claims against TIECO. That's not the same as saying probable cause never existed for the actions taken against TIECO as described in its counterclaim and Rule 60 Motion For New Trial.

### VI.   Summary

If the court were ruling on the TIECO Motion For New Trial using only the discretion vested in the court under Rule 60 or 60(b)(3), it would reach the same result as, in the court's view, the 11th Circuit's decision in this action requires: it would deny the Motion. It does so knowing that it can be said that USS is, "once again, rewarded for its misconduct". Frankly, neither USS nor TIECO present as particularly worthy of relief. TIECO participated in a billing scheme that was on its face misleading and benefitted economically from that scheme while it lasted. TIECO successfully struck USS's case as a sanction for USS discovery violations. USS, regardless of whether it meant to do so or not, misled the trial court up to and through the trial about the existence and location of relevant documents; in return, USS forfeited the opportunity to have a jury pass on its allegations

22

against TIECO. TIECO may well be right that USS's dilatoriness in producing the documents was due to fear that the production would "hurt the case"; certainly anything supporting TIECO's "value provided" or "acquiescence" theories would have detracted from the jury appeal of USS's claims against TIECO, and make it more likely the jury would disbelieve USS's witnesses. While regrettable, the USS conduct did not make out a constitutional violation. USS Steel v. TIECO, *supra*. The court reads the 11th Circuit's ruling as implicitly finding the sanctions imposed by the trial court in 1999 were a satisfactory resolution of the USS conduct.

Finally, the court believes that granting a new trial, no matter how it was characterized, would involve the court in a review of the 11th Circuit's ruling. That is not an appropriate role for any District Court, and this court will not do so.

### VII.   Conclusion

For the reasons stated, and any other reasons that may have been stated from the bench, the TIECO Rule 60(b)(3) Motion For New Trial is denied.

The Motion to Consolidate is denied as moot, as are the requests for discovery in support of the Rule 60(b)(3) Motion For New Trial.

**DONE** and **ORDERED** this ___/___ day of September, 2004.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

23

UNITED STATES STEEL, LLC, Heath-
erwood Golf Club, Inc., Plaintiffs–Ap-
pellants–Counterclaim Defendants,

v.

TIECO, INC., Atoz Management, Inc.,
Fletcher Yielding, Defendants–Ap-
pellees–Counterclaim Plaintiffs.

Nos. 00–11309, 00–12842.

United States Court of Appeals,
Eleventh Circuit.

Aug. 17, 2001.

Steel company and its subsidiary
brought suit against equipment vendor,
vendor's management arm, and vendor's
principal, under Racketeer Influenced and
Corrupt Organizations Act (RICO). Defen-
dants counterclaimed, asserting claims un-
der § 1983, and state law. The United
States District Court for the Northern
District of Alabama, No. 95–03237–CV–C–
S, U.W. Clemon, Chief Judge, granted
summary judgment to principal, granted
judgment as a matter of law to defendants
on subsidiary's claims, dismissed steel
company's claims as a sanction for discov-
ery violations, 189 F.R.D. 674, and entered
judgment on jury verdict for defendants
on counterclaims. Appeals were taken. The
Court of Appeals, Black, Circuit Judge,
held that: (1) district court committed re-
versible error by admitting state court
opinion dismissing criminal charges
against vendor, which arose from criminal
investigation in which steel company had
cooperated; (2) steel company's coopera-
tion in investigation did not violate ven-
dor's rights under due process clause, or
Fourth Amendment; (3) steel company had
probable cause to institute underlying
criminal proceeding; (4) steel company did
not commit torts of abuse of process, or
interference with business relations; and
(5) statement by steel company's outside
counsel regarding vendor which invoked

name of Jeffrey Dahmer was not action-
able.

Affirmed in part, reversed in part, and
vacated and remanded in part.

1. Courts ⟐107

An affirmance by an unpublished
opinion pursuant to Circuit Rule has no
precedential value. U.S.Ct. of App. 11th
Cir.Rule 36–1, 28 U.S.C.A.

2. Federal Courts ⟐823

Rulings on the admission of evidence
are reviewed for abuse of discretion.

3. Federal Courts ⟐896.1, 901.1

An error on an evidentiary ruling will
result in the reversal of a jury's verdict
only if a party establishes a substantial
prejudicial effect or a manifest injustice.

4. Evidence ⟐146

Rule permitting the exclusion of rele-
vant evidence on grounds of prejudice,
confusion, or waste of time involves balanc-
ing, on the one side, the evidence's proba-
tive value and, on the other side, the evi-
dence's dangers, including its unfairly
prejudicial and misleading nature. Fed.
Rules Evid.Rule 403, 28 U.S.C.A.

5. Evidence ⟐314(1)

Hearsay evidence is disfavored be-
cause it is not subjected to oath, the rigors
of cross-examination, or the first-hand
scrutiny of the jury.

6. Federal Civil Procedure ⟐2011

In the context of the confrontation
clause, hearsay that does not fall within a
firmly-rooted exception is presumed unre-
liable. U.S.C.A. Const.Amend. 6.

7. Federal Civil Procedure ⟐2011

Confrontation clause is not applicable
to civil cases. U.S.C.A. Const.Amend. 6.

**EXHIBIT A**

SEP.02'2004 20:25 RECEIVED FROM:          205-278-1772USDC          #1268-025

**8. Evidence ⟜146**

Probative value of opinion in which state court judge dismissed criminal charges against corporate equipment vendor, based on prosecutorial misconduct, was substantially outweighed by its prejudicial effect, so that opinion was not admissible during civil action in which steel company, and its subsidiary, asserted Racketeer Influenced and Corrupt Organizations Act (RICO) claims against vendor and its principal, and vendor and principal asserted counterclaims; opinion, including findings of fact neatly conforming to allegations of vendor and principal, contained particularly unreliable and misleading hearsay, which were rendered more prejudicial after they were adopted by judge. 18 U.S.C.A. § 1961; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**9. Evidence ⟜332(1)**

At common law, a judgment from another case could not be admitted into evidence.

**10. Federal Courts ⟜896.1**

Abuse of discretion by district court in admitting into evidence opinion in which state court judge dismissed criminal charges against corporate equipment vendor, based on prosecutorial misconduct, and made factual findings which neatly conformed to vendor's allegations, was reversible error in suit in which steel company, and its subsidiary, asserted Racketeer Influenced and Corrupt Organizations Act (RICO) claims against vendor and its principal, and vendor and principal asserted counterclaims. 18 U.S.C.A. § 1961; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**11. Federal Courts ⟜776**

Court of Appeals reviews de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**12. Federal Courts ⟜381, 382.1, 386**

In considering claims based on state law, federal court is bound to decide the claim the way it appears the state's highest court would.

**13. Federal Civil Procedure ⟜2127**

In considering motion for judgment as a matter of law, a court considers the evidence in the light most favorable to the non-movant, and grants all reasonable inferences in favor of the non-movant. Fed. Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**14. Federal Civil Procedure ⟜2146**

A non-movant must present more than a mere scintilla of evidence to withstand motion for judgment as a matter of law. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**15. Federal Civil Procedure ⟜2152**

A court should deny a motion for judgment as a matter of law only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Fed.Rules Civ.Proc. Rule 50, 28 U.S.C.A.

**16. Civil Rights ⟜196.1**

To violate § 1983 a party must be acting under color of state law. 42 U.S.C.A. § 1983.

**17. Civil Rights ⟜108.1**

To state a claim under § 1983, a party must prove a violation of a particular constitutional or federal statutory provision. 42 U.S.C.A. § 1983.

**18. Civil Rights ⟜245**

Instruction which was empty of any substance, and did little more than restate text of Fourth Amendment, was inadequate in § 1983 action brought by equipment vendor to steel company to which it supplied products, in which vendor alleged that steel company had violated vendor's Fourth Amendment rights when it acted in concert with state attorney general's office

in connection with criminal investigation of vendor's conduct. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**19. Civil Rights ⊂⊃192**

Like all causes of action, constitutional claims have elements which the claimant must prove.

**20. Constitutional Law ⊂⊃257**
   **Criminal Law ⊂⊃36.6**

Cooperation by steel company with criminal investigation by state attorney general's office into actions of equipment vendor from which steel company had purchased supplies, which resulted in criminal charges being brought, did not violate vendor's due process rights, and thus could not support § 1983 claim against steel company; vendor had no substantive due process right to be free from criminal prosecution, and prosecution, while ultimately successful, was supported by probable cause, so that no procedural due process violation could have occurred. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**21. Constitutional Law ⊂⊃257**

A person has no right under substantive component of due process clause to be free from criminal prosecution without probable cause. U.S.C.A. Const.Amend. 14.

**22. Searches and Seizures ⊂⊃124**

A warrant, and its corresponding search, violates the Fourth Amendment if it fails to specify the place to be searched and the items to be seized, if it is issued by an official who is not neutral and detached, if it is procured by a false statement made intentionally or recklessly, or if it is not supported by probable cause. U.S.C.A. Const.Amend. 4.

**23. Searches and Seizures ⊂⊃33**

Steel company did not violate Fourth Amendment rights of equipment vendor from which it had purchased supplies when

it agreed to delay its audit of equipment vendor, which had allegedly engaged in billing irregularities in connection with its shipments to steel company, until state attorney general's office, which was conducting criminal investigation of vendor, could produce probable cause for a search warrant. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**24. Malicious Prosecution ⊂⊃16**

To prevail on a malicious prosecution claim under Alabama law, plaintiff must show that (1) a prior judicial proceeding was instituted by the defendant, (2) the defendant acted without probable cause in the prior proceeding, (3) the defendant acted with malice in instituting the prior proceeding, (4) the prior proceeding ended in favor of the plaintiff, and (5) the plaintiff was damaged.

**25. Malicious Prosecution ⊂⊃24(7)**

Under Alabama law, grand jury indictments are prima facie evidence that a judicial proceeding was supported by probable cause, and thus will not support malicious prosecution claim; this prima facie evidence is rebutted if the indictments were induced by fraud, subornation, suppression of testimony, or other like misconduct by party seeking the indictment.

**26. Malicious Prosecution ⊂⊃18(1)**

Under Alabama law, "probable cause" to institute judicial proceeding, existence of which will bar any subsequent malicious prosecution claim arising from proceeding, is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.

See publication Words and Phrases for other judicial constructions and definitions.

**27. Malicious Prosecution ⊂⊃18(1)**

In determining whether probable cause existed to institute prior judicial pro-

ceeding, so that subsequent malicious prosecution claim arising from proceeding will be barred under Alabama law, the facts should not be viewed in hindsight, but rather, at the time the prosecution is instituted.

**28. Malicious Prosecution ⟵71(2)**

Under Alabama law, where material facts are disputed, the issue of probable cause is for the jury in a malicious prosecution action, but where the material facts are not disputed, the issue is one of law for the court; put another way, if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution.

**29. Malicious Prosecution ⟵18(2)**

Steel company reasonably suspected that equipment vendor from which it had purchased products had engaged in criminal activity in connection with its billing procedures, and thus had probable cause to commence criminal proceeding against vendor, so that vendor could not maintain suit under Alabama law against steel company for malicious prosecution after criminal charges were dismissed; while vendor may have had an innocent explanation for system in which steel company was billed for items that were not delivered, system on its face gave steel company a reasonable ground for suspecting fraud.

**30. Process ⟵168**

Elements of an abuse of process claim under Alabama law are abuse of a judicial process, malice, and an ulterior purpose.

**31. Process ⟵170, 171**

Under Alabama law, steel company which had participated in state attorney general's criminal investigation into billing practices of equipment vendor from which company had purchased supplies was not

responsible for issuance of, and thus did not abuse the process of, criminal search warrant that was issued for vendor's premises; while steel company cooperated with investigation both before and after issuance of warrant, it did not control or influence, or even participate in, decision to seek and execute warrant.

**32. Process ⟵168**

Process that is challenged in a suit for abuse of process under Alabama law must be a judicial one.

**33. Torts ⟵10(1)**

To prove tortious interference with business relations under Alabama law, plaintiff must show (1) the existence of a contract or business relation, (2) defendant's knowledge of the contract or business relation, (3) intentional interference by the defendant with the contract or business relation, (4) absence of justification for the defendant's interference, and (5) damage to the plaintiff as the result of the defendant's interference; in addition, a plaintiff must show some evidence of fraud, force, or coercion on the defendant's part.

**34. Torts ⟵10(3)**

Minimal interactions between steel company, and suppliers of equipment vendor from which steel company had made purchases, including presence of suppliers while steel company was reviewing billing records of vendor which had been seized during criminal investigation, did not constitute tortious interference with vendor's business relations under Alabama law; nothing indicated that steel company intentionally interfered with a contract or business relation, and there was no indication of the use of fraud, force, or coercion by steel company.

**35. Libel and Slander ⟵123(1)**

Under Alabama law, whether a statement is reasonably capable of defamatory meaning is a question of law for the court.

**36. Libel and Slander ⟨⊃80**

To state a defamation claim in Alabama, a plaintiff must allege (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication of that statement to a third party, (3) fault amounting at least to negligence on the part of the defendant, and (4) either actionability of the statement irrespective of special harm, or the existence of special harm caused by the publication of the statement.

**37. Libel and Slander ⟨⊃6(1)**

A statement is defamatory under Alabama law if it tends to harm the reputation of another as to lower him in the estimation of the community, or to deter third persons from associating or dealing with him.

**38. Libel and Slander ⟨⊃19**

Under Alabama law, when analyzing an allegedly defamatory statement, a court must give the statement's language the meaning that would be ascribed to the language by a reader or listener of average or ordinary intelligence, or by a common mind.

**39. Libel and Slander ⟨⊃19**

To be actionable under Alabama law, alleged defamatory matter must be construed in connection with other parts of the conversation or publication, and the circumstances of its publication.

**40. Libel and Slander ⟨⊃86(4)**

Under Alabama law, once a plaintiff has alleged that the statement defamed him in a certain manner, the plaintiff is thereafter bound by that construction of the statement.

**41. Libel and Slander ⟨⊃9(7)**

Under Alabama law, statement by outside counsel representing steel company that conduct of equipment vendor, which had supplied products to steel company, and its principal, in filing ethics complaint regarding allegedly illegal investigation by state attorney general's office and steel company, which was cooperating in investigation, was "the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet," could not reasonably be construed as defamatory in sense that vendor and its principal were comparable in some fashion to a convicted mass murder.

**42. Conspiracy ⟨⊃1.1**

Under Alabama law, civil conspiracy is not an independent action; rather, a plaintiff must have a viable underlying cause of action.

**43. Federal Civil Procedure ⟨⊃2735**

A court may only tax costs as authorized by statute.

———————

William L. Waudby, John B. Tally, Jr., Lange, Simpson, Robinson & Somerville, Warren B. Lightfoot, William O. Hutchinson, Jere F. White, Jr., Lightfoot Franklin White & Lucas, Birmingham, AL, John J. Dalton, June Ann Sauntry, Troutman, Sanders, Atlanta, GA, for Appellants.

Linda G. Flippo, J. Mark White, William M. Bowen, Jr., White, Dunn and Booker, Birmingham, AL, for Appellees.

Appeals from the United States District Court for the Northern District of Alabama.

Before BLACK, RONEY and COX, Circuit Judges.

BLACK, Circuit Judge:

Appellants, the plaintiffs and counter-claim defendants, are United States Steel,

LLC (USX)[1] and its subsidiary the Heatherwood Golf Club (Heatherwood). Appellees, the defendants and counterclaim plaintiffs, are Fletcher Yielding and two of his corporate entities, TIECO, Inc. (TIECO) and ATOZ Management, Inc. (ATOZ). TIECO is a vendor of golf course maintenance equipment, light industrial equipment, and irrigation equipment. ATOZ is the management arm of TIECO. USX operates a tractor shop, and Heatherwood operates a golf course. Prior to this litigation, USX's tractor shop and Heatherwood's golf course were customers of TIECO.

Appellants sued Appellees alleging liability under the federal RICO statutes and state law. Appellees filed several counterclaims, alleging violations of 42 U.S.C. § 1983 and state law. The district court granted Appellee Yielding summary judgment on all of Appellants' claims. The case proceeded to a jury trial. Before submitting the case to the jury, the district court granted Appellees TIECO and ATOZ judgment as matter of law on Appellant Heatherwood's claims. During jury deliberations, the district court dismissed Appellant USX's claims as a sanction for discovery violations. The jury rendered a verdict in favor of Appellees on the counterclaims, awarding $6.8 million to TIECO and $375,000 to Mr. Yielding, and the district court entered judgment accordingly. Subsequently, regarding Appellees' counterclaims, the district court denied Appellants' renewed motion for judgment as matter of law and motion for

remittitur. With respect to Appellants' claims, the court denied Appellants' motion for a new trial and to vacate judgment of dismissal. Lastly, the district court awarded attorney's fees and costs to Appellees in the total amount of $1,442,769.27.

Appellants contend the following rulings from the district court were erroneous: (1) the grant of judgment as a matter of law to TIECO and ATOZ on Heatherwood's claims and the denial of Appellants' motion for a new trial on Heatherwood's claims, (2) the dismissal of USX's claims as a discovery sanction and the denial of Appellants' motion for a new trial on USX's claims, (3) the judgment awarding $6.8 million to TIECO and $375,000 to Mr. Yielding, (4) the denial of Appellants' renewed motion for judgment as matter of law on Appellees' counterclaims or, in the alternative, the denial of Appellants' motion for remittitur, and (5) the judgment awarding $1,442,769.27 in attorney's fees and costs to Appellees.[2]

[1] The first two errors claimed by Appellants do not warrant discussion, and we affirm without opinion pursuant to 11th Cir. R. 36–1.[3] In Part I of this opinion, we address the third and fourth errors claimed by Appellants, both of which concern Appellees' counterclaims. In Part II, we address the fifth alleged error, concerning the award of attorney's fees and costs.

## I. APPELLEES' COUNTERCLAIMS

Appellees' counterclaims rest on USX's cooperation with the Alabama Attorney

---

1. At the time of trial, United States Steel LLC was constituted as the USX Corporation.

2. Appellants raise the first four alleged errors in appeal number 00–11309. Appellants raise the fifth alleged error in appeal number 00–12842. The two appeals have been consolidated.

3. An affirmance pursuant to Rule 36–1 has no precedential value. *See Va. Props., Inc. v. Home Ins. Co.*, 74 F.3d 1131, 1132 n. 2 (11th Cir.1996).

SEP.02'2004 20:29 RECEIVED FROM:        205-278-1772USDC        #1268-030

General's Office (AG)[4] during a criminal investigation and prosecution of Appellees. According to Appellees, the manner in which USX cooperated with the AG violated federal and Alabama law. The jury agreed. It found USX liable, under federal law, for a violation of 42 U.S.C. § 1983, and, under Alabama law, for the torts of malicious prosecution, abuse of process, interference with business relationships, civil conspiracy, and defamation. Except for the defamation tort, TIECO was the sole counterclaimant. Both TIECO and Mr. Yielding won damages under the defamation counterclaim. Appellants contend USX was entitled to judgment as matter of law on Appellees' counterclaims. In addition, Appellants challenge the judgment on the ground the district court made numerous errors at trial.

In subpart A, we set forth the admissible evidence in the record in the light most favorable to Appellees. Our review of the evidence, however, does not include any evidence derived from a state judicial opinion which was erroneously entered into evidence. In subpart B, we explain why the district court's admission of the state judicial opinion constituted reversible error. In subpart C, we examine, as to each of Appellees' counterclaims, whether USX was entitled to judgment as a matter of law.

### A. *Background*

#### 1. *Initial Stages*

The genesis of the USX–AG cooperation was a disclosure by a former TIECO employee, Marty Colby. By May 1995, Mr. Colby had communicated to his attorney, Victor Hayslip,[5] that TIECO's accounting practices with respect to USX were ques-

tionable. Essentially, Mr. Colby alleged that TIECO used bogus invoices and disloyal USX employees to bill USX for materials purchased but never received. Mr. Colby admitted misappropriating goods himself. Ironically, Mr. Hayslip was an attorney with a firm, Burr & Foreman, which had been serving as USX's outside counsel for many years. Mr. Hayslip informed the AG and USX about Mr. Colby's allegations and arranged a meeting in his office on June 13, 1995.

Prior to the June 13th meeting, the AG and USX discussed Mr. Colby's allegations. At the meeting, the AG and USX interviewed Mr. Colby separately. Mr. Colby repeated his allegations about TIECO's accounting practices. USX's assistant general counsel questioned Mr. Colby's credibility. Nonetheless, both USX and the AG effectively acceded to Mr. Colby's request (made by Mr. Hayslip) that they not pursue any criminal or civil remedies against him.

Although the AG and USX interviewed Mr. Colby separately, they jointly conferred at the June 13th meeting. When USX signaled its intention to conduct an internal audit, the AG requested that USX abstain from any actions which would alert TIECO. Accordingly, USX agreed not to interview any suspected USX employees or pursue any remedy against TIECO.

On June 27, 1995, the AG sent a letter to USX requesting any information possessed by USX about vendors, other than TIECO, who similarly defrauded USX. USX provided the requested information and indicated it was "very interested" in cooperating with the AG's investigation of TIECO and other vendors. Additionally, USX in-

---

4. When referring to the "AG," we are alluding to officials who acted collectively on behalf of the Alabama Attorney General's Office. We are not referring to the particular person who held the office of Attorney General.

5. Mr. Hayslip had represented Mr. Colby and Turfcare Products (TIECO's main competitor) in an unrelated lawsuit brought by TIECO over a non-compete agreement.

terviewed former TIECO employees, and, on July 18, 1995, forwarded summaries of the interviews to the AG. Lastly, in the summer of 1995, Mr. Hayslip called the AG on behalf of USX, inquiring repeatedly about the status of the investigation.

### 2.  *The AG's Seizure of TIECO's Records*

On August 30, 1995, the AG applied in state court for a warrant to seize specific documents and materials from TIECO's place of business. The affidavit accompanying the warrant was signed and prepared by the AG's chief investigator, and it was reviewed by one of the AG's criminal prosecutors. According to the chief investigator, the information in the affidavit was gained from interviews conducted by the AG of Mr. Colby and four other former TIECO employees. Finding probable cause, the state court issued the warrant. On August 31, 1995, led by the chief investigator, the AG seized numerous TIECO documents and computer tapes.

No USX official was present during either the issuance or execution of the warrant. Moreover, the chief investigator, as well as USX, denied that USX was involved in, or even had knowledge of, the AG's efforts to procure the search warrant. No evidence in the record rebuts this denial by the chief investigator, indicates he had a motive to lie, or in any way impeaches his credibility.

### 3.  *USX's Cooperation with the AG after the Seizure of TIECO's Records*

By the time of the seizure, the AG realized it did not have the expertise or the resources to fully investigate the seized records and to pursue a criminal prosecution of TIECO. Accordingly, after the seizure, the AG requested auditors from victim companies, including USX. In particular, the auditors were asked to compare their own company's records with those seized from TIECO. The AG

planned, with USX's cooperation, to have the auditors serve as expert witnesses in any criminal proceeding.

On three separate occasions (October 11–12, 1995, November 7–9, 1995, and January 31–February 1, 1996), USX auditors visited the AG's office to review the seized TIECO records. One of these reviews occurred after USX had filed the instant lawsuit. The auditors examined all documents related to any USX–TIECO transaction. The AG did not permit the auditors to photocopy or remove the records. Instead, the auditors took copious notes, entered data on USX computers, and created spreadsheets from the data. USX kept the AG apprized of the information gained from the audit.

Two of TIECO's suppliers were also present during portions of these reviews. At times, USX auditors reviewed documents with TIECO's suppliers. On at least one occasion, a USX auditor provided an invoice to one of TIECO's suppliers.

In addition to examining records, USX auditors assisted the AG in deciphering computer tapes seized from TIECO. Duplicate tapes were sent for reformatting to a California company, which returned the tapes directly to USX along with software to read the tapes. Although the AG paid the California company for this service, it intended to seek reimbursement from USX and the other victim companies. Moreover, because the AG did not have a computer capable of reading the tapes, USX auditors analyzed the tapes on their own computer. USX and the AG exchanged results of these analyses and other information gleaned from the tapes. Once the analyses were complete, USX maintained some of the data, both on its own computers and in computer printouts.

The cooperation between USX and the AG extended to other areas. For instance, six days after the AG's seizure of TIECO's

records, USX transmitted to the AG printouts of accounts payable information concerning USX–TIECO transactions; in the letter accompanying the printouts, USX stated, "[I]f we have additional ideas on how you might approach the TIECO documents now in your possession, we will be in touch." In October 1995, the AG provided USX information from its interview with a representative of a TIECO supplier. In November 1995, USX mailed to the AG photographs of property owned by a USX employee suspected of wrongdoing. In December 1995, the AG faxed to USX inventories of the seized records and copies of some seized records. In mid-December 1995, Mr. Hayslip, acting on USX's behalf, sent the AG a summary of TIECO's accounts receivable, invoices, pick tickets, and other documents relating to TIECO–USX and TIECO–Heatherwood transactions.

The highest level of the AG–USX cooperation occurred with the interviews of USX employees from the tractor shop and golf course. In November 1995, to prepare for the interviews, USX auditors drafted a lengthy memorandum to inform the AG about the allegations USX had unearthed. The memorandum detailed specifically how each USX employee had participated in the alleged scheme and provided personal information about each employee. Separately, USX provided to the AG social security numbers of the suspected employees. USX's assistant general counsel circulated a memorandum, dated December 19, 1995, which set forth the ground rules for interviewing USX employees. The memorandum called for each employee, without prior warning, to be interviewed twice—once by a team from the AG and FBI and again by a team from USX. On December 20, 1995, the AG, USX, and FBI met to prepare for the

employee interviews; over the next two days, they conducted interviews of nearly every employee in accordance with the December 19th memorandum. USX threatened disciplinary action and criminal prosecutions unless the employees cooperated in the investigation.

### 4. *Appellants' Lawsuit*

Shortly before the employee interviews, Mr. Hayslip filed the instant lawsuit on December 15, 1995, on behalf of Appellants. Before filing the suit, USX had sent Mr. Hayslip information gained from its review of TIECO's seized records. Also prior to the lawsuit, Appellants made a settlement demand, giving Appellees just three days to respond. Among other things, Appellants demanded cooperation in the AG's and USX's parallel investigations and a payment of $555,977.52. That dollar figure was derived from information in TIECO's seized records.[6]

During the first half of 1996, the cooperation between the AG and USX mostly involved legal matters and proceedings. For example, the AG and USX conferred after the district court in this case ordered Appellants to produce "a copy of all of [TIECO's] data, computer tapes, and documents in its possession which were seized by the [AG]." In March 1996, USX's counsel, Burr & Foreman, shared legal research with the AG.

### 5. *Mr. Yielding's Ethics Complaint Against the AG*

In May 1996, attention shifted from the investigation of TIECO to an ethics complaint filed by Mr. Yielding, on behalf of himself, TIECO, and ATOZ. The complaint, filed with the Alabama State Ethics Commission (Commission), alleged the AG

---

6. Appellants argue that evidence of the settlement demand should not have been admitted

pursuant to Fed.R.Evid. 408. We need not address this argument to resolve this case.

seized TIECO's property and then shared, with USX and Burr & Foreman, information gained from that seizure. Mr. Yielding stated he never authorized such a disclosure.

At the Commission's proceedings, appearances were made by USX's assistant general counsel, Mr. Hayslip, and James Wager, who was USX's lead auditor. The presentation given to the Commission by Mr. Wager was crucial to the AG's defense: he asserted it was probable TIECO was bribing local USX managers. However, although USX was aware that Mr. Colby had stolen some items from TIECO, Mr. Wager did not mention this fact. On July 10, 1996, the Commission concluded there were insufficient facts to find the AG had violated Alabama ethics laws. In a letter to USX, the AG expressed gratitude for USX's assistance, stating it went "beyond the call of duty."

### 6. *Mr. Hayslip's Statement to the Press*

During the pendency of the ethics complaint, Mr. Hayslip made some derogatory comments related to the ethics complaint. One newspaper reported the following:

> Victor Hayslip ... said Tieco's complaints ring hollow. "What they're doing is the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet," Hayslip said. "It's without merit." ... Hayslip said the complaints were an attempt to embarrass [the Ala-

bama Attorney General] for political reasons.

Similar comments were printed in multiple Alabama newspapers.

### 7. *Grand Jury Indictments*

Another event that occurred during the pendency of the ethics complaint was a state grand jury investigation led by the AG. In June 1996, the grand jury returned seven indictments containing 125 counts alleging wrongdoing by TIECO. Twenty-one counts pertained to USX–TIECO transactions.

In his testimony before the grand jury, Mr. Hayslip misrepresented the extent of Mr. Colby's personal involvement in the scheme.[7] At the trial in this case, USX's assistant general counsel acknowledged that he was aware of Mr. Hayslip's misrepresentations. Nonetheless, USX never informed the AG, the grand jury, or the state court about the misleading aspects of Mr. Hayslip's testimony.

Besides Mr. Hayslip, the other USX representative to provide significant grand jury testimony was Mr. Wager, the lead auditor. Mr. Wager accused TIECO of billing USX for items it had never received. By the time of the grand jury proceeding, however, USX's audit team had failed to search the golf course or the tractor shop.[8] Just as he had done before the Commission, Mr. Wager failed to inform the grand jury that Mr. Colby, in participating in the alleged scheme, had stolen some items from TIECO.

---

7. To reiterate, we are not finding that Mr. Hayslip made misrepresentations before the grand jury. We are merely portraying the facts in the light most favorable to Appellees. Mr. Hayslip and Burr & Foreman are not parties to this appeal, and they have not been heard on this allegation.

8. Appellees assert that, subsequent to the indictments, USX found several of the alleged missing items at the tractor shop. However,

the record citations provided by Appellees do not support this assertion. One citation is the cross-examination of Mr. Wager, but Mr. Wager stated he had no knowledge about the subsequent search. The other citation is to a state judicial opinion, which was not admissible for reasons discussed below. *See infra* Part I.B. Regardless, even if Appellees' assertion is true, it would not alter our legal analysis.

The core of Mr. Wager's testimony was an explanation of TIECO's accounting system and how TIECO was billing USX for items never delivered to USX. According to Mr. Wager, TIECO would create an invoice for a certain item. The invoice would show the item was shipped to USX's tractor shop in Alabama. To bill USX, the invoice would be sent to USX's headquarters in Pittsburgh, Pennsylvania. Initially, TIECO's inventory would be debited to reflect the loss of the item. In Mr. Wager's view, all of the foregoing practices were acceptable, but the insidious aspect of TIECO's system was a so-called "adjustment account." Under this account, TIECO would credit its inventory for an item which, according to the invoice, already had been shipped to the tractor shop and for which USX had been billed. Put simply, from TIECO's accounting records, it appeared TIECO was billing USX Pittsburgh for items which were never delivered to USX.

TIECO's explanation of its accounting system conformed, to a large extent, with the explanation given by Mr. Wager. At trial, Appellees called Pam Hackbarth, a TIECO employee who knew more than anyone about TIECO's accounting system and the adjustment account. She testified as follows:

> [T]he branch secretary [for TIECO] generate[s] an invoice, and the invoice is mailed to USX in Pittsburgh for payment. USX pays. And TIECO shows the invoice paid, and credits the [a]djustment [a]ccount, and credits the account with the payment.
>
> . . . .
>
> [W]hen we would bill [USX], that would be relieving our inventory of that item. And we would put a credit into the [a]djustment [a]ccount, bringing it back into inventory so it would be available.

Ms. Hackbarth admitted the adjustment account was used when TIECO was invoicing a customer for items not delivered. She further conceded that USX in Pittsburgh was not informed about the adjustment account.

Contrary to Mr. Wager's suggestion, however, the purpose of the adjustment account was not to commit fraud on USX. Rather, Ms. Hackbarth explained:

> [T]he customer would want one product, and maybe because of budget reasons could not buy that product. And so [TIECO] would bill for parts. . . . Then [TIECO] would create the account for those parts, and that would create a credit balance. And then [the customer] . . . would build a credit, and then he could buy what he needed. And it was to be items that the customer used in doing his job or taking care of the facility . . . .

By referring to "customer," Ms. Hackbarth was not referring to USX's headquarters in Pittsburgh, but rather to USX employees in Alabama at the tractor shop and the golf course. These Alabama employees would use TIECO's adjustment account as a means to procure items they could not otherwise obtain through the normal USX budgetary process. This fact became evident, not only from Ms. Hackbarth's testimony, but also from the testimony of former USX and TIECO employees.[9] In any event, the Alabama employees were procuring items for use at USX's facilities, not for personal use.

The grand jury indictments against TIECO went nowhere. In April 1997, the AG voluntarily dismissed all counts related to USX. In July 1997, Judge James S. Garrett of the Circuit Court of Jefferson

---

9. The employees worked for USX's subsidiary, Heatherwood, but their testimony was

that all budgetary decisions were made by the parent corporation, USX.

County dismissed the remaining counts for prosecutorial misconduct.

As part of his opinion dismissing the indictments, Judge Garrett incorporated a statement of facts prepared by TIECO in connection with its motion to dismiss the indictment. Not surprisingly, the statement of facts is quite favorable to Appellees and relied upon heavily by Appellees in their brief to this Court. As we discuss immediately below, the admission of Judge Garrett's opinion was improper, *see infra* Part I.B, and we do not consider the evidence contained therein.

### B. *Admissibility of State Judicial Opinion*

#### 1. *Background*

The AG and TIECO were parties in the state criminal proceeding before Judge Garrett. Burr & Foreman represented USX in the proceeding, but USX was not a party. In dismissing the indictments, Judge Garrett issued an opinion which adopted *in toto* a memorandum of facts prepared by TIECO in connection with its motion to dismiss the indictment.

Over Appellants' objection, the district court admitted the opinion, including the memorandum of facts. The memorandum was an exhaustive account that neatly conformed to Appellees' allegations, especially with respect to the malicious prosecution, abuse of process, and civil conspiracy counterclaims. As is set forth in the margin, the memorandum depicted in great detail Appellees' view about the nature of USX's involvement in the AG's investigation of

TIECO.[10] Furthermore, Judge Garrett did not mince words, as he found, "[T]he misconduct of the [AG] in this case far surpasses in both extensiveness and measure the totality of any prosecutorial misconduct ever previously presented to or witnessed by this Court."

Judge Garrett's opinion was a significant portion of Appellees' case (as well as their brief on appeal). During the examination of witnesses, Appellees' counsel repeatedly referred to the proceedings before Judge Garrett, and on at least one occasion, counsel read verbatim an extensive portion of the opinion. In closing argument, Appellees' counsel told the jurors if they had any question about the credibility of Appellants' witnesses, they should read Judge Garrett's opinion.

Prior to trial, Appellants filed a motion *in limine* objecting to Judge Garrett's opinion, and they raised the objection again at trial. Appellants argued the opinion should be excluded pursuant to Fed. R.Evid. 401 and Fed.R.Evid. 403. We address solely the Rule 403 argument.

#### 2. *Fed.R.Evid. 403*

[2, 3] Rulings on the admission of evidence are reviewed for abuse of discretion. *See, e.g., United States v. Adair,* 951 F.2d 316, 320 (11th Cir.1992). An error on an evidentiary ruling will result in the reversal of a jury's verdict only if a party establishes a substantial prejudicial effect or a manifest injustice. *See Anderson v. WBMG–42,* 253 F.3d 561, 563 (11th Cir. 2001) (citing *Piamba Cortes v. Am. Air-*

---

10. The memorandum of fact described, *inter alia:* (1) cooperation between the AG and USX in reviewing TIECO's seized documents, (2) a meeting on November 8, 1995, where USX informed the AG that it intended to sue TIECO and would be providing the AG with copies of charts; (3) the coordination between the AG and USX in having TIECO's computer tapes reformatted and read; (4) USX's agreement to repay the AG for reformatting the

tapes; (5) an implication that either USX's lead auditor, Mr. Wager, or the AG's investigator, John Mulligan, had lied about the repayment agreement; (6) legal advice given to the AG and USX that "USX should not be used as quasi government agency"; (7) cooperation between the AG and USX in conducting interviews of USX's employees; and (8) the AG's sending TIECO's records to USX in preparation for the interviews.

*lines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999)).

As a preliminary matter, had Appellants lodged an objection pursuant to Fed. R.Evid. 801(c), the admissibility of Judge Garrett's opinion could be easily resolved. *See United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir.1994). In *Jones*, the district court admitted factual findings made in a separate case by another district court. *See id.* at 1551. We concluded such factual findings were hearsay, and they could not be either judicially noticed or admitted under the public records exception to the hearsay rule. *See id.* at 1553–54 (citing Fed.R.Evid. 201 and Fed. R.Evid. 803(8)(C)); *see also Nipper v. Snipes*, 7 F.3d 415, 417–18 (4th Cir.1993).

[4–7] Despite not being raised, the conclusion that Judge Garrett's opinion was inadmissible hearsay is not inconsequential to our analysis under Rule 403.[11] Rule 403 involves balancing, on the one side, the evidence's probative value and, on the other side, the evidence's dangers, including its unfairly prejudicial and misleading nature. By comparison, hearsay is disfavored because it is not subjected to the oath, the rigors of cross-examination, or the first-hand scrutiny of the jury. *See United States v. Parry*, 649 F.2d 292, 294–95 (5th Cir.1981)[12] (citing *McCormick on Evidence* § 245 (2d ed.1972)). As a result, hearsay can be unreliable; for instance, in

the context of the Confrontation Clause,[13] hearsay that does not fall within a firmly-rooted exception is presumed unreliable. *See Idaho v. Wright*, 497 U.S. 805, 818, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990). Due to its unreliability, hearsay can be misleading and unfairly prejudicial.

[8, 9] The hearsay in Judge Garrett's opinion—which does not satisfy a firmly-rooted exception[14]—was particularly unreliable and misleading. Although the statement of facts was presented to the jury as Judge Garrett's finding, it was prepared entirely by Appellees' counsel. In effect, the admission of the statement of facts permitted counsel to testify on his client's behalf, without being cross-examined. Further, the statement of facts was intended to exculpate TIECO, and thus, it was self-serving and unreliable. *Cf. United States v. Reme*, 738 F.2d 1156, 1168–69 (11th Cir.1984).

Of course, Judge Garrett accepted the statement of facts by incorporating it into his opinion. But this made the hearsay contained therein even more unfairly prejudicial and misleading. As the Fourth Circuit has stated, "[J]udicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice." *Nipper*, 7 F.3d at 418 (internal quotations omitted).

---

11. Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, and needless presentation of cumulative evidence."

12. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

13. Of course, the Confrontation Clause is not applicable to civil cases, but we refer to its jurisprudence to illustrate hearsay's unreliability.

14. As we noted in *Jones*, the common law did not permit the admission of a judgment from another case. 29 F.3d at 1554. One court has found that judicial findings are admissible under the residual exception to the hearsay rule. *See Jones v. Wash. Metro. Area Transit Auth.*, 946 F.Supp. 1011, 1019–20 (D.D.C. 1996). But that exception is not firmly rooted. *See Wright*, 497 U.S. at 817–18, 110 S.Ct. at 3147–48.

The Fourth Circuit's *Nipper* decision is particularly pertinent to the instant case. When we ruled in *Jones* that a judicial finding was inadmissible hearsay, we relied heavily on *Nipper*. *See Jones*, 29 F.3d at 1554. In *Nipper*, like here, the plaintiff introduced the factual findings of a state court to prove a civil conspiracy. *See Nipper*, 7 F.3d at 416. While reversing on the ground that the judicial findings were inadmissible hearsay, the Fourth Circuit also concluded that judicial findings, due to the danger of unfair prejudice, were inadmissible under Rule 403. *See id.* at 417–418; *see also Carter v. Burch*, 34 F.3d 257, 265 (4th Cir.1994); *United States v. DeSantis*, 134 F.3d 760, 770 (6th Cir.1998) (Nelson, J., concurring); *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F.Supp.2d 320, 324, 325 (E.D.N.Y. 2001); *Hariston v. Wash. Metro. Area Transit Auth.*, No. CIV. 93–2127, 1997 WL 411946 (D.D.C. April 10, 1997).

[10]   The district court abused its discretion in admitting Judge Garrett's opinion. The jury, not Judge Garrett, was charged with making factual findings on Appellees' allegations in this case. Moreover, Appellants have shown they were substantially prejudiced by the admission of Judge Garrett's opinion, as Appellees relied on the opinion throughout the trial. Most notably, during closing argument, Appellees' counsel told the jury to use the opinion to make credibility determinations. Therefore, the district court's admission of the opinion constituted reversible error.

## C.   *Judgment as a Matter of Law*

[11, 12]   A party is entitled to judgment as a matter of law "[i]f during a trial by jury [the opposing] party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for [the opposing] party on that issue." Fed.R.Civ.P. 50(a)(1). We review de novo the denial of a Rule 50 motion and apply the same standard as the district court. *See, e.g., Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656 (11th Cir.1998). Furthermore, for those close claims based on state law, "we are bound to decide the [claim] the way it appears the state's highest court would." *E.g., Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1040 (11th Cir.2001) (internal quotations and citation omitted).

[13–15]   Under Rule 50, a court considers the evidence in the light most favorable to the non-movant and grants all reasonable inferences in favor of the non-movant. *See, e.g., Bogle*, 162 F.3d at 656. Nonetheless, a non-movant must present more than a mere scintilla of evidence. *See, e.g., Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir.2000). A court should deny a motion for judgment as a matter of law "only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* (internal quotations omitted). With this standard, we analyze for each of Appellees' counterclaims whether USX should have been granted judgment as a matter of law.

### 1.   *Violation of 42 U.S.C. § 1983*

[16, 17]   To violate 42 U.S.C. § 1983, a party must be acting "under color of state law." *Id.; e.g., Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). Although USX is a private corporation, Appellees contend USX nonetheless violated § 1983 because it acted in concert with the AG, an arm of the state of Alabama. Even if this assertion is true, it does not, by itself, establish liability under § 1983. To state a claim under § 1983, a party must also prove a violation of a particular constitutional or federal statutory provision. *See id.; Whiting v. Traylor*, 85 F.3d 581, 583, 584 n. 4, 586 (11th Cir. 1996). In this case, Appellees claim a

violation of (1) the Due Process Clause of the Fourteenth Amendment and (2) the Fourth Amendment as applied to states through the Fourteenth Amendment.

[18, 19] As a preliminary matter, the district court's jury instruction on the Due Process Clause and the Fourth Amendment was inadequate. The charge merely stated the following:

> Under the Fourth Amendment ..., every person ... has the right to be free from an unreasonable search and seizure. Under the Fourteenth Amendment ..., no state may deny to any of its citizens "due process of law." Notice of contemplated action and an opportunity to be heard are the two rights guaranteed by the due process clause of the Constitution.

This instruction was empty of any substance, as it does little more than restate the constitutional text. Like all causes of action, constitutional claims have elements which the claimant must prove. *See, e.g.,* Eleventh Circuit Pattern Jury Instructions (Civil Cases) § 2.2, at 198 (1999) (describing elements of Fourth Amendment claim). The hollow instruction in this case, however, effectively permitted the jury to usurp the district court's role as interpreter of the Constitution.

[20, 21] Nevertheless, even if the jury had been properly instructed, it could not

have reasonably found a constitutional violation. In arguing the Due Process Clause was violated, Appellees point to much of the same evidence they rely on for the state law malicious prosecution claim.[15] But TIECO has no right under the substantive component of the Due Process Clause to be free from criminal prosecution without probable clause. *See Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 810, 127 L.Ed.2d 114 (1994); *Whiting,* 85 F.3d at 584 nn. 3 & 4.

Whether a malicious prosecution claim can be brought via the procedural component of the Due Process Clause is an open question in this circuit.[16] *See Whiting,* 85 F.3d at 584 n. 3 (citing *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 43 (1st Cir. 1994)). Justice Kennedy, joined by Justice Thomas, has suggested that such a claim would lack merit where, as here, state law provides a cause of action for malicious prosecution. *See Albright,* 510 U.S. at 283–86, 114 S.Ct. at 818–19 (Kennedy, J., concurring). We need not address this question today. Even if we were to accept the proposition that such a cause of action existed, the plaintiff would be required, at the very least, to establish the common-law tort of malicious prosecution, including the absence of probable cause. *See Albright,* 510 U.S. at 270 n. 4, 114 S.Ct. at 811 n. 4; *see also id.* at 292, 296–97, 300–02, 114

---

15. While relying on the same evidence, Appellees state in their brief, "There is no assertion of a malicious prosecution claim under 42 U.S.C. § 1983." Appellees' Br. 33. This statement highlights the perplexing nature of Appellees' § 1983 claim. When asked at oral argument to articulate the heart of the constitutional claim, Appellees' counsel was unable to do so.

16. Allegations of malicious prosecution could plausibly constitute a violation of the Fourth Amendment. For instance, we observed in *Whiting:*

> Labeling ... a section 1983 claim as one for a "malicious prosecution" can be a

shorthand way of describing a kind of legitimate section 1983 claim: the kind of claim where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead.

85 F.3d at 584; *accord Uboh v. Reno,* 141 F.3d 1000, 1002–03 (11th Cir.1998). But, in this case, TIECO, a corporation, was never arrested, detained, or seized in any way. Thus, the Fourth Amendment violation envisioned by *Whiting* could not have occurred in this case.

S.Ct. at 823, 825, 827–28 (Stevens, J., dissenting) (suggesting Due Process Clause is violated whenever prosecution is not predicated on probable cause). As discussed below, probable cause existed to prosecute TIECO, and thus Appellees have not established the common-law tort. *See infra* Part I.C.2. Thus, no violation of procedural due process could have occurred.[17]

[22, 23] Finally, we address Appellees' allegations concerning the search and seizure of TIECO's records. Appellees must rely on the Fourth Amendment, the explicit constitutional text that protects citizens from searches and seizures. *See Albright,* 510 U.S. at 274, 114 S.Ct. at 813. A warrant, and its corresponding search, violates the Fourth Amendment if it fails to specify the place to be searched and the items to be seized, *see Steele v. United States,* 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925); *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); or if it is issued by an official who is not neutral and detached, *see Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), or if it is procured by a false statement made intentionally or recklessly, *see Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); or if it is not supported by probable cause, *see Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). None of the foregoing occurred here. On the contrary, Appellees allege that USX agreed to delay its audit of TIECO "so the AG could produce probable cause for a search warrant."

Appellees' Br. 4; *see also* Appellees' Am. Compl. ¶ 2.a., at 5 (stating that "[i]n an effort to help the [AG] establish enough probable cause to obtain a search warrant, USX began supplying the [AG] with information"). Assuming that Appellees' allegation is true, an agreement to delay a search until there *is* probable cause could not possibly run afoul of the Fourth Amendment. *See* U.S. Const. amend. IV (stating that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation").

In sum, there is no evidence in the record to support a finding that Appellees' federal constitutional rights were violated. The district court should have granted USX judgment as a matter of law on the § 1983 counterclaim.

### 2. *Malicious Prosecution*

[24, 25] Under Alabama law, to prevail on a malicious prosecution claim, a plaintiff (in this case, TIECO) must show: (1) a prior judicial proceeding was instituted by the defendant (in this case, USX); (2) the defendant acted without probable cause in the prior proceeding; (3) the defendant acted with malice in instituting the prior proceeding; (4) the prior proceeding ended in favor of the plaintiff; and (5) the plaintiff was damaged. *See Poff v. Hayes,* 763 So.2d 234, 240 (Ala.2000); *S.S. Kresge Co. v. Ruby,* 348 So.2d 484, 487–88 (Ala.1977). Appellants contend Appellees failed to establish the first, second, and third elements. We address solely the second element, probable cause.[18]

---

17. Appellees also argue that TIECO's procedural due process right was violated because the AG and USX conspired to violate Alabama's ethics laws. This contention lacks merit.

18. Grand jury indictments are prima facie evidence of probable cause under Alabama law. *See, e.g., Simpson v. Life Ins. Co. of Ga.,* 614 So.2d 994, 996 (Ala.1993). This prima

facie evidence is rebutted if the indictments were "induced by fraud, subornation, suppression of testimony, or other like misconduct of the party seeking the indictment." *Nat'l Sec. Fire & Cas. Co. v. Bowen,* 447 So.2d 133, 140 (Ala.1983). Because we conclude probable cause was established as a matter of law even in the absence of an indictment, we need not decide whether the grand jury indictments in this case were rebutted.

[26–28] Probable cause is "a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *Simpson v. Life Ins. Co. of Ga.*, 614 So.2d 994, 996 (Ala. 1993) (internal quotations omitted); *accord Eidson v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala.1988); *see also Delchamps, Inc. v. Bryant*, 738 So.2d 824, 832 (Ala.1999); *S.S. Kresge* 348 So.2d at 488. In determining whether probable cause existed, the facts should not be viewed in hindsight, but rather at the time the prosecution is instituted. *See Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133, 139 (Ala.1984). Where material facts are disputed, the issue of probable cause is for the jury; however, where the material facts are not disputed, the issue is one of law for the court. *See S.S. Kresge*, 348 So.2d at 488. Put another way, if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution. *See Eidson*, 527 So.2d at 1285.

[29] In this case, undisputed facts establish that, at the time of the grand jury's investigation, USX reasonably suspected TIECO of criminal activity. As mentioned previously, TIECO's description of its accounting system essentially comported with the description given by USX to the grand jury. Mr. Wager, USX's lead auditor, told the grand jury that TIECO billed USX in Pittsburgh for items not delivered to USX's tractor shop or golf course. Similarly, Ms. Hackbarth, TIECO's employee in charge of accounting, testified at trial that TIECO was billing USX in Pittsburgh for one item while delivering a different item to the tractor shop and golf course.

In other words, the item being billed was not being delivered. Although TIECO may have had an innocent explanation for this accounting system, the system, on its face, gave USX a reasonable ground for suspecting TIECO of fraud. Furthermore, even though USX may have had reason to question the credibility of TIECO's principal accuser (Mr. Colby), that did not denigrate the probable cause created by TIECO's accounting system. Therefore, the district court should have granted USX judgment as a matter of law on the malicious prosecution counterclaim.

### 3. Abuse of Process

[30, 31] To state an abuse of process claim, one must allege the abuse of a judicial process. *See* W. Page Keeton, *Prosser and Keeton on Torts* § 121, at 898 (5th ed.1984) (cited in *Drill Parts and Serv. Co. v. Joy Mfg. Co.*, 619 So.2d 1280, 1288 (Ala. 1993)). In this case, Appellees allege USX abused the process of a criminal search warrant. However, based on the Supreme Court of Alabama's decision in *Drill Parts*, Appellees have failed to establish an abuse of process claim. 619 So.2d at 1286–89.

The plaintiffs in *Drill Parts*, like Appellees here, alleged that the defendants had used a criminal search warrant to gather information for a civil suit against the plaintiffs. *See id.* at 1282, 1286. Noting that malice was an element of an abuse of process claim,[19] the Supreme Court of Alabama held, "[T]o establish malice in this case[,] the plaintiffs must show that the defendants *willfully caused* a criminal search warrant to issue for the wrongful purpose of obtaining discovery for a civil action against the plaintiffs." *Id.* at 1289 (emphasis added); *accord Keeton, supra*, § 121, at 898 (stating an essential element is "a wilful act in the use of the process not

19. The other elements for an abuse of process claim under Alabama law are ulterior purpose and wrongful use of process. *See, e.g.,*

*Caldwell v. City of Tallassee*, 679 So.2d 1125, 1127 (Ala.1996).

proper in the regular conduct of the proceeding"). In the instant case, the evidence is insufficient to show that USX "willfully caused" the search warrant for TIECO's premises.

[32] Granted, USX was cooperating with the AG both before and after the issuance of the search warrant, and USX used information from the seized records to prepare its settlement demand. To reiterate, however, the challenged process must be a judicial one, that is the search warrant—not the AG's investigation.[20] Nothing in the record indicates that USX controlled or influenced, or even participated in, the decision to seek and execute the warrant. No USX representative was present for either the procurement or execution of the warrant. Further, according to the AG's chief investigator (who sought and executed the warrant), all the information in the affidavit accompanying the warrant application was gained from the AG's own interviews of former TIECO employees. Most importantly, the chief investigator unequivocally denied that USX was involved in, or had knowledge of, procurement of the search warrant, and Appellees presented no evidence to rebut or impeach this sworn testimony. Therefore, the district court should have granted USX judgment as a matter of law on the abuse of process counterclaim.

### 4. Tortious Interference With Business Relations

[33] To prove tortious interference with business relations in Alabama, a plaintiff must show: (1) the existence of a contract or business relation, (2) defendant's knowledge of the contract or business relation, (3) intentional interference by the defendant with the contract or business relation, (4) absence of justification for the defendant's interference, and (5) damage to the plaintiff as the result of the defendant's interference. See Mut. Savs. Life Ins. Co. v. James River Corp. of Va., 716 So.2d 1172, 1180 (Ala.1998). In addition, a plaintiff must show "some evidence of fraud, force, or coercion[ ] on the defendant's part." Joe Cooper & Assocs., Inc. v. Cent. Life Assurance Co., 614 So.2d 982, 986 (Ala.1992) (citing Griese–Traylor Corp. v. First Nat'l Bank of Birmingham, 572 F.2d 1039, 1045 (5th Cir.1978)); accord Barber v. Business Prods. Ctr., Inc., 677 So.2d 223, 227 (Ala.1996).

[34] TIECO's claim under this tort hinges on interactions between USX and TIECO's suppliers. Specifically, while USX was reviewing TIECO's seized records, two of TIECO's suppliers were also present and reviewing the documents; on one occasion, USX provided an invoice to a supplier. These minimal interactions, as a matter of law, did not constitute tortious interference with business relations. Appellees have presented no evidence that USX intentionally interfered with a contract or business relation between TIECO and its suppliers. Furthermore, Appellees have not pointed to any evidence indicating the use of fraud, force, or coercion by USX. The district court should have granted USX judgment as a matter of law on the counterclaim for tortious interference with business relations.

### 5. Defamation

As previously noted, unlike the other counterclaims, the defamation action

---

**20.** That does not mean evidence of USX's conduct after the warrant issued and during the AG's investigation was irrelevant. Such evidence was pertinent to establishing an ulterior purpose and a wrongful use of process. See supra note 19; Shoney's, Inc. v. Barnett,

773 So.2d 1015, 1024 (Ala.Civ.App.1999) (stating that "[t]he tort of abuse of process is concerned with the wrongful use of process after it has been issued" (internal quotations omitted)).

sought relief for both Mr. Yielding and TIECO. Appellees contend that USX is liable for defamation because its outside counsel, Mr. Hayslip, compared TIECO and Mr. Yielding to Jeffrey Dahmer, the convicted mass murderer.[21]

[35–39]   Under Alabama law,[22] whether a statement is reasonably capable of defamatory meaning is a question of law for the court. *See Blevins v. W.F. Barnes Corp.*, 768 So.2d 386, 390 (Ala.Civ.App. 1999) (citing *Harris v. School Annual Publ'g Co.*, 466 So.2d 963, 964 (Ala.1985)); *Drill Parts*, 619 So.2d at 1289–90. A statement is defamatory if it "tends ... to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Blevins*, 768 So.2d at 389–90 (internal quotations omitted) (citing *Harris*, 466 So.2d at 964). When analyzing an allegedly defamatory statement, a court must give the statement's language the "meaning that would be ascribed to the language by a reader or listener of average or ordinary intelligence, or by a common mind." *Id.* at 390 (internal quotations omitted) (citing *Camp v. Yeager*, 601 So.2d 924, 927 (Ala.1992)); *see also Labor Review Publ'g Co. v. Galliher*, 153 Ala. 364, 45 So. 188, 190 (1907). Furthermore, the "alleged defamatory matter must be construed in connection with other parts of the conversation or publication, and the circumstances of its publication ...." *Marion v. Davis*, 217 Ala. 16, 114 So. 357, 359 (1927); *see also Drill Parts*, 619 So.2d at 1289.

[40]   Equally well established is the rule that once a plaintiff has alleged that the statement defamed him in a certain manner, the plaintiff is thereafter bound by that construction of the statement. *See Smith Bros. & Co. v. W.C. Agee & Co.*, 178 Ala. 627, 59 So. 647, 648 (1912) (citing *Gaither v. Advertiser Co.*, 102 Ala. 458, 14 So. 788 (1894)); *Labor Review*, 45 So. at 190. In their amended complaint, Appellees averred that Mr. Hayslip's statement was an attempt by USX to compare TIECO to the "vile and evil" nature of Jeffrey Dahmer. Am. Compl. ¶ 2, at 33. Similarly, at trial, Appellees' counsel argued that, with Mr. Hayslip's statement, "[USX] said [Mr. Yielding] is like Jeffrey Dahmer." Trial Tr. 1759. Appellees are bound by these constructions of Mr. Hayslip's statement.

[41]   In light of the circumstances and context of Mr. Hayslip's statement, no reasonable person could have construed it to be defamatory as alleged by Appellees. The context was USX's allegations concerning fraud by TIECO and Appellees' allegations concerning an unethical and illegal investigation by the AG and USX. Under these circumstances, any reasonable person who heard or read Mr. Hayslip's statement would have inferred the following: USX was strongly implying, through a distasteful metaphor, that Appellees were guilty of fraud and that Appellees' ethics complaint was without merit.

Such an implication was capable of having defamatory meaning in that Appellees' reputation could have been diminished if

---

21.  The allegedly defamatory statement is fully set forth above. *See supra* Part I.A.6.

22.  To state a defamation claim in Alabama, a plaintiff must allege: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least

to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Pub'g Co.*, 544 So.2d 875, 877 (Ala.1989) (citing Restatement (Second) of Torts § 558 (1977)).

the community believed Appellees were committing fraud and filing frivolous complaints. But Appellees did not argue this construction of the statement to the jury. Rather, Appellees averred that their reputation was diminished because the community, after hearing Mr. Hayslip's statement, would believe they were comparable, in some fashion, to a convicted mass murderer. Considering the circumstances surrounding Mr. Hayslip's statement, no reasonable person could have thought Appellees were similar to a mass murderer. Therefore, the district court erred by not granting judgment as a matter of law to USX on the defamation counterclaim.

### 6. *Civil Conspiracy*

**[42]** Under Alabama law, civil conspiracy is not an independent action; rather, a plaintiff must have a viable underlying cause of action. *See Drill Parts*, 619 So.2d at 1289. As is evident from our discussion above regarding the other counterclaims, Appellees have failed to present sufficient evidence of any underlying cause of action. Therefore, the district court should have granted USX judgment as a matter of law on the civil conspiracy counterclaim.

### II. ATTORNEY'S FEES AND COSTS

Pursuant to 42 U.S.C. § 1988(b), Appellees were awarded $1,332,024.86 in attorney's fees. Section 1988(b) permits attorney's fees to the "prevailing party" for actions brought under various civil rights provisions, including 42 U.S.C. § 1983. As is evident from Part I.C.1 of our opinion,

Appellees did not prevail on the § 1983 claim. Therefore, insofar as it awarded attorney's fees, the judgment must be vacated.

**[43]** Appellees were also awarded $110,744.4 in costs. Fed.R.Civ.P. 54(d) permits a court to award costs, other than attorney's fees, to the prevailing party. In light of our holdings, further proceedings are required in the district court, as it is no longer clear which party should be considered the prevailing party. *Cf. Terry Props., Inc. v. Standard Oil Co.*, 799 F.2d 1523, 1540 (11th Cir.1986). Thus, insofar as it awarded costs, the judgment must be vacated and remanded for reconsideration by the district court.[23]

### III. CONCLUSION

We hold as follows: (1) We AFFIRM the judgment as a matter of law in favor of Appellees on Appellant Heatherwood's claims. (2) We AFFIRM the dismissal of Appellant USX's claims. (3) We REVERSE the denial of Appellants' motion for judgment as matter of law on Appellees' counterclaims for a violation of 42 U.S.C. § 1983, malicious prosecution, abuse of process, tortious interference with business relations, defamation, and civil conspiracy. (4) We REVERSE the judgment of the district court awarding $6.8 million to Appellee TIECO and $375,000 to Appellee Yielding. (5) We VACATE the judgment awarding $1,442,769.27 in attorney's fees and costs to Appellees and RE-

---

**23.** "[A] court may only tax costs as authorized by statute." *EEOC v. W&O, Inc.*, 213 F.3d 600, 622–23 (11th Cir.2000) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987)). The parties agree the award of costs is governed by 28 U.S.C. § 1920. Thus, if a cost is not enumerated in § 1920, Appellees should not have requested reimbursement. Nevertheless, many of Appellees' requests for costs cannot be located in § 1920 (or any

other statute). For instance, Appellees sought costs incurred in defending the AG's criminal prosecution, *see Loranger v. Stierheim*, 10 F.3d 776, 782 (11th Cir.1994), and they sought fees for their expert witnesses beyond the amount prescribed by 28 U.S.C. § 1821, *see Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir.1996). On remand, if the occasion to award costs arises again, the district court should closely scrutinize its award.

MAND for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, VACATED and REMANDED in part.



**A. GRIFFIN, Plaintiff–Appellee,**

v.

**CITY OF OPA–LOCKA, Earnie P. Neal, Defendants–Appellants.**

No. 00–12200.

United States Court of Appeals, Eleventh Circuit.

Aug. 17, 2001.

Former city employee brought suit against city and former city manager, alleging sexual harassment and rape by the manager. The United States District Court for the Southern District of Florida, No. 98-01550-CV-PAS, Patricia A. Seitz, J., entered judgment on jury verdict awarding plaintiff $500,000 for harassment and $1.5 million for the rape, and defendants appealed. The Court of Appeals, Fay, Circuit Judge, held that: (1) district court did not abuse its discretion in refusing to bifurcate sexual harassment claims against city and city manager; (2) city manager was acting under color of state law for purposes of § 1983 when he raped city employee in her apartment; (3) city could not be held liable under § 1983 for city manager's rape of city employee absent jury finding that city had a custom or policy of ignoring or tolerating rape or sexual assault; (4) whether city had a policy or custom of ignoring or tolerating gross sexual harassment was question for jury; (5) whether city manager's sexual harassment of city employee was sufficiently severe or pervasive as to constitute a hostile working envi-

ronment was question for jury; and (6) whether city, in hiring city manager, acted with deliberate indifference to the risk that manager would engage in sexual harassment, rendering it liable under § 1983, was question for jury.

Affirmed in part and reversed in part.

Anderson, Chief Judge, filed specially concurring opinion.

**1. Federal Civil Procedure ⟜1956**

District court did not abuse its discretion in refusing to bifurcate sexual harassment claims against city and city manager, despite manager's contention that refusal to bifurcate resulted in unfair prejudice because plaintiff was permitted to introduce evidence that he harassed other women and had a reputation as a harasser to prove that city had a custom or policy of being indifferent to sexual harassment. Fed.Rules Civ.Proc.Rule 42(b), 28 U.S.C.A.

**2. Federal Courts ⟜631**

District court did not commit plain error in sexual harassment suit against city and city manager in failing to sua sponte provide a limiting instruction with regard to evidence that manager had harassed other women and had a reputation as a harasser, which was introduced to prove that city had a custom or policy of being indifferent to sexual harassment. Fed.Rules Evid.Rules 105, 404(b), 28 U.S.C.A.

**3. Evidence ⟜506, 508**

Expert testimony about common responses by victims of rape or harassment, such as the failure to resist a perpetrator, bathing immediately after the assault, and the failure to file or a delay in filing a formal report or charge, was admissible in female employee's suit alleging sexual harassment and sexual assault by city manager, where expert did not comment

SEP.02'2004 20:44 RECEIVED FROM:          205–278–1772USDC      #1268–045

**B**

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2        NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

3

4  USX CORPORATION, ET AL,            )
                                      )
5                      PLAINTIFFS,    )   CASE NO. CV-95-C-3237-S
                                      )
6            V.                       )  Birmingham, Alabama
                                      )  October 27, 1999
7  TIECO, INCORPORATED, ET            )  October 28, 1999
   AL,                                )  November 4, 1999
8                                     )
                      DEFENDANTS.     )
9                                                    VOLUME VIII

10                TRANSCRIPT OF **JURY** TRIAL
            HELD BEFORE HONORABLE U. W. CLEMON,
11              UNITED STATES  DISTRICT JUDGE

12

13              A P P E A R A N C E S

14  FOR THE PLAINTIFFS:        MR. JOHN B. TALLY, JR.
                               MR. WILLIAM L. WAUDBY
15                             MR. TODD M. HIGEY
                               MR. J. L. CHESTNUT, JR.
16                             Attorneys at Law

17
    FOR THE DEFENDANTS:        MR. J. MARK WHITE
18                             MS. LINDA G. FLIPPO
                               MR. STEPHEN R. ARNOLD
19                             Attorneys at Law

20
    ALSO PRESENT:              MR. EDWARD O. CONERLY
21                             Attorney at Law

22
    COURT REPORTER:            THOMAS E. DEMPSEY, RPR
23

24

25

1833

(JURY OUT AT 5:10 P. M.)

THE COURT: Mr. White.

MR. WHITE: Judge, I take no pleasure in reporting what I am about to report to the court.

Your Honor is aware the last time we were on the record right around lunch you ordered produced for our inspection three boxes that have been brought to court. I was stunned by what was in the boxes by what had not been produced. It is apparent and obviously contained in there are at least a portion of the Tractor Shop records that have been the subject of much testimony and have been the subject of much debate and requests concerning production. There are lists, inventories of Cushman vehicles. There are individual --

THE COURT: In these files?

MR. WHITE: Yes, sir.

There are lists of Cushman vehicles. There are -- it does not say "inventory", Your Honor. But there are lists.

There are individual file folders showing Cushman vehicles with inconsistent serial numbers. They bear the company numbers that we have heard so much about.

Judge, if I may be indulged for a moment, I have vaccilated between anger and disgust since about one o'clock, and I know this has been a long case, and I know it is late

1   in the day.  And I know I am closer to anger than disgust

2   at this point.  For that I apologize.

3        On December the 24th, 1997, the first request for

4   production in this case was filed, and a response was filed

5   by USX on the 23rd day of January, 1998.  And part of this

6   I now know is perhaps because Mr. Hilton demands specifici-

7   ty.  Because when he wants it to be an audit, he calls it

8   an audit.  When he wants it to be a special investigation,

9   he calls it a special investigation.

10        THE COURT:  Well, now, let's clear up for the record.

11  What we are talking about are documents that came from Mr.

12  Hilton?

13        MR. WHITE:  That is my understanding, that these

14  three boxes.  But he sent them to -- Lange, Simpson will

15  have to say that.  But, Judge --

16        THE COURT:  All right.  Mr. Tally, where did these

17  boxes come from?

18        MR. TALLY:  I think -- Your Honor, I'm not trying

19  to hide behind anything, but Bill Waudby knows more about

20  it.

21        THE COURT:  Sure.

22        MR. TALLY:  I will be glad to tell what I know.

23        THE COURT:  All right.  Mr. Waudby.

24        MR. TALLY:  To that question I think he knows more

25  than I.

THE COURT:  Where did these three boxes come from?

MR. WAUDBY:  Different locations, Your Honor.  I can't give one answer to the contents of all three boxes, other than to say that these records came from USX.  But there are different things in the boxes.

What I think Mr. White was referring to the Tractor Shop files and the Cushman file folders --

THE COURT:  Yes, sir.

MR. WAUDBY:  -- those came from Pittsburgh.

THE COURT:  Did they come from Mr. Hilton?

MR. WAUDBY:  He sent them to me, Your Honor, yes.

MR. TALLY:  Can I give some background on those three boxes, Your Honor?

THE COURT: Yes, sir.

MR. TALLY:  I think one reason that Bill is having trouble saying where they came from is this: on Sunday, October the 10th, Sunday afternoon, I was in my office, and Bill had been to a deposition of Ken Falls.  And either on Sunday or Saturday before that, he mentioned that according to the results of that deposition, which I didn't attend, it seemed obvious that there was a claim that some documents ought to be in existence that we had never seen. On that Sunday afternoon I called Jim Wager in Slovakia, and Bill was in my office while I got him on the speaker phone, and I said, "Look, let's take another slice at this.

1    Have you got any idea of any place where a person could go

2    at USX's office in Pittsburgh and try to find if there is

3    any more documents that we don't have?"

4        He said, "There is a place you can look."  I forget

5    if he said in a cabinet or bottom shell of some place like

6    that in the Audit Department.  And we talked some more, and

7    I thanked him.  And I think it was after that that Bill

8    Waudby made a call the next day, Monday, when people were

9    at work to request that somebody look in whatever place it

10   was that Mr. Wager had said, "If there is anything missing,

11   look there."  And so when Bill says it was Mr. Hilton that

12   sent them, I -- I expect that is right.  But I doubt that

13   they came out of Hilton's office, because I'm certain that

14   was not the place that Wager said to go and look.

15       THE COURT:  All right.  But you got -- Mr. Waudby,

16   you're telling me you received these records around the

17   12th or 14th of October?

18       MR. WAUDBY:  It was a Wednesday.  I don't know what

19   day -- what day of the month that was.

20       THE COURT:  But you had these records in your posses-

21   sion when you represented to me here in court that you had

22   turned over all the records?

23       MR. WAUDBY:  I don't believe that was the represen-

24   tation.  But I had the records when we had --

25       THE COURT:  Oh, yes.  You represented to me here in

court that you had turned over all the records concerning

the Cushman vehicles, all the files, inventory, audits con-

cerning the Cushman vehicles.

But you say that that is not so?

MR. WAUDBY:  I -- I did -- Your Honor, that is cor-

rect.

I don't agree with the characterization, but --

THE COURT:  All right.  Well, what did you represent

to me?

MR. WAUDBY:  That -- well, on that Thursday that we

had the hearing in Your Honor's chambers, you asked me,

"Do you have records on Cushman vehicles?"

And I said, "Yes.  There are Cushman vehicle files."

And I tried to explain to the court that I didn't think that

they had been requested nor had they been --

THE COURT:  All right.  You're right.

MR. WAUDBY:  But what I said  I did not know the lo-

cation of was at that time the list of thirty-six vehicles

sold.  That was the only documents that I did not know of

the location on.  But when Your Honor turned to me and said,

"Are there records of Cushman vehicles that have not been

produced," the Thursday in the hearing before Your Honor, I

said, "Sure. There are."

THE COURT:  But you also told me that you didn't

know where they were.

1838

```
 1        MR. WAUDBY:  That was -- I was only speaking to the
 2  list of the thirty-six vehicles sold, Your Honor.  We weren't
 3  speaking about the --
 4        THE COURT:  I was.
 5        MR. WAUDBY:  Well then --
 6        THE COURT:  Oh, yes, I was.
 7        MR. WAUDBY:  Okay.
 8                        (PAUSE.)
 9        THE COURT:  Mr. White.
10        MR. WHITE:  Your Honor --
11        THE COURT:  No.
12        Mr. Waudby, what you're saying to me is that you
13  knew that you had in your office records relating to Cush-
14  man vehicles which had not been produced?
15        MR. WAUDBY:  And that is what I told Your Honor on
16  that Thursday.  Yes, Your Honor.
17        THE COURT:  No, sir, you did not.
18        MR. WAUDBY:  Well --
19        THE COURT:  No, sir, you did not.  You absolutely did
20  not.  You absolutely did not tell me that you had these re-
21  cords in your office, and they had not been produced.  You
22  did not tell me.
23        MR. WAUDBY:  I didn't think the question was, are
24  they in my office?
25        The question was, "Are there Cushman records that
```

1   haven't been produced?"

2          And I said, "Yes."

3          THE COURT:  And you also said that you didn't know

4   where the records were.  You did not know the whereabouts

5   of the records.  And in fact, I think I referenced that in

6   the memorandum opinion that I wrote.  I believe I did.  But

7   it is on file.  Let me look at it again, because I am just

8   as sure as I am sitting here that what you represented to

9   me was that you did not know the whereabouts of the records

10  relating -- of some other records relating to Cushman ve-

11  hicles.  That is what you told me then.  But now you're

12  telling me that in fact you knew that you had records in

13  your office relating to Cushman vehicles which had not been

14  produced.

15                         (PAUSE.)

16          MR. WAUDBY:  I have a copy right here, Your Honor.

17          THE COURT:  All right.

18                 (DOCUMENT HANDED TO JUDGE.)

19                      (LONG PAUSE.)

20          THE COURT:  Yes.  And the reference was this, and

21  I'm quoting from the opinion.  "And based on the uncertain-

22  ty of plaintiff's counsel concerning the actual location

23  of the requested materials, the court finds that said ma-

24  terials cannot reasonably be expected to be produced to de-

25  fendant's counsel in sufficient time for use at trial."

1    Obviously, if you had indicated to me that the re-

2  cords were in your office, those records could have been

3  produced to defendant's counsel immediately.

4    MR. WAUDBY:  I --

5    THE COURT:  Here is your copy.

6       (DOCUMENT HANDED TO MR. WAUDBY.)

7    Now I believe you filed something, a memorandum ask-

8  ing me to reconsider.

9    MR. WAUDBY:  A motion to reconsider.

10    THE COURT:  All right.  Let me find it and see what

11  you said in it.

12       (LONG PAUSE.)

13    MR. WHITE:  May I make my record?

14    THE COURT:  Yes, sir.

15    MR. WHITE:  It is more basic than that.

16    When the response was filed back in January of '98,

17  USX represented that it had produced materials covered under

18  any and all investigative files, including memorandum notes,

19  messages, correspondence, et cetera, created, requested

20  and/or prepared by USX, its attorneys, auditors, employees,

21  agents and/or representatives.  And their response was,

22  "Produced."

23    Judge, you have heard -- unlike most discovery dis-

24  putes,  you  have heard the testimony and witnesses that

25  have taken that witness stand and sworn, I submit to you,

falsely under oath about their knowledge concerning the files.

If they called Mr. Wager concerning these, why was his testimony like that at the trial of the case?

My recollection is that multiple witnesses were asked about where these files were, or did they have any knowledge.

If Mr. Wager became the person that suddenly points them to a shelf or a cabinet, he was -- he wasn't in Slovakia, I don't even think, in '97 or '98. But the obligation is USX's.

I have seen notes in the files today concerning Mr. Hilton's criticism of me not having specificity in certain requests.

It is more basic than that, Judge. In that same production request -- and I think this goes to the issue of USX's candor to the court and USX's compliance. They didn't care about your first order because Mr. Hilton said data doesn't mean data. They didn't care about your subsequent order. In that same production request they were asked, "Produce any and all retention agreements or letters of authorization providing authority for Victor Hayslip to perform legal services on behalf of plaintiffs related in any way to the allegations made the basis of this lawsuit."

Response: "None."

I just noticed that today.

You know, I didn't get all that stuff until Saturday.

1    And I guess if I were a better lawyer, I would have remem-

2    bered my first response to production.

3       But, Judge, my experience with this court and not with

4    just Your Honor, but when I say "the court" as the Northern

5    District and with lawyers in this city, is that when you talk

6    about open discovery, that is exactly what you mean.

7       Quite frankly, these are Rule 26 matters that should

8    have been coughed up. And they led this jury to believe that

9    nobody knew where they were. They led this jury to believe

10    that nobody knew where these Tractor Shop records were taken.

11    And it is more than passing strange to me that the only copy

12    of that audit memo talking about them going out there and

13    getting the files was in Mr. Bob "Specificity" Hilton's file

14    that we got on Saturday.

15       I -- I would request, first and foremost, because I

16    think -- I think some people have testified from that witness

17    stand and committed the prospect of perjury.

18       I would like there to be, first and foremost, every

19    document in these three boxes to be taken and Bates stamped

20    and copied, and I would like a copy of every single document.

21    But I think, quite frankly, the chain of custody has to be

22    protected on these documents at this point.

23       THE COURT: Well, the documents will be--

24       MR. WHITE: And not at my client's expense.

25       THE COURT: The documents will be considered in the

custody of the clerk of the court until further order of the court.

Mr. Waudby.

MR. WAUDBY:  Yes, Your Honor.

In the motion to reconsider, in the eleventh paragraphe, I wrote that I -- "Counsel for plaintiff," and that was me at the time at the hearing, stated that I did not know where the list that Ron Ingram found  which was the list of thirty-six vehicles,  I did not know the whereabouts of that.  And that's what I recall telling Your Honor.

THE COURT:  Well, did you, in discharging the duties of candor that you owed to the court, did you, in the motion or elsewhere, indicate that in fact you had documents relating to Cushman vehicles which had not  been produced?

MR. WAUDBY:  Yes.

THE COURT:  That you had those documents in your office?

MR. WAUDBY:  I did not say "in my office".

THE COURT:  All right.  Well, Mr. White, I am going to require you to file, if you wish to pursue this matter, a motion.

MR. WHITE:  Yes, sir.

THE COURT:  And I anticipate that it will be a motion for order to show cause.  And when the motion is received, if it says what I expect it will say, it will be granted.

And starting with you, Mr. Waudby, I am going to require you to show cause, if there be any, why you shouldn't be held in contempt of court.

These documents go to the heart of the defendant's contention that USX received goods in return for every invoice billed to it, and which it paid. And that is the core of the defendant's defense to the claims of the plaintiff.

I don't know how to deal with this jury in terms of this highly probative evidence that is not before the jury, was sought by the defendant and was withheld by the plaintiff.

How do you suggest I deal with it?

MR. WAUDBY:  Well, Your Honor --

THE COURT:  And assume for purposes of answering it, if you care to answer it, assume that I am going to find just what I said. And you're not required to answer the question.

MR. WAUDBY:  Well, the position which I took up -- which I said in Your Honor's chambers was that I did not believe that the materials were relevant to claims. But I did not represent to the court that I did not know where they were. I represented to the court that there were Cushman vehicle files.

THE COURT:  No, you're not responding to my question. And like I say to you, you don't have to respond to it, if

1    you care not to respond to it.

2         But my question is this: how do I deal with this jury

3    which has been presented incomplete evidence on the defense

4    of these defendants based on the failure of the plaintiff

5    to produce the records?

6         Do I reopen the evidence?  Recharge the jury?

7                        (PAUSE.)

8         MR. WHITE:  Are you asking me, Judge?

9         THE COURT:  Yes, sir.

10        MR. WHITE:  It is more than just the Cushman files.

11        Included in the boxes are specific references by Audit,

12   as part of what I deemed to be their investigation, showing

13   that practices and procedures and controls in the Tractor

14   Shop were lacking.

15        There appears to be a handwritten note from Mr. Wager

16   at one point admitting that the controls were deficient, and

17   that was the problem with USX and its employees.

18        And when I look at this and hold it up against that

19   note from Mr. Hilton to get the word out to Mr. Filipowski

20   and the others, because not only is there compelling evidence

21   in here, but there is some strange gaps, too.  Judge, it is

22   more than just  Cushman, because they said, "Produced," where

23   they said, "none."  And the concept of somebody now coming

24   in and saying, well, you didn't put the capital C on Cushman

25   or you didn't say, "Cushman," you said "vehicles," is

14                                                                  1846

1    offensive.  And I think we are entitled to the relief under

2    Rule 37 of having judgment as a matter of law on all of USX's

3    claims, which is a very, very short isntruction.  And I think

4    the jury should only deliberate starting tomorrow morning

5    and only have written charges on the counterclaims.

6          You decide, Judge -- I have never had a situation

7    where I was -- and I'm talking about USX.  I have never seen

8    a situation where you have got a three-time loser in a civil

9    case, because they thought your order was funny the first

10   time you put it out.  That data didn't mean data.  They

11   thought it was funny when they could say "none" and not --

12   on Victor Hayslip's letter and produced on these other mat-

13   ters, and apparently feels no continuing obligation to satis-

14   fy their requirement.

15         As Your Honor remembers in our Thursday session, USX

16   conceded that it had not looked for these matters and had not

17   made inquiry.

18         You have got a motion before you now seeking Rule 37

19   sanctions that you carried with the case.

20         See, what happened -- and I am sure they thought it

21   was great.

22         What happens was the sanctions you gave on the Cush-

23   man saying they couldn't put on evidence of the Cushman --

24         THE COURT:  Actually, as it turned out, it was a boon

25   to USX.

1    MR. WHITE:  To USX.

2    THE COURT:  To USX.

3    MR. WHITE:  That is correct.

4    And I think it comes down to Mr. Hilton.  And I always

5    sat there and wondered, because I thought the cross-examina-

6    tion wasn't that bad of him that I did.  And I have been

7    sitting here trying to wonder why I had to get back up in

8    sixty seconds for the next witness.

9    I think Mr. Hilton was the guy in charge.  I think he

10   has been sitting up there deciding to hide whatever he wants

11   to hide.  And I think he believes you're a joke.  He sure be-

12   lieves I am a joke.  And I think that the appropriate and

13   only sanction is to take from the jury any claim by USX and

14   enter judgment as a matter of law and let them deliberate

15   only on the counterclaims.

16   MR. WAUDBY:  Your Honor?

17   THE COURT:  Yes, sir.

18   MR. WAUDBY:  Before the court takes any action, I

19   would ask that the court review these Cushman file folders

20   to determan their relevance or probative value.  That is why

21   I submitted the motion to reconsider.

22   THE COURT:  Well, no.  At this point, no, I am not

23   going to review the records to determine their relevance or

24   probative value.  I am going to review the records to deter-

25   mine whether you had them, whether you had records which you

1    represented to the court that you didn't have in your office,

2    or whether USX had in its possession records which it had

3    been ordered to produce and failed to produce.

4         Now, Mr. White, of course, represents the interest of

5    his client, but I am obliged, as long as I wear this black

6    robe, and even if I don't wear it when I'm sitting up here,

7    I have the duty to protect the integrity of the court.  And

8    if, in fact, there has been some perjury from that witness

9    stand, the appropriate thing for me to do is either to ini-

10   tiate criminal contempt proceedings or refer the matter to

11   the United States Attorney.  Of course, if I initiate crimi-

12   nal contempt proceedings, the matter will be assigned to an-

13   other judge, and there will be a right to a jury trial and

14   all that.  But I don't believe that there is any corporation

15   in this country greater than the United States government

16   and our system of justice.  And if it turns out that a wit-

17   ness or a corporation, be it Tieco or USX, has committed

18   perjury, I am obliged not just to grant civil relief to the

19   parties, I am obliged to uphold the integrity of the system.

20   So I am going to look at the records, and I am going to do

21   that now, if you will give them to me.

22        MR. WHITE:  Yes, sir.

23        THE COURT:  And I take it, Mr. Waudby, you have seen

24   these records?

25        MR. WAUDBY:  Yes, Your Honor.

                              (PAUSE.)

        THE COURT:  I am not going to look at all of those

records.  Now pull out the ones that you contend go to the

heart of the issue of whether --

        MR. ARNOLD:  Your Honor, I will represent to the

court that this box here doesn't go to the heart of anything.

(Indicating.)

        THE COURT:  All right.

        MR. ARNOLD:  And Your Honor cannot look at this box.

        THE COURT:  All right.  If that is so, then let's --

the court will order that box to be returned to Lange, Simp-

son.

        MR. ARNOLD:  That is fine.

        This box here contains the Tractor Shop records,

listings and accountings and such other Cushman vehicles.

And there are other pertinent documents that Mark and Linda

are going through now.

        THE COURT:  And we will be in informal recess.

        (RECESS FROM 5:41 P. M. UNTIL 6:38 P. M.:)

        THE COURT:  I have taken a cursory look at the files

that have been produced.

                              (PAUSE.)

        Mr. Waudby, I am going to ask you to come and iden-

tify for the record, and we will mark this as Court's Exhibit

1, this accordion envelope. Identify for the record what

this envelope contains.

MR. WAUDBY:  These are what we have referred to as the Cushman vehicle folders or Manila folders with the "C" numbers.

THE COURT:  All right.  All of these documents refer to Cushman vehicles?

MR. WAUDBY:  I think that is what the "C" number means, Your Honor.  And I think that is correct.

THE COURT:  All right.  So these documents can be considered as Cushman  files, can they not?

MR. WAUDBY:  They are file folders that contain information on Cushman vehicles, yes, Your Honor.

THE COURT:  So is that your way of saying, "Yes, they are Cushman files?"

MR. WAUDBY:  Yes.

THE COURT:  All right.  And you agree that this was only made available to Tieco this afternoon or today?

MR. WAUDBY:  There are two or three that I can recall that were in the Audit files which I had produced.  I don't know which vehicle file number they were related to, but all but probably two or three, yes.

(PAUSE.)

THE COURT:  And these files, Mr. Waudby, were in your office at the time when you appeared in chambers in response to the defendant's motion to compel?

1    MR. WAUDBY:  Yes, sir.

2    THE COURT:  What is this document which I am going to

3    have marked as Court's Exhibit 2?

4    MR. WAUDBY:  This appears to be similar contents of

5    what is in the Cushman vehicle files as a Product Registra-

6    tion Form, two parts, and then a third page, Proof of Deliv-

7    ery.

8    THE COURT:  All right.  And again this is a document

9    that was in your actual possession at the time when you ap-

10   peared in chambers to respond to the motion to compel?

11   MR. WAUDBY:  Yes, sir.

12   THE COURT:  And I am going to have these documents

13   marked in a group as Court's  Exhibit 3.

14                          (PAUSE.)

15   What do these documents refer to?

16                          (PAUSE.)

17   What do these documents refer to?

18                          (LONG PAUSE.)

19   MR. WAUDBY:  It appears to refer to a Trailer Unit

20   and a Coil Carrying Rack.  And it's on some letterhead from

21   Jones Machine & Welding Company to Harry McClelland who is

22   the Purchasing Agent at Fairfield.

23   Then there is a Tieco document.

24   THE COURT:  Is that an invoice?

25   MR. WAUDBY:  I don't know, Your Honor.  It doesn't

1  look like the other invoices.  It looks like maybe a specifi-

2  cation of some sort.

3       THE COURT:  All right.  And who are those invoices

4  addressed to?

5       MR. WAUDBY:  Well, the Tieco -- what I think looks

6  like specifications of maybe two vehicles is addressed to

7  Richard Autry, U. S. Steel, Fairfield Works.

8       THE COURT: ·Is it your judgment that these Tieco docu-

9  ments refer to Cushman vehicles?

10                    (PAUSE.)

11       There is no way to tell?

12       MR. WAUDBY:  I can't answer.  I don't know.

13       THE COURT:  All right.  There is a stick-on.

14       MR. WAUDBY:  Post-it Note?

15       THE COURT:  Yes.  A Post-it Note, yellow, which has

16  the handwriting, "Right side of Autry's desk."

17       Was this Post-it Note on this document when it was

18  in your office?

19       MR. WAUDBY:  Yes.  I did not add that Post-it.

20       THE COURT:  This is how you received the document

21  from USX?

22       MR. WAUDBY:  I believe that is accurate.  I have not

23  added any Post-it Notes to that set.

24       THE COURT:  Mark this as Court's Exhibit 4.

25       What is this file, Mr. Waudby?

(LONG PAUSE.)

MR. WAUDBY:  The file folder has a label of Tieco.
And it contains documents from PHH Fleet America, which is
what I understand was one of the leasing companies.  Numerous
of those.

Then it has what looks to be possibly equipment spe-
cifications and a Maintenance Agreement from Tieco.

THE COURT:  Do they relate to Cushman vehicles?

MR. WAUDBY:  I don't know about every page of them,
but the Burden Carriers is what I understand are Cushman
vehicles.

(LONG PAUSE.)

THE COURT:  Mark this the next one.

(EXHIBIT MARKED.)

What is this document that has been marked as Court's
Exhibit #5?

(PAUSE.)

MR. WAUDBY:  It is one page entitled "Ordering and
Receiving Practices."  And in the upper righthand corner
it has a number 96-2-30.  And it has subheadings for U. S.
Steel Mining and U. S. Steel Fairfield.

THE COURT:  All right.

(LONG PAUSE.)

Mr. White, are there any other specific documents
that you wish to bring to the court's attention?

1854

1    MR. WHITE:  Yes, sir, Your Honor.

2    If you will mark this, this is a printout of Cushman

3    vehicles with "C" numbers that also show maintenance on them

4    and other matters that relate to Cushman vehicles.

5    THE COURT:  Court's Exhibit 6.

6    MR. WHITE:  Tractor Shop files.

7    THE COURT:  All right.  Do you agree, Mr. Waudby,

8    that this document reflects matters of materials dealing with

9    Cushman vehicles?

10                    (LONG PAUSE.)

11    MR. WAUDBY:  Some of the entries of -- are for Cush-

12    man vehicles, not all of them.

13    THE COURT:  All right.

14                    (LONG PAUSE.)

15    Mr. Waudby, is it a fair statement that the documents

16    which you have produced include files relating to Cushman

17    vehicles?

18    MR. WAUDBY:  The ones that we just identified?

19    THE COURT:  Yes, sir.

20    MR. WAUDBY:  Yes.

21    THE COURT:  And why were those files not produced

22    earlier than yesterday?

23    MR. WAUDBY:  The ones that we have marked, Your Honor,

24    I received Wednesday before trial started.  And I reviewed

25    the discovery, did not believe that the materials were

1  requested were relevant to the items in this case. And that

2  is what I tried to convey to the court at the hearing on

3  Thursday when I acknowledged that they existed.

4        If there is any evidence as to what was the result

5  or the use of the funds in the Adjustment Account, that is,

6  from the invoices on the credit memos or the Adjustment Ac-

7  count invoices, and that is all in evidence, and that was

8  on  that spread sheet.  So there are -- that is the evidence

9  of what the dollar for dollar use, if any, of the Adjustment

10 Account was.

11       THE COURT:  All right.  I previously indicated for

12 the record that in fact what you represented to me was that

13 yes, there might be some other files somewhere in Pittsburgh.

14 You did not know precisely the location of the files.

15       You concede, do you not, that you never told me that

16 you had in your office, even as you stood there, records re-

17 lating to Cushman files?

18       MR. WAUDBY:  I don't agree with the first part.  But

19 I agree that I did not tell Your Honor that I had these in

20 my office.  But I -- when there was reference to Pittsburgh,

21 we were looking for the list -- questions that were being

22 discussed was the list of the thirty-six vehicles sold.  You

23 asked me if I looked in Pittsburgh for it, and I said I did

24 not.  And I --

25       THE COURT:  No, sir.  That was not -- the discussion

1856

1  was not so limited, and I so find for the record.

2  Mr. White?

3  MR. WHITE:  Your Honor, I would make additional in-

4  formation available to the court concerning how important

5  these files could have been as to certain witnesses, in par-

6  ticular Mr. Richard Autry, who was a witness propounded by

7  USX who talked about these files or at least a portion of

8  these files who indicated they were there, who said what they

9  were.

10  One of these folders is "C" No. 3.

11  Mr. Ken Falls then testified that that electric Cush-

12  man is "C" No. 3.

13  "C" No. 3 in this file is some other vehicle.

14  Additionally, Mr. Wager testified, Your Honor, and I

15  would indicate that I am looking at my notes, that he is

16  the one that had the auditors go  through the desks and take

17  the stuff from the Tractor Shop desks.  He says no document

18  has ever been destroyed.  He does not know what happened

19  to Autry's list  and is not familiar with it.

20  And as I understand the representation today is the

21  very person that on the 10th day of the month before he tes-

22  tified here a few days later that told them where the files

23  were, was Mr. Wager.  And I can't imagine anything that

24  would have been more relevant, if nothing else, for cross-

25  examination.

Judge, in addition, we went through all those machi-
nations and trying to match analysis and everything else.
The only recollection I ever have of the list was that Mr.
Waudby indicated he had not looked at Engineering in Pitts-
burgh.

Judge, based on  the testimony there are still other
files there.

Mr. Falls testified on that witness stand he sent --
that when he got to work there, he made a list of all the
vehicles that were not on the Mobile Equpiment Inventory
and sent it to Engineering.  So what I'm telling you is there
is still more files out there.

Now your order operated I guess somewhat as -- inure
to the benefit.

THE COURT:  Well, actually the court made a serious
error, and that is putting it charitably, because the effect
of the order of preclusion was to reward USX for its with-
holding of materials that it had been ordered  to produce.

MR. WHITE:  And as I recall --

THE COURT:  And it also obviously worked to the detri-
ment of the party who was wronged.

MR. WHITE:  You understand my damage argument a little
bit better now, I guess.

THE COURT:  Yes, sir, I do.

MR. WHITE:  At least for the moment.

26                                                                 1858

1           And it is my recollection that Mr. Hilton, when we

2     got into this stuff about what files he sent to Lange, Simp-

3     son, he said he sent them several weeks ago.

4           By the way, I believe those two guys.

5           Now I think we should  have had them, but I think I

6     should have been able to confront Mr. Hilton with that mat-

7     ter, too, because he obviously knew about them, notwithstand-

8     ing his protestations to the contrary.

9           So my only additional proffer for purposes of this

10    record is that to suggest that they have no relevance or pro-

11    bative value in this trial is ludicrous.

12          THE COURT:  Well, as I have indicated in the record

13    before, in the court's view these records go to the very

14    heart of the defendant's contention that it provided equip-

15    ment that was equal in value to the invoices which were

16    billed to USX.

17          MR. WHITE:  And to the extent they kept them, re-

18    paired them, did all those things, it goes directly to acqui-

19    escence.  And it fails the stink test on who knew about that.

20          THE COURT:  All right.  Well, any further argument

21    as to why the court should not, as a sanction for failure

22    to provide discovery and for defying the court's order to

23    produce and for breaching -- and for misleading the court

24    and for breaching the duty of candor owed to the court, the

25    court should not strike all of USX's claims in this case?

1    MR. WAUDBY:  Yes, Your Honor.

2    First off, personally I did -- I did not mislead the

3    court, and if I did, I don't see where.  But when we went

4    up for the hearing on --

5    THE COURT:  Well, we are going to take up that issue

6    later, I can assure you.

7    MR. WAUDBY:  I understand.

8    When we went up for the hearing Thursday, the matters

9    set forth on the motion addressed not Cushman vehicle files.

10   And when the discussion turned in the hearing to Cushman ve-

11   hicle files, the  Manila folders, I acknowledged that they

12   existed.  And I also tried to argue that they weren't rele-

13   vant or material.  And for the reasons set forth -- let me

14   try to explain.

15   First off, these records don't show that there was a

16   dollar for dollar benefit through the Adjustment Account.

17   THE COURT:  Well, they are relevant or material once

18   the court orders you to produce them, is totally irrelevant.

19   And in fact, I don't want to hear any other argument along

20   those lines.

21   Do you have anything else to say?

22   MR. WAUDBY:  Not at this time, Your Honor.

23   THE COURT:  All right.  Thank you.

24   The motion to strike USX's claims will be granted.

25   And I will tomorrow inform the jury that the court has dis-

28                                                                     1860

1    posed of USX's claims, and it need no longer consider those

2    claims.  And I will, at the appropriate time, issue a writ-

3    ten opinion outlining the basis of the action.  The basis

4    should be clear from the record, but so that the court of

5    appeals may be directed immediately to the basis of the

6    court's action, I will write an opinion, and on motion of the

7    defendant the court will consider further sanctions.

8             Anything else?

9             MR. WHITE:  No, sir.

10            THE COURT:  Thank y'all.  See y'all tomorrow.

11                              (PAUSE.)

12            MR. WHITE:  Judge, are you still going to give writ-

13   ten instructions to the jury on the remaining claims?

14            THE COURT:  Yes.

15            MR. WHITE:  Okay.

16            (Proceedings adjourned at 7:02 P. M., October 28,

17   1999, until 9:08 A. M., October 29, 1999.)

18   OCTOBER 29, 1999                              9:08 A .M.

19                         MORNING SESSION

20

21                         (JURY OUT.)

22            THE COURT:  Good morning, ladies and gentlemen.

23            MR. WHITE:  Good morning, Judge.

24            MR. TALLY:  Good morning.

25            THE COURT:  Anything you want to bring up before we

1    substantially with USX in a major case on the other side.

2    I have never seen this kind of conduct in terms of failing

3    to produce and to disclose records.

4          But let's bring the jury in.

5                    (JURY IN AT 9:12 A. M.:)

6          THE COURT:  Good morning, ladies and gentlemen.

7          JURORS:   Good morning.

8          THE COURT:  Trust you had a good evening.

9          JURORS:  Yes.

10         THE COURT:  The claims of USX against Tieco have

11   been disposed of for reasons as to which you should not

12   speculate, and you should resume your deliberations only

13   on the claims of Tieco and Mr. Fletcher Yeilding against

14   U. S. Steel.  And I am going to give you now the instruc-

15   tions.

16         You may resume your deliberations.

17                    (PAUSE.)

18         Ladies and gentlemen, on the verdict form in section A,

19   I think the first six of A questions, obviously you will

20   not answer those.

21         All right.  Thank you very much.

22                    (JURY OUT AT 9:14 A. M.:)

23         THE COURT:  I am going to direct the court reporter,

24   at Mr. Waudby's expense, to prepare a transcript of the tes-

25   timony of Mr. Wager, Mr. Hilton and a transcript of whatever

C

Westlaw.

189 F.R.D. 674                                                                                        Page 1
189 F.R.D. 674, 45 Fed.R.Serv.3d 1390
**(Cite as: 189 F.R.D. 674)**

▶

United States District Court,
N.D. Alabama,
Southern Division.

USX CORPORATION, et al., Plaintiffs,
v.
TIECO, INC., et al., Defendants.

**No. Civ.A. 95-C-3237-S.**

Nov. 9, 1999.

Purchaser of vehicle parts brought action against
seller, alleging violations of Racketeer Influenced
and Corrupt Organizations Act (RICO), fraud and
breach of contract. Seller counterclaimed, alleging
civil conspiracy, violation of civil rights, malicious
prosecution, defamation, and intentional interference
with business relationships. Following jury trial, the
District Court, Clemon, J., held that purchaser's
actions, in willfully failing to disclose material
evidence after repeated requests and in misleading
court about location of evidence, warranted dismissal
of purchaser's claims.

Ordered accordingly.

West Headnotes
**[1] Federal Civil Procedure ☞1278**
170Ak1278 Most Cited Cases
Discovery sanction of dismissal may not
constitutionally be utilized when failure to comply is
based on inability, rather than wilfulness or bad faith.
Fed.Rules Civ.Proc.Rule 37(b)(2)(C), (d), 28
U.S.C.A.

**[2] Federal Civil Procedure ☞1278**
170Ak1278 Most Cited Cases
Discovery sanction of dismissal should not be
utilized when lesser sanctions would achieve same
ends. Fed.Rules Civ.Proc.Rule 37(b)(2)(C), (d), 28
U.S.C.A.

**[3] Federal Civil Procedure ☞1278**
170Ak1278 Most Cited Cases
Rule governing discovery sanctions confers on
district courts broad discretion to fashion appropriate
sanctions for violations of discovery orders.
Fed.Rules Civ.Proc.Rule 37(b)(2)(C), (d), 28
U.S.C.A.

**[4] Federal Civil Procedure ☞1278**
170Ak1278 Most Cited Cases
District court has inherent power to utilize dismissal
sanction for violation of discovery orders.

**[5] Federal Civil Procedure ☞1278**
170Ak1278 Most Cited Cases
When district court relies on its inherent power to
utilize dismissal sanction for violation of discovery
order, it should explain why lesser sanctions are
unlikely to be effective in deterring and punishing
abuses of judicial process.

**[6] Federal Civil Procedure ☞1278**
170Ak1278 Most Cited Cases
Plaintiff's conduct, in willfully failing to disclose
material evidence after repeated requests and in
misleading court about locations of such evidence,
warranted dismissal of plaintiff's claims; although
court did not issue order compelling plaintiff to
produce evidence, absence of such order was
attributable to plaintiff's misrepresentations to
defendant and court and case had been fully tried
when plaintiff's transgressions were discovered.
Fed.Rules Civ.Proc.Rule 37(b)(2)(C), (d), 28
U.S.C.A.
  **\*675** Robert D Hunter, Stephen A Rowe, John B
Tally, Jr, William L Waudby, Todd M Higey, Lange
Simpson Robinson & Somerville, Birmingham, AL,
Victor L Hayslip, Burr & Forman LLP, Birmingham,
AL, JL Chestnut, Jr, Chestnut Sanders Sanders &
Pettaway PC, Selma, AL, for plaintiffs.

George W Andrews, III, Stephen R Arnold, J Mark
White, Linda G Flippo, White Dunn & Booker,
Birmingham, AL, for defendants.

Edward O Conerly, Hall Conerly Mudd & Bolvig
PC, Birmingham, AL, for Burr & Forman, movant.

Stephen A Strickland, Jaffe Strickland Beasley &
Drennan PC, Birmingham, AL, for A G Langston,
movant.

**MEMORANDUM OPINION STRIKING THE
CLAIMS OF THE PLAINTIFF**

CLEMON, District Judge.

This is a case in which Plaintiff has failed to initially
disclose to Defendant evidence relevant to disputed
facts;  purposefully failed to produce relevant
evidence as requested by Defendant; misled the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Court; and deprived the jury of probative evidence. For all of these reasons, and as a sanction, the Court withdrew and struck Plaintiff's claims, pursuant to F.R.Civ.P. 37 and the inherent power of the Court. This opinion memorializes the background and circumstances which led to the imposition of this extraordinary sanction.

I

Plaintiff USX Corporation ("USX") claims that Defendant TIECO, Inc., ("TIECO") violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962, ("RICO"), defrauded USX, and breached its contract with USX by submitting false invoices for Cushman vehicle parts never delivered to the Tractor Shop of its Fairfield (Alabama) Works. While admitting that the Cushman parts listed on various invoices were not delivered to USX, TIECO maintains that at the request of, and as an accommodation to USX agents and employees, it delivered to the Tractor Shop equivalent parts and entire Cushman vehicles having a value equal to that of the parts listed on the invoices, as ordered by USX purchasing managers and expediters possessing the requisite purchasing authority. TIECO contends that USX ratified the actions of its managers and employees by accepting, utilizing, and sometimes disposing of the vehicles after their useful life.

*676 Crucial to TIECO's defense are USX's files and inventories of Cushman mobile equipment physically present at the Tractor Shop. It is obviously a relevant consideration whether such files and inventories reflect the known presence and usage on USX premises of Cushman equipment never invoiced to USX.

II

In its initial disclosures to TIECO required under F.R.Civ.P. 26, USX did not include all documents relating to Cushman vehicles.

Through various requests for production, TIECO clearly sought the relevant documents. [FN1] Indubitably, some of the requested materials were produced after continued and labored efforts of TIECO, but other probative Cushman-related documents were not produced.

FN1. In the second paragraph of TIECO's July 2, 1998, Second Request for Production, it sought "any and **all audits**, reconciliations and/or **inventories** related to

the tractor shop at the Fairfield plant ..." p. 2. (emphasis added). Preserving the usual perfunctory objections, USX responded that it would produce audit reports completed from 1993 to 1995 relating to the Tractor Shop.

In request No. 7 of TIECO's May 13, 1999, Fifth Request for Production, it requested "**all** fixed asset reports, **inventories** and/or reconciliations, **book inventories** and/or **physical inventories** performed by, performed in connection with, and/or performed on the **Tractor Shop** and/or central Tractor Shop from 1986 to present." (emphasis added). USX's June 1999 response to the request, recites, in relevant part: "Plaintiff already produced mobile and automotive equipment lists dated 02/08/96, and produced herewith are current mobile and automotive equipment lists. Plaintiffs will supplement this response and produce the current fixed asset report pertaining to mobile and automotive equipment at Fairfield Works and documents pertaining to the most recent physical inventory, to the extent any exist."

A week before trial, TIECO filed another motion to compel and for sanctions. The motion was premised, *inter alia*, on the alleged failure of USX to produce the Bob Brown inventory of Cushman vehicles, and the Falls/Ingram or Facility Re-Deployment Task Force list of Cushman vehicles compiled between May and July 1996. The Court summoned counsel for an in-chambers conference on the motion on Thursday afternoon of October 14.

At the conference, TIECO's counsel argued that in addition to the unproduced Brown and Falls inventories, USX had failed to produce any Cushman vehicle inventory maintained by Richard Autry, the head of the Tractor Shop. The Court then inquired of William Waudby, trial counsel for USX, whether he had produced to TIECO's counsel all of the Cushman vehicle documents in USX's possession. Waudby stated that he had produced all Cushman documents in his possession; but that other Cushman-related documents may be in various USX files at its headquarters in Pittsburgh. He stated that he did not know the location of these Pittsburgh files. He specifically denied knowledge of the location of materials taken from the files of Autry by USX personnel when Autry was discharged. The Court was convinced (1) that Waudby had in fact produced all of the Cushman materials in his possession; and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

(2) other Cushman materials remained at an undefined location in USX's Pittsburgh headquarters.

Rather than striking all of USX's claims, the Court imposed the less severe sanction of barring USX from using at trial any evidence relating to Cushman vehicles. [FN2] In its October 15 Memorandum Opinion and Order of Preclusion, the Court wrote:

> FN2. The preclusion sanction was illusory-- for it was obviously not in USX's interests to offer such evidence. In fact, USX took the position that even though the TIECO-provided Cushman vehicles may have been received, used, and disposed of by USX, such evidence would be irrelevant because USX was not properly invoiced for the vehicles. Without such evidence, TIECO justifiably argued that it would be prejudiced in its defense of the action.

Counsel for the Plaintiffs has conceded that USX Corporation may not have produced all of the available materials sought by the Defendants relating to inventories/records of Cushman vehicles. These materials should have been produced a long time ago. Several months ago, USX erroneously represented to Defendants' counsel that the materials had already been produced.
The court finds and concludes that USX has made evasive and incomplete responses *677 to the Defendants' discovery efforts related to Cushman vehicles. The court further finds no substantial justification for USX's failure to reasonably comply with Defendants' production requests.
... And based on the uncertainty of Plaintiffs' counsel concerning the actual location of the requested materials, the Court finds that the said materials cannot reasonably be expected to be produced to Defendants' counsel in sufficient time for use at trial.
Document 79, Court File.

Two business days after the conference, the case proceeded to trial by jury.

The trial testimony of Robert Hilton, the in-house USX associate counsel in charge of the TIECO matter, revealed that certain Cushman-related records had been shipped from Pittsburgh headquarters to Attorney Waudby's law firm in Birmingham several weeks before the trial.

The Court ordered Attorney Waudby to extract from those files any material claimed to be protected by the Lange-Simpson/USX attorney-client privilege, and to produce the files *instanter* for an *in camera* review. The redacted files were then produced in three boxes.

The contents of the files were incredible. They clearly showed that the Court had been misled, and that relevant Cushman vehicle files had not been produced. [FN3]

> FN3. One of the items produced is a brown accordion pocket envelope containing numerous numbered manilla folders. The folders are numbered C1-C85, and each folder relates to a discrete Cushman vehicle. Several folders are missing, but 45 of the extant 67 folders reflect Cushman vehicles provided to USX by or through TIECO! Put another way, two-thirds of USX's Cushman vehicles are associated, in some way or another, with TIECO. Court Exhibit ("CX") 1.
> A "post-it" yellow note is appended to the cover of a green file entitled, "TIECO." The note recites: "from Autry's bottom right hand desk drawer." CX 4. Included in the file are documents describing various Cushman vehicles, including Cushman vehicles provided to USX by TIECO. One document, entitled "Mobile Equipment Maintenance Cost Summary, Sept. 1994," describes each piece of mobile equipment. CX 6. One set of documents deals with two Cushman vehicles delivered by TIECO to USX on February 21, 1995, and its third page reflects "Proof of Delivery" at USX by TIECO. CX 2. Another set of documents "From Autry's In Box-2d shelf" reflects, *inter alia,* TIECO's sale and delivery of various Cushman vehicles and parts to Richard Autry at USX, found on the "Right side of Autry's desk." CX 3, pp. 1, 3-6.
> Documents in other files are unmistakably inventories of Cushman vehicles. CX 7-10.

Waudby admitted that all of these files were in his possession at the time of the October 14 conference.

By the time that these previously unproduced files were delivered to and examined by TIECO's counsel, the case already had been submitted to the jury.

In these circumstances, the Court was convinced that if a lesser sanction and a re-trial on the merits were

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

ordered, USX would not have been sufficiently punished and others would not be deterred from using similar abusive litigation tactics. Therefore, it struck and dismissed USX's claims.

### III

In imposing the fatal sanction of dismissal of USX's claims, the Court did not write on a clean slate. Rule 37(d) of the Federal Rules of Civil Procedure authorizes, among other things, the dismissal of an action where a party fails to produce documents properly sought under Rule 34. *Cf.* F.R.Civ.P. 37(b)(2)(C).

[1][2] The constitutionality of dismissal of claims as a sanction for failure to provide discovery has been consistently upheld by the Supreme Court over the last ninety years. *Hammond Packing Co. v. State of Arkansas,* 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909). That case involved a refusal by the plaintiff to produce documents as ordered by the court. The court dismissed Hammond Packing's claims as a sanction. In upholding the sanction against a claim of violation of due process rights, Mr. Justice White wrote:

> The proceeding here taken may therefore find its sanction in the undoubted right of the lawmaking power to create a presumption of fact as to be bad faith and untruth of an answer to be gotten from the suppression or failure to produce the proof ordered, when such proof concerned the *678 rightful decision of the cause.... [T]he preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense.

*Id.* at 350-51, 29 S.Ct. 370. The sanction of dismissal may not constitutionally be utilized when the failure to comply is based on inability, rather than wilfulness or bad faith. *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897). And, obviously, a dismissal sanction should not be utilized when lesser sanctions would achieve the same ends.

[3] Pursuant to Rule 37 of the Federal Rules of Civil Procedure, a court is authorized to strike pleadings, stay the proceedings, dismiss an action, or enter a default judgment against a party who has failed to properly respond to discovery. F.R.Civ.P. 37(d);(b)(2)(C). The Rule confers on district courts broad discretion to fashion appropriate sanctions for

violations of discovery orders.

In *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), the Third Circuit had reversed the district court's dismissal of an antitrust action for the plaintiff's failure to timely answer written interrogatories. In reversing the circuit court's decision, the Supreme Court observed:

> There is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order. It is quite reasonable to conclude that a party who has been subjected to such an order will feel duly chastened, so that even though he succeeds in having the order reversed on appeal he will nonetheless comply promptly with future discovery orders of the district court.
> But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent. If the decision of the Court of Appeals remained undisturbed in this case, it might well be that these respondents would faithfully comply with all future discovery orders entered by the District Court in this case. But other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts.

*Id.* at 642-43, 96 S.Ct. 2778.

Both before and after *National Hockey,* our circuit and its predecessor have upheld dismissals as sanctions under Rule 37. In *Emerick v. Fenick Industries, Inc.,* 539 F.2d 1379 (5th Cir.1976) the old Fifth Circuit held that where a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities, dismissal as a sanction is not an abuse of discretion. The court in *Factory Air Conditioning Corp., v. Westside Toyota, Inc.,* 579 F.2d 334, 337 (5th Cir.1978), observed that where a party has consistently failed to provide discovery as ordered by the court, the dismissal sanction is mandated: "To do otherwise would be an open admission by this court that it can do nothing when a party in a civil suit deliberately flouts its orders." The Eleventh Circuit has held that "[w]hen a party demonstrates flagrant disregard for the court and the discovery process, ... dismissal is not an abuse of discretion." *Aztec Steel Co. v. Florida Steel Corp.,*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 480, 481 (11th Cir.1982). *See also* Buchanan v. Bowman, 820 F.2d 359 (11th Cir.1987); Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536 (11th Cir.1993).

The Rule 37 dismissal sanction is predicated on the violation of an order compelling discovery. U.S. v. Certain Real Property Located at Route 1, 126 F.3d 1314 (11th Cir.1997); Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1556 (11th Cir.1986).

[4][5] In addition to the broad discretion conferred by Rule 37 for violation of discovery orders, a district court has inherent power *679 to utilize the dismissal sanction. But where a court relies on such inherent power, it should explain why lesser sanctions are unlikely to be effective in deterring and punishing abuses of the judicial process. Shepherd v. American Broadcasting Companies, Inc., 62 F.3d 1469, 1479 (D.C.Cir.1995).

IV

[6] The sanction of dismissal of USX's claims is compelled by its egregious conduct.

Although the Court had not formally issued an order compelling USX to produce the Cushman vehicle inventories and documents, the absence of such orders is attributable to TIECO's false representation to TIECO's counsel that it had already produced the requested documents prior to the expiration of the discovery deadline, and USX's misrepresentation to the Court that it had produced all of the Cushman vehicle documents in the possession of its counsel. Put another way, the absence of court orders compelling discovery is the product of USX's bad faith misrepresentation both to opposing counsel and to the Court. Under these circumstances, USX's misconduct has waived the usual requirement of a court order compelling production as the predicate for sanctions. Cf. Certain Real Property, 126 F.3d at 1317-18.

V

Lesser sanctions in this case would not have been effective in punishing and deterring USX. Most importantly, the case had been fully-tried over an eight-day period and submitted to the jury when USX's transgressions were unearthed. It would have been imprudent to (1) interrupt the jury's deliberations near the end of the second week of trial; (2) send the jurors on their separate ways for an indefinite period of time as TIECO's counsel

reviewed the new evidence and otherwise prepared for a re-trial; (3) re-open the evidentiary phase of the trial; (4) reschedule summations; and (5) resubmit the case to the jury to resume its deliberations. Most probably, by the time that the case would have been resubmitted to the jurors, their individual and collective dimmed recollections of the original evidence would have been substantially compromised, and therefore most unlikely to produce a just verdict.

To declare a mistrial, impose monetary sanctions on USX, and schedule a retrial of USX's claims would also have been inadvisable. In compensatory damages, USX claims less than $60,000. This amount is considerably less than it paid its auditors in processing the case. USX's compensatory damages pale in comparison to the predictable cost of its attorneys' fees in the event of a retrial. It is a fair guess that TIECO is less than overjoyed by the prospect of incurring such fees for retrial of the case. Moreover, the Court's docket cannot accommodate a retrial of USX's claims at anytime in the near future.

It is significant that USX had fair warning of the likely consequences in the event the Court learned of its transgressions. In the related criminal prosecution of TIECO [FN4] and some of its officers/employees, the state court dismissed with prejudice the criminal prosecutions initiated at USX's behest. [FN5] *State of Alabama v. TIECO, Inc., et al.*, (Jefferson County Circuit Court, Nos. CC-96-2961, 2964, 2967, 2986, 2988, 2990- 2991, Opinion dated July 16, 1997). In doing so, Circuit Court Judge Garrett wrote:

> FN4. The jury found for TIECO on all of its counterclaims, including those for civil conspiracy. The civil conspiracy counterclaim is that USX conspired with the Office of the Attorney General of the State of Alabama, *inter alia*, to use the criminal process to collect a civil debt.

> FN5. The trial of this case was stayed during the pendency of the criminal proceedings. Had TIECO been convicted, liability in this case would have been established. The jury would only have tried the issue of damages.

The Defendants have presented extensive evidence of serious and wholesale prosecutorial misconduct by the Office of the Attorney General, its attorneys, investigators, and agents, throughout the initiation,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

investigation, and prosecution of this case. The Attorney General has failed to rebut this evidence.... The Court finds that even having been given every benefit of any doubt, the misconduct of the Attorney General in this case far surpasses in both *680 extensiveness and measure the totality of any prosecutorial misconduct ever previously presented to or witnessed by this court.

* * *

The dismissal of these indictments is fully justified in this case because this Court is dealing with more than just the mere failure to produce exculpatory evidence or with just a mere instance of prosecutorial misconduct. Based on the totality of circumstances in this case including: (1) the Attorney General's repeated refusals and failures to produce exculpatory evidence; (2) the Attorney General's repeated denials of the very existence of exculpatory evidence subsequently discovered by the Defendants; (3) the flagrant disregard of the constitutional rights of the accused; (4) the completely incredible and deceptive testimony of so many witnesses this court treated as officers of the court (some of whom were either assistants or agents for the Attorney General); and (5) the very patterns of prosecutorial misconduct which exist in this case; this Court can only conclude it is dealing with either intentional and deliberate misconduct or conduct so reckless and improper as to constitute conscious disregard for the lawful duties of the Attorney General and the integrity and dignity of this court and this judge.

Defendants' Exhibit ("DX") 1, pp. 1-2. Thus, as a virtual party to the criminal proceedings, USX was well aware of the substantial risk of a sanctions dismissal when it wilfully decided to suppress material evidence after such evidence had been repeatedly requested by TIECO, and when it apparently decided to intentionally deceive this Court about its suppression. It deliberately chose to run the risk of dismissal of its claims with prejudice if its misconduct were subsequently discovered.

If the dismissal with prejudice of its criminal charges against TIECO were not enough to dissuade USX from suppressing evidence and misleading the Court in the civil litigation of essentially the same issues, lesser sanctions would surely not suffice to deter similar misconduct by USX and others in the future.

It is doubtful that lesser sanctions would have sufficiently punished USX.

**Conclusion**

For all of the reasons explicated herein, the Court granted TIECO's motion to strike all of USX's claims, with prejudice.

**FINAL JUDGMENT**

In its Special Verdict, the Jury found as follows:

1. Plaintiff USX Corporation, in violation of Alabama law, engaged in a civil conspiracy with the Office of the Attorney General of the State of Alabama to unlawfully use the criminal process against Defendant TIECO to enhance its position in this civil case, and/or to utilize a search warrant to obtain the Defendant TIECO's business records and then to turn those records over to USX for its use in this case.

2. Plaintiff USX Corporation, acting under color of the authority of the State of Alabama by the authority conferred the Office of the Attorney General of Alabama, intentionally deprived Defendant TIECO of its federal constitutional rights under 42 U.S.C. § 1983.

3. Plaintiff USX Corporation maliciously prosecuted Defendant TIECO.

4. Plaintiff USX Corporation abused one or more of the processes of court, in violation of Defendant TIECO's rights under Alabama law.

5. Plaintiff USX Corporation defamed Defendant TIECO.

6. Plaintiff USX Corporation intentionally interfered with the business relationships of Defendant TIECO.

7. Plaintiff USX Corporation defamed Defendant Fletcher Yeilding.

8. Defendant TIECO suffered compensatory damages in the amount of Three Million Four Hundred Thousand Dollars ($3,400,000.00) as a proximate result of Plaintiff USX's violation of various laws of the State of Alabama.

*681 9. For USX Corporation's violation of TIECO's rights under the laws of Alabama, TIECO is entitled to One Million Seven Hundred Thousand Dollars ($1,700,000.00) as punitive damages.

10. For USX Corporation's intentional violation of 42 U.S.C. § 1983, TIECO is entitled to One Million Seven Hundred Thousand Dollars ($1,700,000.00).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

11. Defendant Fletcher Yeilding suffered One Hundred Twenty-Five Thousand Dollars ($125,000) in compensatory damages as a proximate result of USX's defamation.

12. Defendant Fletcher Yeilding is entitled to Two Hundred Fifty Thousand Dollars ($250,000.00) as punitive damages.

Based on the findings of the Jury, as embodied in its Special Verdict, judgments as a matter of law previously dictated into the record at the close of the evidence, and the contemporaneous Memorandum Opinion, **FINAL JUDGMENT** is hereby entered as follows:

1. Plaintiff Heatherwood Golf Club, Inc., shall have and recover nothing of the Defendants.

2. The claims of Plaintiff USX Corporation against Defendants TIECO, Inc., and ATOZ Management, Inc., are hereby DISMISSED, with prejudice, as a sanction.

3. Defendant/counterclaimant TIECO, Inc., shall have and recover from Plaintiff/counterdefendant USX Corporation the sum of Three Million Four Hundred Thousand Dollars ($3,400,000.00) as compensatory damages and Three Million Four Hundred Thousand Dollars ($3,400,000.00) as punitive damages.

4. Defendant/counterclaimant FLETCHER YEILDING shall have and recover from Plaintiff/counterdefendant USX Corporation the sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) as compensatory damages and Two Hundred Fifty Thousand Dollars ($250,000.00) as punitive damages.

5. On its claim brought under 42 U.S.C. § 1983, Defendant/counterclaimant TIECO is entitled to a reasonable attorney's fee, to be hereafter set by the Court in the absence of agreement between the parties. Within fifteen (15) days of the date of this Order, counsel for TIECO shall file a statement of their hours expended, services rendered, expenses incurred, and fee demanded on the civil rights claim. The Court shall subsequently set down the matter for hearing.

The costs of this action are hereby taxed against Plaintiff USX Corporation.

189 F.R.D. 674, 45 Fed.R.Serv.3d 1390

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

99 NOV -9 PM 3: 50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| USX CORPORATION, et al., | ) | **ENTERED** *sub* |
| | ) | |
| Plaintiffs, | ) | NOV 0 9 1999 |
| | ) | |
| vs. | ) | CIVIL ACTION NUMBER |
| | ) | |
| TIECO, INC., et al., | ) | 95-C-3237-S |
| | ) | |
| Defendants. | ) | |

**FINAL JUDGMENT**

In its Special Verdict, the Jury found as follows:

1. Plaintiff USX Corporation, in violation of Alabama law, engaged in a civil conspiracy with the Office of the Attorney General of the State of Alabama to unlawfully use the criminal process against Defendant TIECO to enhance its position in this civil case, and/or to utilize a search warrant to obtain the Defendant TIECO's business records and then to turn those records over to USX for its use in this case.

2. Plaintiff USX Corporation, acting under color of the authority of the State of Alabama by the authority conferred the Office of the Attorney General of Alabama, intentionally deprived Defendant TIECO of its federal constitutional rights under 42 U.S.C. § 1983.

3. Plaintiff USX Corporation maliciously prosecuted Defendant TIECO.

4. Plaintiff USX Corporation abused one or more of the processes of court, in violation of Defendant TIECO's rights under Alabama law.

5. Plaintiff USX Corporation defamed Defendant TIECO.

6. Plaintiff USX Corporation intentionally interfered with the business relationships of Defendant TIECO.

309

7. Plaintiff USX Corporation defamed Defendant Fletcher Yeilding.

8. Defendant TIECO suffered compensatory damages in the amount of Three Million Four Hundred Thousand Dollars ($3,400,000.00) as a proximate result of Plaintiff USX's violation of various laws of the State of Alabama.

9. For USX Corporation's violation of TIECO's rights under the laws of Alabama, TIECO is entitled to One Million Seven Hundred Thousand Dollars ($1,700,000.00) as punitive damages.

10. For USX Corporation's intentional violation of 42 U.S.C. § 1983, TIECO is entitled to One Million Seven Hundred Thousand Dollars ($1,700,000.00).

11. Defendant Fletcher Yeilding suffered One Hundred Twenty-Five Thousand Dollars ($125,000) in compensatory damages as a proximate result of USX's defamation.

12. Defendant Fletcher Yeilding is entitled to Two Hundred Fifty Thousand Dollars ($250,000.00) as punitive damages.

Based on the findings of the Jury, as embodied in its Special Verdict, judgments as a matter of law previously dictated into the record at the close of the evidence, and the contemporaneous Memorandum Opinion, **FINAL JUDGMENT** is hereby entered as follows:

1. Plaintiff Heatherwood Golf Club, Inc., shall have and recover nothing of the Defendants.

2. The claims of Plaintiff USX Corporation against Defendants TIECO, Inc., and ATOZ Management, Inc., are hereby DISMISSED, with prejudice, as a sanction.

3. Defendant/counterclaimant TIECO, Inc., shall have and recover from Plaintiff/counterdefendant USX Corporation the sum of Three Million Four Hundred Thousand Dollars ($3,400,000.00) as compensatory damages and Three Million Four Hundred Thousand Dollars ($3,400,000.00) as punitive damages.

2

4. Defendant/counterclaimant FLETCHER YEILDING shall have and recover from Plaintiff/counterdefendant USX Corporation the sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) as compensatory damages and Two Hundred Fifty Thousand Dollars ($250,000.00) as punitive damages.

5. On its claim brought under 42 U.S.C. § 1983, Defendant/counterclaimant TIECO is entitled to a reasonable attorney's fee, to be hereafter set by the Court in the absence of agreement between the parties. Within fifteen (15) days of the date of this Order, counsel for TIECO shall file a statement of their hours expended, services rendered, expenses incurred, and fee demanded on the civil rights claim. The Court shall subsequently set down the matter for hearing.

The costs of this action are hereby taxed against Plaintiff USX Corporation.

DONE this _____ 9th _____ day of November, 1999.

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON

3

E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

USX CORPORATION AND )
HEATHERWOOD GOLF CLUB, INC. )
)
*Plaintiffs,* )
)
v. )  CIVIL ACTION NUMBER
)  95-C-3237-S
TIECO, INC.; ATOZ MANAGEMENT, )
INC.; AND FLETCHER YIELDING, )
)
*Defendants/Counterclaimants* )
)

MEMORANDUM OPINION AWARDING ATTORNEYS' FEES AND COSTS

Defendants' (hereinafter collectively referred to as "Tieco") attorneys, the law firm of White, Dunn, and Booker originally petitioned the Court to award them Two Hundred Fifty-Two Thousand, Nine Hundred Seventy Dollars and Seventy-Six Cents ($2,252,970.76) for legal services rendered and incidental costs incurred in representing Defendants/Counterclaimants in the *USX v. Tieco* civil proceeding. This number reflects 5,627.4 hours billed at $250 per hour, minus fees claimed in defending the criminal case, plus costs and expenses, and a 100% enhancement.

On March 3, 2000, an attorney's fee hearing was held at the Hugo L. Black Federal Courthouse in Birmingham, Alabama. Counsel for both parties stipulated that Tieco's attorneys expended 3,853.5 hours in the prosecution of its section 1983 claims. The Court allowed Tieco's attorneys ten days to file an *Amended Bill of Costs* and a supporting brief.

Based upon a review of the *Verified Attorney's Fee Application*, the supporting and opposing memoranda of law, and the *Amended Bill of Costs*, the Court makes the following findings:

1. J. Mark White expended 1,579.94 hours in prosecuting this case. Attorney White will be compensated at the rate of three hundred dollars ($300.00) per hour.

2. Linda G. Flippo expended 1,734.08 hours in prosecuting this case. Attorney Flippo will be compensated at the rate of two hundred twenty-five dollars ($225.00) per hour.

3. Stephen R. Arnold expended 269.74 hours in prosecuting this case. Attorney Arnold will be compensated at the rate of two hundred fifty dollars ($250.00) per hour.

4. William M. Bowen expended 192.67 hours in prosecuting this case. Attorney Bowen will be compensated at the rate of two hundred fifty dollars ($250.00) per hour.

5. George W. Andrews expended 77.07 hours in prosecuting this case. Attorney Andrews will be compensated at the rate of two hundred fifty dollars ($250) per hour.

6. Due to the unusual circumstances of this case, the exceptional results earned by the White, Dunn, and Booker law firm, and as a further sanction for Plaintiffs' contumacious conduct, the lodestar for the respective Tieco attorneys will be enhanced by

one third.[1]

      7. Defendants' counsel incurred One Hundred Ten Thousand, Seven Hundred and Forty-Four Dollars and Forty-One Cents ($110,744.41) in litigation costs prosecuting the section 1983 claims.

      For the foregoing reasons, the Court concludes that Defendant's counsel is entitled to One Million Four Hundred Forty-Two Thousand Seven Hundred Sixty-Nine Dollars and Twenty-Seven Cents ($1,442,769.27) for services rendered and costs incurred prosecuting this action in court.

      DONE this 28ᵗʰ day of ___April___, 2000.

                                         UNITED STATES DISTRICT JUDGE
                                           U.W. CLEMON

---

[1] As a result of the one-third enhancement, the respective lodestar for each attorney is $400 for Mark White; $333.33 for Stephen R. Arnold, William M. Bowen, and George W. Andrews; $300 for Linda Flippo.

F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN  DIVISION

CO ... -8  AH 10: 14
U.S. .......  COURT
N.D. OF ALABAMA

| | |
|---|---|
| USX CORPORATION and | ) |
| HEATHERWOOD GOLF CLUB, INC., | ) |
| | ) |
| Plaintiffs/Counterclaim Defendants, | ) |
| | ) |
| v. | ) Civil Action  No.  CV 99-C-3237-S |
| | ) |
| TIECO, INC., ATOZ MANAGEMENT, INC., | ) |
| and FLETCHER YIELDING, an Individual, | ) |
| | ) |
| Defendants/Counterclaim Plaintiffs. | ) |

## NOTICE OF APPEAL

Notice is hereby given that USX Corporation ("USX") and Heatherwood Golf Club,

Inc., ("Heatherwood"), plaintiffs/counterclaim defendants in the above-styled case, hereby appeal

to the United States Court of Appeals for the Eleventh Circuit from (1) the Order of the District

Court granting summary judgment in favor of Fletcher Yielding on USX's claims and the final

judgment entered thereon on August 11, 1999; (2) the Order of the District Court dated October 26,

1999, entering judgment as a matter of law on Heatherwood's claims against TIECO, Inc.

("TIECO") and the final judgment entered thereon on November 9, 1999; (3) the Order of the

District Court dated October 28, 1999, dismissing USX's claims against TIECO and ATOZ

Management, Inc., and the final judgment entered thereon on November 9, 1999; (4) the final

judgment in favor of TIECO and Fletcher Yielding in the amount of $7,175,000 on their

counterclaims against USX; and (5) the Order of the District Court dated February 8, 2000, denying

1

USX and Heatherwood's Renewed Motion for Judgment as a Matter of Law, New Trial or Remittitur and Motion To Vacate Judgment of Dismissal.

One of the Attorneys for the
Plaintiffs/Counterclaim Defendants
USX Corporation and Heatherwood Golf
Club, Inc.

OF COUNSEL:

Warren B. Lightfoot (LIGHW9552)
Jere F. White, Jr. (WHITJ1759)
William O. Hutchinson (HUTCW4361)
**LIGHTFOOT, FRANKLIN & WHITE, L.L.C.**
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)

OF COUNSEL:

John J. Dalton, Esquire
June Ann Sauntry, Esquire
William N. Withrow, Jr., Esquire
**TROUTMAN SANDERS, LLP**
Bank of America Plaza
600 Peachtree Street, N.E., Suite 5200
Atlanta, Georgia  30308-2216

2

OF COUNSEL:

John B. Tally, Jr., Esquire
William Waudby, Esquire
**LANGE, SIMPSON, ROBINSON & SOMERVILLE**
417 20th Street North
Suite 1700
Birmingham, AL  35203-3217

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel listed below by placing a copy in the U.S. Mail properly addressed and first class postage prepaid on this _8th_ day of _March_ , 2000.

J. Mark White, Esquire
Linda G. Flippo, Esquire
Steve Arnold, Esquire
**WHITE, DUNN & BOOKER**
290 21st Street North
Suite 600
Birmingham, AL  35203

OF COUNSEL

3

UNITED STATES DISTRICT COURT
Northern District of Alabama
Office of the Clerk
Hugo L. Black United States Courthouse
Room 140, 1729 5th Avenue North
Birmingham, Alabama 35203
(205) 278-1700

March 9, 2000

Mr. Thomas K. Kahn, Clerk
U.S. Court of Appeals, 11th Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

U.S.D.C. No. CV-95-C-3237-S
U.S.C.A. No.
IN RE: USX CORP; et al vs. TIECO, INC; et al

Enclosed are documents regarding an appeal in this matter.  Please acknowledge receipt on the enclosed copy of this transmittal.

X   Certified copy of Notice of Appeal, Docket Entries and Judgment/Order and Opinion appealed from enclosed.  Please check if judgment was oral:

    Certified record supplemental record on appeal consisting of:  volume(s) of pleadings, etc.;  volume(s) of transcripts;

X   First Notice of Appeal? YES Dates of other Notices:

    The following materials SEALED in this court (order enclosed) consisting of:

    Original papers (court file) and certified copy of docket entries per USCA request.

    There was no hearing from which a transcript could be made.

    Copy of CJA Form 20 or District Court order appointing counsel.

X   The appellant docket fee has been paid.  YES Date Paid: 3/8/00

    The appellant has been leave to appeal in forma pauperis and  a request for certificate of probable cause (order enclosed).

X   The Judge/Magistrate Judge appealed from is: U W CLEMON

X   The Court Reporter is: THOMAS E DEMPSEY  205-252-6565.

    This is a BANKRUPTCY APPEAL.  Please send notice of final order and/or opinion to: William C. Redden, Clerk, U.S. Bankruptcy Court, 1800 5th Avenue North, Birmingham, Alabama 35203.

    This is a DEATH PENALTY appeal.

    Other:

xc: Counsel                    Perry D. Mathis, Clerk

                               By: _Shirley Brown_
                                   Deputy Clerk

337

G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
00 MAY 25 PM 1: 27
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| USX CORPORATION and<br>HEATHERWOOD GOLF CLUB, INC., | )<br>)<br>) |
| Plaintiffs/Counterclaim Defendants, | )<br>) |
| v. | ) Civil Action  No.  CV 95-C-3237-S<br>) |
| TIECO, INC., ATOZ MANAGEMENT, INC.,<br>and FLETCHER YEILDING, an Individual, | )<br>)<br>) |
| Defendants/Counterclaim Plaintiffs. | )<br>) |

## NOTICE OF APPEAL

Notice is hereby given that USX Corporation and Heatherwood Golf Club, Inc.,

plaintiffs/counterclaim defendants in the above-styled case, hereby appeal to the United States Court

of Appeals for the Eleventh Circuit from the Order of the District Court dated and entered on April

28, 2000, and the Judgment entered thereon on May 24, 2000, awarding attorneys' fees and costs

to defendants/counterclaim plaintiffs' counsel.

_____
One of the Attorneys for the
 Plaintiffs/Counterclaim Defendants
USX Corporation and Heatherwood Golf
Club, Inc.

1

352

OF COUNSEL:

Warren B. Lightfoot (LIGHW9552)
Jere F. White, Jr. (WHITJ1759)
William O. Hutchinson (HUTCW4361)
**LIGHTFOOT, FRANKLIN & WHITE, L.L.C.**
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 (fax)


OF COUNSEL:

John J. Dalton, Esquire
June Ann Sauntry, Esquire
William N. Withrow, Jr., Esquire
**TROUTMAN SANDERS, LLP**
Bank of America Plaza
600 Peachtree Street, N.E., Suite 5200
Atlanta, Georgia  30308-2216


OF COUNSEL:

John B. Tally, Jr., Esquire
William Waudby, Esquire
**LANGE, SIMPSON, ROBINSON & SOMERVILLE**
417 20th Street North
Suite 1700
Birmingham, AL  35203-3217

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel listed below by placing a copy in the U.S. Mail properly addressed and first class postage prepaid on this _25th_ day of _May_____, 2000.

J. Mark White, Esquire
Linda G. Flippo, Esquire
Steve Arnold, Esquire
**WHITE, DUNN & BOOKER**
2025 Third Avenue North
Suite 600
Birmingham, AL 35203

_____
OF COUNSEL

3

UNITED STATES DISTRICT COURT
Northern District of Alabama
Office of the Clerk
Hugo L. Black United States Courthouse
Room 140, 1729 5th Avenue North
Birmingham, Alabama 35203
(205) 278-1700

May 26, 2000

Mr. Thomas K. Kahn, Clerk
U.S. Court of Appeals, 11th Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

U.S.D.C. No. CV-95-C-3237-S
U.S.C.A. No.
IN RE: USX CORPORATION, et al vs. TIECO, INC, et al

Enclosed are documents regarding an appeal in this matter.  Please acknowledge receipt on the enclosed copy of this transmittal.

X    Certified copy of Notice of Appeal, Docket Entries and Judgment/Order and Opinion appealed from enclosed.  Please check if judgment was oral:

     Certified record  supplemental record on appeal consisting of:  volume(s) of pleadings, etc.;  volume(s) of transcripts;

X    First Notice of Appeal? NO Dates of other Notices: 3/8/00

     The following materials SEALED in this court (order enclosed) consisting of:

     Original papers (court file) and certified copy of docket entries per USCA request.

     There was no hearing from which a transcript could be made.

     Copy of CJA Form 20 or District Court order appointing counsel.

X    The appellant docket fee has been paid.  Yes  Date Paid: 5/25/00

     The appellant has been  leave to appeal in forma pauperis and  a request for certificate of probable cause (order enclosed).

X    The Judge/Magistrate Judge appealed from is: U W CLEMON

X    The Court Reporter is: THOMAS E. DEMPSEY  205-252-6565.

     This is a BANKRUPTCY APPEAL.  Please send notice of final order and/or opinion to: William C. Redden, Clerk, U.S. Bankruptcy Court, 1800 5th Avenue North, Birmingham, Alabama 35203.

     This is a DEATH PENALTY appeal.

     Other:

xc:  Counsel

Perry D. Mathis, Clerk

By: _____
Deputy Clerk

352

H

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 MAY 24 PM 2:37

U.S. DISTRICT COURT
N.D. OF ALABAMA

USX CORPORATION, et al., )
)
    Plaintiffs, )
)
v. )           Case No. CV-95-C-3237-S
)
TIECO, INC., et al., )
)
    Defendants/ )
    Counterclaimants. )

GRANTED

_____ 6/6/00
JUDGE              DATE

JUN 6 2000

## MOTION TO SUPPLEMENT RECORD

Come now TIECO, Inc., ATOZ Management, Inc. and Fletcher
Yeilding (collectively referred to as "TIECO"), by and through
counsel, and hereby move this Honorable to supplement the record in
this case to include documents recently produced by Plaintiffs.
For grounds, TIECO would show unto the Court as follows:

1.   On November 2, 1999, subsequent to the trial of this
case, TIECO filed a Motion for an Order to Produce and Preserve
Evidence to direct USX to preserve and produce any and all
documents in its possession related to the Cushman vehicles. (Doc.
306)

2.   On November 18, 1999, USX produced a file folder
containing certain records relating to Cushman vehicles that had
been discovered in the office of USX's counsel.   (Attachment A)
Those documents were marked at Court Exhibit 13.

3.   Also on November 18, 1999, USX confirmed its agreement to
make another search of the Engineering Department and/or

355

(35)

Reclamation Office and to preserve and produce any documents that were located.  (Attachment B)

    3.  On May 11, 2000, USX produced approximately 100 pages of records Bates numbered 07451 through 07554.   (Attachment C) Included in the production were:

| Bates No. | Description |
|---|---|
| 07451-07466 | Excerpts from the Mobile Equipment Report dated February 18, 1993 and pages listing information about various Cushman vehicles |
| 07467-07489 | Depreciable Property Facility Inventory Listing dated September 30, 1999 |
| 07490-07504 | Retired Property Facility Inventory Listing dated September 30, 1999 |
| 07505-07534 | Documents evidencing the sale of the 36 Cushman vehicles to Western Steel Inc. on July 9, 1996, including the Order Acknowledgement, a copy of the purchase check, PT Order Form(s), Bid Form(s) |
| 07535-07546 | Memos from P.K. Kacmarcik to K.H. Koch, Corporate Manager of Facility Redeployment dated July and August of 1996 re Facility Redeployment Activities |
| 07547-07549 | Memo from P.K. Kacmarcik to W. Lewis, General Manager of Fairfield Works dated January 15, 1997 re Facility Redeployment Activities at Fairfield |
| 07550 | Memo from J.A. Dobrinski to Accounting and Demolition dated May 20, 1996 re Surplus Scooters with handwritten note |
| 07551 | Same as 07550 without note |
| 07552 | Listing of four Cushman vehicles entitled Fixed Assets - Scooters May, 1996 |

07553          Memo from Kacmarcik to Don Giles dated May 3,
               1996 re Surplus Scooters, approved by Steve
               Filipowski

07554          Listing of Scooters Available for Disposal
               dated April 29, 1996 (See Defendant's Exhibit
               66)

4.  On May 15, 2000, counsel for TIECO wrote USX requesting information as to where the documents were located, when they were located and by whom.  TIECO further requested information as to when USX provided the records to counsel for production.  TIECO also advised USX that page numbered 07542 was missing from the production.  (Attachment D)

5.  On May 16, 2000, in response to TIECO's request, USX provided the missing page.  However, as of the filing of this motion, USX has failed to provide the requested information regarding the location of these records.  (Attachment E)

6.  These records were requested by TIECO and should have been produced during the discovery process in this case.  Further, these are exactly the type of records that were the subject of the pre-trial hearing that lead to this Court's preclusion order and subsequent order dismissing USX's claims.  It is apparent from the face of the records that they were either generated by or received by the Purchasing Department in Pittsburgh as well as the Facility Redeployment office at Fairfield Works.

WHEREFORE, PREMISES CONSIDERED, TIECO respectfully requests the Court supplement the record in this case by directing that

3

Attachments C and E be made Court Exhibit No. 14.

                        J. Mark White
                        Linda G. Flippo
                        Stephen R. Arnold

OF COUNSEL:
WHITE, DUNN & BOOKER
2025 Third Avenue North
Suite 600
Birmingham, Alabama 35203
(205) 323-1888

## CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing
pleading on the following counsel of record by placing a copy in
the United States Mail, properly addressed and postage prepaid, on
this the 24th day of May, 2000:

John B. Tally, Jr.
William L. Waudby
Todd M. Higey
Lange, Simpson, Robinson
 & Somerville
417 20th Street North
Suite 1700
Birmingham, Alabama 35203-3217


Warren B. Lightfoot
Jere F. White
William O. Hutchinson
Lightfoot, Franklin & White, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203

John J. Dalton
June Ann Sauntry
William N. Withrow
Troutman Sanders, LLP
Bank of America Plaza
600 Peachtree St., NE
Suite 5200
Atlanta, Georgia 30308-2216

_____
Of Counsel

**Westlaw.**

261 F.3d 1275
261 F.3d 1275, 57 Fed. R. Evid. Serv. 1350, 14 Fla. L. Weekly Fed. C 1130
(Cite as: 261 F.3d 1275)

Page 1

**H**
Briefs and Other Related Documents

United States Court of Appeals,
Eleventh Circuit.

UNITED STATES STEEL, LLC, Heatherwood Golf
Club, Inc., Plaintiffs-
Appellants-Counterclaim Defendants,
v.
TIECO, INC., Atoz Management, Inc., Fletcher
Yielding, Defendants-Appellees-
Counterclaim Plaintiffs.

**Nos. 00-11309, 00-12842.**

Aug. 17, 2001.

Steel company and its subsidiary brought suit against
equipment vendor, vendor's management arm, and
vendor's principal, under Racketeer Influenced and
Corrupt Organizations Act (RICO). Defendants
counterclaimed, asserting claims under § 1983, and
state law. The United States District Court for the
Northern District of Alabama, No. 95-03237-CV-C-
S, U.W. Clemon, Chief Judge, granted summary
judgment to principal, granted judgment as a matter
of law to defendants on subsidiary's claims,
dismissed steel company's claims as a sanction for
discovery violations, 189 F.R.D. 674, and entered
judgment on jury verdict for defendants on
counterclaims. Appeals were taken. The Court of
Appeals, Black, Circuit Judge, held that: (1) district
court committed reversible error by admitting state
court opinion dismissing criminal charges against
vendor, which arose from criminal investigation in
which steel company had cooperated; (2) steel
company's cooperation in investigation did not
violate vendor's rights under due process clause, or
Fourth Amendment; (3) steel company had probable
cause to institute underlying criminal proceeding; (4)
steel company did not commit torts of abuse of
process, or interference with business relations; and
(5) statement by steel company's outside counsel
regarding vendor which invoked name of Jeffrey
Dahmer was not actionable.

Affirmed in part, reversed in part, and vacated and
remanded in part.

West Headnotes

**[1] Courts ⚖107**
106k107 Most Cited Cases
An affirmance by an unpublished opinion pursuant
to Circuit Rule has no precedential value. U.S.Ct. of
App. 11th Cir.Rule 36-1, 28 U.S.C.A.

**[2] Federal Courts ⚖823**
170Bk823 Most Cited Cases
Rulings on the admission of evidence are reviewed
for abuse of discretion.

**[3] Federal Courts ⚖896.1**
170Bk896.1 Most Cited Cases
**[3] Federal Courts ⚖901.1**
170Bk901.1 Most Cited Cases
An error on an evidentiary ruling will result in the
reversal of a jury's verdict only if a party establishes a
substantial prejudicial effect or a manifest injustice.

**[4] Evidence ⚖146**
157k146 Most Cited Cases
Rule permitting the exclusion of relevant evidence
on grounds of prejudice, confusion, or waste of time
involves balancing, on the one side, the evidence's
probative value and, on the other side, the evidence's
dangers, including its unfairly prejudicial and
misleading nature. Fed.Rules Evid.Rule 403, 28
U.S.C.A.

**[5] Evidence ⚖314(1)**
157k314(1) Most Cited Cases
Hearsay evidence is disfavored because it is not
subjected to oath, the rigors of cross-examination, or
the first-hand scrutiny of the jury.

**[6] Federal Civil Procedure ⚖2011**
170Ak2011 Most Cited Cases
In the context of the confrontation clause, hearsay
that does not fall within a firmly-rooted exception is
presumed unreliable. U.S.C.A. Const.Amend. 6.

**[7] Federal Civil Procedure ⚖2011**
170Ak2011 Most Cited Cases
Confrontation clause is not applicable to civil cases.
U.S.C.A. Const.Amend. 6.

**[8] Evidence ⚖146**
157k146 Most Cited Cases
Probative value of opinion in which state court judge
dismissed criminal charges against corporate
equipment vendor, based on prosecutorial
misconduct, was substantially outweighed by its
prejudicial effect, so that opinion was not admissible
during civil action in which steel company, and its
subsidiary, asserted Racketeer Influenced and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

261 F.3d 1275    Case 2:01-cv-01372-SLB   Document 39   Filed 11/12/04   Page 124 of 159   Page 2

261 F.3d 1275, 57 Fed. R. Evid. Serv. 1350, 14 Fla. L. Weekly Fed. C 1130

**(Cite as: 261 F.3d 1275)**

Corrupt Organizations Act (RICO) claims against vendor and its principal, and vendor and principal asserted counterclaims; opinion, including findings of fact neatly conforming to allegations of vendor and principal, contained particularly unreliable and misleading hearsay, which were rendered more prejudicial after they were adopted by judge. 18 U.S.C.A. § 1961; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[9] Evidence ☞332(1)**

157k332(1) Most Cited Cases

At common law, a judgment from another case could not be admitted into evidence.

**[10] Federal Courts ☞896.1**

170Bk896.1 Most Cited Cases

Abuse of discretion by district court in admitting into evidence opinion in which state court judge dismissed criminal charges against corporate equipment vendor, based on prosecutorial misconduct, and made factual findings which neatly conformed to vendor's allegations, was reversible error in suit in which steel company, and its subsidiary, asserted Racketeer Influenced and Corrupt Organizations Act (RICO) claims against vendor and its principal, and vendor and principal asserted counterclaims. 18 U.S.C.A. § 1961; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**[11] Federal Courts ☞776**

170Bk776 Most Cited Cases

Court of Appeals reviews de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[12] Federal Courts ☞381**

170Bk381 Most Cited Cases

**[12] Federal Courts ☞382.1**

170Bk382.1 Most Cited Cases

**[12] Federal Courts ☞386**

170Bk386 Most Cited Cases

In considering claims based on state law, federal court is bound to decide the claim the way it appears the state's highest court would.

**[13] Federal Civil Procedure ☞2127**

170Ak2127 Most Cited Cases

In considering motion for judgment as a matter of law, a court considers the evidence in the light most favorable to the non-movant, and grants all reasonable inferences in favor of the non-movant. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[14] Federal Civil Procedure ☞2146**

170Ak2146 Most Cited Cases

A non-movant must present more than a mere scintilla of evidence to withstand motion for

judgment as a matter of law. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[15] Federal Civil Procedure ☞2152**

170Ak2152 Most Cited Cases

A court should deny a motion for judgment as a matter of law only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[16] Civil Rights ☞1324**

78k1324 Most Cited Cases

(Formerly 78k196.1)

To violate § 1983 a party must be acting under color of state law. 42 U.S.C.A. § 1983.

**[17] Civil Rights ☞1027**

78k1027 Most Cited Cases

(Formerly 78k108.1)

To state a claim under § 1983, a party must prove a violation of a particular constitutional or federal statutory provision. 42 U.S.C.A. § 1983.

**[18] Civil Rights ☞1437**

78k1437 Most Cited Cases

(Formerly 78k245)

Instruction which was empty of any substance, and did little more than restate text of Fourth Amendment, was inadequate in § 1983 action brought by equipment vendor to steel company to which it supplied products, in which vendor alleged that steel company had violated vendor's Fourth Amendment rights when it acted in concert with state attorney general's office in connection with criminal investigation of vendor's conduct. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[19] Civil Rights ☞1304**

78k1304 Most Cited Cases

(Formerly 78k192)

Like all causes of action, constitutional claims have elements which the claimant must prove.

**[20] Constitutional Law ☞257**

92k257 Most Cited Cases

**[20] Criminal Law ☞36.6**

110k36.6 Most Cited Cases

Cooperation by steel company with criminal investigation by state attorney general's office into actions of equipment vendor from which steel company had purchased supplies, which resulted in criminal charges being brought, did not violate vendor's due process rights, and thus could not support § 1983 claim against steel company; vendor had no substantive due process right to be free from criminal prosecution, and prosecution, while ultimately successful, was supported by probable cause, so that no procedural due process violation could have occurred. U.S.C.A. Const.Amend. 14; 42

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

261 F.3d 1275
261 F.3d 1275, 57 Fed. R. Evid. Serv. 1350, 14 Fla. L. Weekly Fed. C 1130
**(Cite as: 261 F.3d 1275)**

U.S.C.A. § 1983.

**[21] Constitutional Law** ☞257
92k257 Most Cited Cases
 A person has no right under substantive component of due process clause to be free from criminal prosecution without probable cause. U.S.C.A. Const.Amend. 14.

**[22] Searches and Seizures** ☞124
349k124 Most Cited Cases
 A warrant, and its corresponding search, violates the Fourth Amendment if it fails to specify the place to be searched and the items to be seized, if it is issued by an official who is not neutral and detached, if it is procured by a false statement made intentionally or recklessly, or if it is not supported by probable cause. U.S.C.A. Const.Amend. 4.

**[23] Searches and Seizures** ☞33
349k33 Most Cited Cases
 Steel company did not violate Fourth Amendment rights of equipment vendor from which it had purchased supplies when it agreed to delay its audit of equipment vendor, which had allegedly engaged in billing irregularities in connection with its shipments to steel company, until state attorney general's office, which was conducting criminal investigation of vendor, could produce probable cause for a search warrant. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[24] Malicious Prosecution** ☞16
249k16 Most Cited Cases
 To prevail on a malicious prosecution claim under Alabama law, plaintiff must show that (1) a prior judicial proceeding was instituted by the defendant, (2) the defendant acted without probable cause in the prior proceeding, (3) the defendant acted with malice in instituting the prior proceeding, (4) the prior proceeding ended in favor of the plaintiff. and (5) the plaintiff was damaged.

**[25] Malicious Prosecution** ☞24(7)
249k24(7) Most Cited Cases
 Under Alabama law, grand jury indictments are prima facie evidence that a judicial proceeding was supported by probable cause, and thus will not support malicious prosecution claim; this prima facie evidence is rebutted if the indictments were induced by fraud, subornation, suppression of testimony, or other like misconduct by party seeking the indictment.

**[26] Malicious Prosecution** ☞18(1)
249k18(1) Most Cited Cases
 Under Alabama law, "probable cause" to institute judicial proceeding, existence of which will bar any subsequent malicious prosecution claim arising from proceeding, is a reasonable ground for suspicion,

supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.

**[27] Malicious Prosecution** ☞18(1)
249k18(1) Most Cited Cases
 In determining whether probable cause existed to institute prior judicial proceeding, so that subsequent malicious prosecution claim arising from proceeding will be barred under Alabama law, the facts should not be viewed in hindsight, but rather, at the time the prosecution is instituted.

**[28] Malicious Prosecution** ☞71(2)
249k71(2) Most Cited Cases
 Under Alabama law, where material facts are disputed, the issue of probable cause is for the jury in a malicious prosecution action, but where the material facts are not disputed, the issue is one of law for the court; put another way, if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution.

**[29] Malicious Prosecution** ☞18(2)
249k18(2) Most Cited Cases
 Steel company reasonably suspected that equipment vendor from which it had purchased products had engaged in criminal activity in connection with its billing procedures, and thus had probable cause to commence criminal proceeding against vendor, so that vendor could not maintain suit under Alabama law against steel company for malicious prosecution after criminal charges were dismissed; while vendor may have had an innocent explanation for system in which steel company was billed for items that were not delivered, system on its face gave steel company a reasonable ground for suspecting fraud.

**[30] Process** ☞168
313k168 Most Cited Cases
 Elements of an abuse of process claim under Alabama law are abuse of a judicial process, malice, and an ulterior purpose.

**[31] Process** ☞170
313k170 Most Cited Cases
**[31] Process** ☞171
313k171 Most Cited Cases
 Under Alabama law, steel company which had participated in state attorney general's criminal investigation into billing practices of equipment vendor from which company had purchased supplies was not responsible for issuance of, and thus did not abuse the process of, criminal search warrant that was issued for vendor's premises; while steel company cooperated with investigation both before and after

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

issuance of warrant, it did not control or influence, or even participate in, decision to seek and execute warrant.

**[32] Process** ☞168
313k168 Most Cited Cases
Process that is challenged in a suit for abuse of process under Alabama law must be a judicial one.

**[33] Torts** ☞10(1)
379k10(1) Most Cited Cases
To prove tortious interference with business relations under Alabama law, plaintiff must show (1) the existence of a contract or business relation, (2) defendant's knowledge of the contract or business relation, (3) intentional interference by the defendant with the contract or business relation, (4) absence of justification for the defendant's interference, and (5) damage to the plaintiff as the result of the defendant's interference; in addition, a plaintiff must show some evidence of fraud, force, or coercion on the defendant's part.

**[34] Torts** ☞10(3)
379k10(3) Most Cited Cases
Minimal interactions between steel company, and suppliers of equipment vendor from which steel company had made purchases, including presence of suppliers while steel company was reviewing billing records of vendor which had been seized during criminal investigation, did not constitute tortious interference with vendor's business relations under Alabama law; nothing indicated that steel company intentionally interfered with a contract or business relation, and there was no indication of the use of fraud, force, or coercion by steel company.

**[35] Libel and Slander** ☞123(1)
237k123(1) Most Cited Cases
Under Alabama law, whether a statement is reasonably capable of defamatory meaning is a question of law for the court.

**[36] Libel and Slander** ☞80
237k80 Most Cited Cases
To state a defamation claim in Alabama, a plaintiff must allege (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication of that statement to a third party, (3) fault amounting at least to negligence on the part of the defendant, and (4) either actionability of the statement irrespective of special harm, or the existence of special harm caused by the publication of the statement.

**[37] Libel and Slander** ☞6(1)
237k6(1) Most Cited Cases
A statement is defamatory under Alabama law if it tends to harm the reputation of another as to lower him in the estimation of the community, or to deter

third persons from associating or dealing with him.

**[38] Libel and Slander** ☞19
237k19 Most Cited Cases
Under Alabama law, when analyzing an allegedly defamatory statement, a court must give the statement's language the meaning that would be ascribed to the language by a reader or listener of average or ordinary intelligence, or by a common mind.

**[39] Libel and Slander** ☞19
237k19 Most Cited Cases
To be actionable under Alabama law, alleged defamatory matter must be construed in connection with other parts of the conversation or publication, and the circumstances of its publication.

**[40] Libel and Slander** ☞86(4)
237k86(4) Most Cited Cases
Under Alabama law, once a plaintiff has alleged that the statement defamed him in a certain manner, the plaintiff is thereafter bound by that construction of the statement.

**[41] Libel and Slander** ☞9(7)
237k9(7) Most Cited Cases
Under Alabama law, statement by outside counsel representing steel company that conduct of equipment vendor, which had supplied products to steel company, and its principal, in filing ethics complaint regarding allegedly illegal investigation by state attorney general's office and steel company, which was cooperating in investigation, was "the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet," could not reasonably be construed as defamatory in sense that vendor and its principal were comparable in some fashion to a convicted mass murder.

**[42] Conspiracy** ☞1.1
91k1.1 Most Cited Cases
Under Alabama law, civil conspiracy is not an independent action; rather, a plaintiff must have a viable underlying cause of action.

**[43] Federal Civil Procedure** ☞2735
170Ak2735 Most Cited Cases
A court may only tax costs as authorized by statute.
**\*1279** William L. Waudby, John B. Tally, Jr., Lange, Simpson, Robinson & Somerville, Warren B. Lightfoot, William O. Hutchinson, Jere F. White, Jr., Lightfoot Franklin White & Lucas, Birmingham, AL, John J. Dalton, June Ann Sauntry, Troutman, Sanders, Atlanta, GA, for Appellants.

Linda G. Flippo, J. Mark White, William M. Bowen, Jr., White, Dunn and Booker, Birmingham, AL, for Appellees.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Appeals from the United States District Court for the Northern District of Alabama.

Before BLACK, RONEY and COX, Circuit Judges.

BLACK, Circuit Judge:

Appellants, the plaintiffs and counterclaim defendants, are United States Steel, *1280 LLC (USX) [FN1] and its subsidiary the Heatherwood Golf Club (Heatherwood). Appellees, the defendants and counterclaim plaintiffs, are Fletcher Yielding and two of his corporate entities, TIECO, Inc. (TIECO) and ATOZ Management, Inc. (ATOZ). TIECO is a vendor of golf course maintenance equipment, light industrial equipment, and irrigation equipment. ATOZ is the management arm of TIECO. USX operates a tractor shop, and Heatherwood operates a golf course. Prior to this litigation, USX's tractor shop and Heatherwood's golf course were customers of TIECO.

> FN1. At the time of trial, United States Steel LLC was constituted as the USX Corporation.

Appellants sued Appellees alleging liability under the federal RICO statutes and state law. Appellees filed several counterclaims, alleging violations of 42 U.S.C. § 1983 and state law. The district court granted Appellee Yielding summary judgment on all of Appellants' claims. The case proceeded to a jury trial. Before submitting the case to the jury, the district court granted Appellees TIECO and ATOZ judgment as matter of law on Appellant Heatherwood's claims. During jury deliberations, the district court dismissed Appellant USX's claims as a sanction for discovery violations. The jury rendered a verdict in favor of Appellees on the counterclaims, awarding $6.8 million to TIECO and $375,000 to Mr. Yielding, and the district court entered judgment accordingly. Subsequently, regarding Appellees' counterclaims, the district court denied Appellants' renewed motion for judgment as matter of law and motion for remittitur. With respect to Appellants' claims, the court denied Appellants' motion for a new trial and to vacate judgment of dismissal. Lastly, the district court awarded attorney's fees and costs to Appellees in the total amount of $1,442,769.27.

Appellants contend the following rulings from the district court were erroneous: (1) the grant of judgment as a matter of law to TIECO and ATOZ on Heatherwood's claims and the denial of Appellants'

motion for a new trial on Heatherwood's claims, (2) the dismissal of USX's claims as a discovery sanction and the denial of Appellants' motion for a new trial on USX's claims, (3) the judgment awarding $6.8 million to TIECO and $375,000 to Mr. Yielding, (4) the denial of Appellants' renewed motion for judgment as matter of law on Appellees' counterclaims or, in the alternative, the denial of Appellants' motion for remittitur, and (5) the judgment awarding $1,442,769.27 in attorney's fees and costs to Appellees. [FN2]

> FN2. Appellants raise the first four alleged errors in appeal number 00-11309. Appellants raise the fifth alleged error in appeal number 00- 12842. The two appeals have been consolidated.

[1] The first two errors claimed by Appellants do not warrant discussion, and we affirm without opinion pursuant to 11th Cir. R. 36-1. [FN3] In Part I of this opinion, we address the third and fourth errors claimed by Appellants, both of which concern Appellees' counterclaims. In Part II, we address the fifth alleged error, concerning the award of attorney's fees and costs.

> FN3. An affirmance pursuant to Rule 36-1 has no precedential value. See Va. Props., Inc. v. Home Ins. Co., 74 F.3d 1131, 1132 n. 2 (11th Cir.1996).

I. APPELLEES' COUNTERCLAIMS

Appellees' counterclaims rest on USX's cooperation with the Alabama Attorney *1281 General's Office (AG) [FN4] during a criminal investigation and prosecution of Appellees. According to Appellees, the manner in which USX cooperated with the AG violated federal and Alabama law. The jury agreed. It found USX liable, under federal law, for a violation of 42 U.S.C. § 1983, and, under Alabama law, for the torts of malicious prosecution, abuse of process, interference with business relationships, civil conspiracy, and defamation. Except for the defamation tort, TIECO was the sole counterclaimant. Both TIECO and Mr. Yielding won damages under the defamation counterclaim. Appellants contend USX was entitled to judgment as matter of law on Appellees' counterclaims. In addition, Appellants challenge the judgment on the ground the district court made numerous errors at trial.

> FN4. When referring to the "AG," we are

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

alluding to officials who acted collectively on behalf of the Alabama Attorney General's Office. We are not referring to the particular person who held the office of Attorney General.

In subpart A, we set forth the admissible evidence in the record in the light most favorable to Appellees. Our review of the evidence, however, does not include any evidence derived from a state judicial opinion which was erroneously entered into evidence. In subpart B, we explain why the district court's admission of the state judicial opinion constituted reversible error. In subpart C, we examine, as to each of Appellees' counterclaims, whether USX was entitled to judgment as a matter of law.

### A. Background

#### 1. Initial Stages

The genesis of the USX-AG cooperation was a disclosure by a former TIECO employee, Marty Colby. By May 1995, Mr. Colby had communicated to his attorney, Victor Hayslip, [FN5] that TIECO's accounting practices with respect to USX were questionable. Essentially, Mr. Colby alleged that TIECO used bogus invoices and disloyal USX employees to bill USX for materials purchased but never received. Mr. Colby admitted misappropriating goods himself. Ironically, Mr. Hayslip was an attorney with a firm, Burr & Foreman, which had been serving as USX's outside counsel for many years. Mr. Hayslip informed the AG and USX about Mr. Colby's allegations and arranged a meeting in his office on June 13, 1995.

> FN5. Mr. Hayslip had represented Mr. Colby and Turfcare Products (TIECO's main competitor) in an unrelated lawsuit brought by TIECO over a non-compete agreement.

Prior to the June 13th meeting, the AG and USX discussed Mr. Colby's allegations. At the meeting, the AG and USX interviewed Mr. Colby separately. Mr. Colby repeated his allegations about TIECO's accounting practices. USX's assistant general counsel questioned Mr. Colby's credibility. Nonetheless, both USX and the AG effectively acceded to Mr. Colby's request (made by Mr. Hayslip) that they not pursue any criminal or civil remedies against him.

Although the AG and USX interviewed Mr. Colby separately, they jointly conferred at the June 13th

meeting. When USX signaled its intention to conduct an internal audit, the AG requested that USX abstain from any actions which would alert TIECO. Accordingly, USX agreed not to interview any suspected USX employees or pursue any remedy against TIECO.

On June 27, 1995, the AG sent a letter to USX requesting any information possessed by USX about vendors, other than TIECO, who similarly defrauded USX. USX provided the requested information and indicated it was "very interested" in cooperating with the AG's investigation of TIECO and other vendors. Additionally, USX interviewed *1282 former TIECO employees, and, on July 18, 1995, forwarded summaries of the interviews to the AG. Lastly, in the summer of 1995, Mr. Hayslip called the AG on behalf of USX, inquiring repeatedly about the status of the investigation.

#### 2. The AG's Seizure of TIECO's Records

On August 30, 1995, the AG applied in state court for a warrant to seize specific documents and materials from TIECO's place of business. The affidavit accompanying the warrant was signed and prepared by the AG's chief investigator, and it was reviewed by one of the AG's criminal prosecutors. According to the chief investigator, the information in the affidavit was gained from interviews conducted by the AG of Mr. Colby and four other former TIECO employees. Finding probable cause, the state court issued the warrant. On August 31, 1995, led by the chief investigator, the AG seized numerous TIECO documents and computer tapes.

No USX official was present during either the issuance or execution of the warrant. Moreover, the chief investigator, as well as USX, denied that USX was involved in, or even had knowledge of, the AG's efforts to procure the search warrant. No evidence in the record rebuts this denial by the chief investigator, indicates he had a motive to lie, or in any way impeaches his credibility.

#### 3. USX's Cooperation with the AG after the Seizure of TIECO's Records

By the time of the seizure, the AG realized it did not have the expertise or the resources to fully investigate the seized records and to pursue a criminal prosecution of TIECO. Accordingly, after the seizure, the AG requested auditors from victim companies, including USX. In particular, the auditors were asked to compare their own company's records

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

with those seized from TIECO. The AG planned, with USX's cooperation, to have the auditors serve as expert witnesses in any criminal proceeding.

On three separate occasions (October 11-12, 1995, November 7-9, 1995, and January 31-February 1, 1996), USX auditors visited the AG's office to review the seized TIECO records. One of these reviews occurred after USX had filed the instant lawsuit. The auditors examined all documents related to any USX-TIECO transaction. The AG did not permit the auditors to photocopy or remove the records. Instead, the auditors took copious notes, entered data on USX computers, and created spreadsheets from the data. USX kept the AG apprized of the information gained from the audit.

Two of TIECO's suppliers were also present during portions of these reviews. At times, USX auditors reviewed documents with TIECO's suppliers. On at least one occasion, a USX auditor provided an invoice to one of TIECO's suppliers.

In addition to examining records, USX auditors assisted the AG in deciphering computer tapes seized from TIECO. Duplicate tapes were sent for reformatting to a California company, which returned the tapes directly to USX along with software to read the tapes. Although the AG paid the California company for this service, it intended to seek reimbursement from USX and the other victim companies. Moreover, because the AG did not have a computer capable of reading the tapes, USX auditors analyzed the tapes on their own computer. USX and the AG exchanged results of these analyses and other information gleaned from the tapes. Once the analyses were complete, USX maintained some of the data, both on its own computers and in computer printouts.

The cooperation between USX and the AG extended to other areas. For instance, six days after the AG's seizure of TIECO's *1283 records, USX transmitted to the AG printouts of accounts payable information concerning USX-TIECO transactions; in the letter accompanying the printouts, USX stated, "[I]f we have additional ideas on how you might approach the TIECO documents now in your possession, we will be in touch." In October 1995, the AG provided USX information from its interview with a representative of a TIECO supplier. In November 1995, USX mailed to the AG photographs of property owned by a USX employee suspected of wrongdoing. In December 1995, the AG faxed to USX inventories of the seized records and copies of some seized

records. In mid-December 1995, Mr. Hayslip, acting on USX's behalf, sent the AG a summary of TIECO's accounts receivable, invoices, pick tickets, and other documents relating to TIECO-USX and TIECO-Heatherwood transactions.

The highest level of the AG-USX cooperation occurred with the interviews of USX employees from the tractor shop and golf course. In November 1995, to prepare for the interviews, USX auditors drafted a lengthy memorandum to inform the AG about the allegations USX had unearthed. The memorandum detailed specifically how each USX employee had participated in the alleged scheme and provided personal information about each employee. Separately, USX provided to the AG social security numbers of the suspected employees. USX's assistant general counsel circulated a memorandum, dated December 19, 1995, which set forth the ground rules for interviewing USX employees. The memorandum called for each employee, without prior warning, to be interviewed twice--once by a team from the AG and FBI and again by a team from USX. On December 20, 1995, the AG, USX, and FBI met to prepare for the employee interviews; over the next two days, they conducted interviews of nearly every employee in accordance with the December 19th memorandum. USX threatened disciplinary action and criminal prosecutions unless the employees cooperated in the investigation.

*4. Appellants' Lawsuit*

Shortly before the employee interviews, Mr. Hayslip filed the instant lawsuit on December 15, 1995, on behalf of Appellants. Before filing the suit, USX had sent Mr. Hayslip information gained from its review of TIECO's seized records. Also prior to the lawsuit, Appellants made a settlement demand, giving Appellees just three days to respond. Among other things, Appellants demanded cooperation in the AG's and USX's parallel investigations and a payment of $555,977.52. That dollar figure was derived from information in TIECO's seized records. [FN6]

> FN6. Appellants argue that evidence of the settlement demand should not have been admitted pursuant to Fed.R.Evid. 408. We need not address this argument to resolve this case.

During the first half of 1996, the cooperation between the AG and USX mostly involved legal matters and proceedings. For example, the AG and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

USX conferred after the district court in this case ordered Appellants to produce "a copy of all of [TIECO's] data, computer tapes, and documents in its possession which were seized by the [AG]." In March 1996, USX's counsel, Burr & Foreman, shared legal research with the AG.

### 5. Mr. Yielding's Ethics Complaint Against the AG

In May 1996, attention shifted from the investigation of TIECO to an ethics complaint filed by Mr. Yielding, on behalf of himself, TIECO, and ATOZ. The complaint, filed with the Alabama State Ethics Commission (Commission), alleged the AG **\*1284** seized TIECO's property and then shared, with USX and Burr & Foreman, information gained from that seizure. Mr. Yielding stated he never authorized such a disclosure.

At the Commission's proceedings, appearances were made by USX's assistant general counsel, Mr. Hayslip, and James Wager, who was USX's lead auditor. The presentation given to the Commission by Mr. Wager was crucial to the AG's defense: he asserted it was probable TIECO was bribing local USX managers. However, although USX was aware that Mr. Colby had stolen some items from TIECO, Mr. Wager did not mention this fact. On July 10, 1996, the Commission concluded there were insufficient facts to find the AG had violated Alabama ethics laws. In a letter to USX, the AG expressed gratitude for USX's assistance, stating it went "beyond the call of duty."

### 6. Mr. Hayslip's Statement to the Press

During the pendency of the ethics complaint, Mr. Hayslip made some derogatory comments related to the ethics complaint. One newspaper reported the following:

> Victor Hayslip ... said Tieco's complaints ring hollow. "What they're doing is the equivalent of Jeffrey Dahmer complaining his victims got blood on the carpet," Hayslip said. "It's without merit." ... Hayslip said the complaints were an attempt to embarrass [the Alabama Attorney General] for political reasons.

Similar comments were printed in multiple Alabama newspapers.

### 7. Grand Jury Indictments

Another event that occurred during the pendency of the ethics complaint was a state grand jury investigation led by the AG. In June 1996, the grand jury returned seven indictments containing 125 counts alleging wrongdoing by TIECO. Twenty-one counts pertained to USX-TIECO transactions.

In his testimony before the grand jury, Mr. Hayslip misrepresented the extent of Mr. Colby's personal involvement in the scheme. [FN7] At the trial in this case, USX's assistant general counsel acknowledged that he was aware of Mr. Hayslip's misrepresentations. Nonetheless, USX never informed the AG, the grand jury, or the state court about the misleading aspects of Mr. Hayslip's testimony.

> FN7. To reiterate, we are not finding that Mr. Hayslip made misrepresentations before the grand jury. We are merely portraying the facts in the light most favorable to Appellees. Mr. Hayslip and Burr & Foreman are not parties to this appeal, and they have not been heard on this allegation.

Besides Mr. Hayslip, the other USX representative to provide significant grand jury testimony was Mr. Wager, the lead auditor. Mr. Wager accused TIECO of billing USX for items it had never received. By the time of the grand jury proceeding, however, USX's audit team had failed to search the golf course or the tractor shop. [FN8] Just as he had done before the Commission, Mr. Wager failed to inform the grand jury that Mr. Colby, in participating in the alleged scheme, had stolen some items from TIECO.

> FN8. Appellees assert that, subsequent to the indictments, USX found several of the alleged missing items at the tractor shop. However, the record citations provided by Appellees do not support this assertion. One citation is the cross-examination of Mr. Wager, but Mr. Wager stated he had no knowledge about the subsequent search. The other citation is to a state judicial opinion, which was not admissible for reasons discussed below. See infra Part I.B. Regardless, even if Appellees' assertion is true, it would not alter our legal analysis.

**\*1285** The core of Mr. Wager's testimony was an explanation of TIECO's accounting system and how TIECO was billing USX for items never delivered to USX. According to Mr. Wager, TIECO would create an invoice for a certain item. The invoice would show the item was shipped to USX's tractor shop in Alabama. To bill USX, the invoice would be sent to USX's headquarters in Pittsburgh, Pennsylvania.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 2:01-cv-01372-SLB   Document 39   Filed 11/12/04   Page 131 of 159

261 F.3d 1275                                                                                        Page 9
261 F.3d 1275, 57 Fed. R. Evid. Serv. 1350, 14 Fla. L. Weekly Fed. C 1130
(Cite as: 261 F.3d 1275)

Initially, TIECO's inventory would be debited to reflect the loss of the item. In Mr. Wager's view, all of the foregoing practices were acceptable, but the insidious aspect of TIECO's system was a so-called "adjustment account." Under this account, TIECO would credit its inventory for an item which, according to the invoice, already had been shipped to the tractor shop and for which USX had been billed. Put simply, from TIECO's accounting records, it appeared TIECO was billing USX Pittsburgh for items which were never delivered to USX.

TIECO's explanation of its accounting system conformed, to a large extent, with the explanation given by Mr. Wager. At trial, Appellees called Pam Hackbarth, a TIECO employee who knew more than anyone about TIECO's accounting system and the adjustment account. She testified as follows:

[T]he branch secretary [for TIECO] generate[s] an invoice, and the invoice is mailed to USX in Pittsburgh for payment. USX pays. And TIECO shows the invoice paid, and credits the [a]djustment [a]ccount, and credits the account with the payment.

....

[W]hen we would bill [USX], that would be relieving our inventory of that item. And we would put a credit into the [a]djustment [a]ccount, bringing it back into inventory so it would be available.

Ms. Hackbarth admitted the adjustment account was used when TIECO was invoicing a customer for items not delivered. She further conceded that USX in Pittsburgh was not informed about the adjustment account.

Contrary to Mr. Wager's suggestion, however, the purpose of the adjustment account was not to commit fraud on USX. Rather, Ms. Hackbarth explained:

[T]he customer would want one product, and maybe because of budget reasons could not buy that product. And so [TIECO] would bill for parts.... Then [TIECO] would create the account for those parts, and would create a credit balance. And then [the customer] ... would build a credit, and then he could buy what he needed. And it was to be items that the customer used in doing his job or taking care of the facility ....

By referring to "customer," Ms. Hackbarth was not referring to USX's headquarters in Pittsburgh, but rather to USX employees in Alabama at the tractor shop and the golf course. These Alabama employees would use TIECO's adjustment account as a means to procure items they could not otherwise obtain through the normal USX budgetary process. This

fact became evident, not only from Ms. Hackbarth's testimony, but also from the testimony of former USX and TIECO employees. [FN9] In any event, the Alabama employees were procuring items for use at USX's facilities, not for personal use.

> FN9. The employees worked for USX's subsidiary, Heatherwood, but their testimony was that all budgetary decisions were made by the parent corporation, USX.

The grand jury indictments against TIECO went nowhere. In April 1997, the AG voluntarily dismissed all counts related to USX. In July 1997, Judge James S. Garrett of the Circuit Court of Jefferson *1286 County dismissed the remaining counts for prosecutorial misconduct.

As part of his opinion dismissing the indictments, Judge Garrett incorporated a statement of facts prepared by TIECO in connection with its motion to dismiss the indictment. Not surprisingly, the statement of facts is quite favorable to Appellees and relied upon heavily by Appellees in their brief to this Court. As we discuss immediately below, the admission of Judge Garrett's opinion was improper, see infra Part I.B, and we do not consider the evidence contained therein.

B. Admissibility of State Judicial Opinion

1. Background

The AG and TIECO were parties in the state criminal proceeding before Judge Garrett. Burr & Foreman represented USX in the proceeding, but USX was not a party. In dismissing the indictments, Judge Garrett issued an opinion which adopted in toto a memorandum of facts prepared by TIECO in connection with its motion to dismiss the indictment.

Over Appellants' objection, the district court admitted the opinion, including the memorandum of facts. The memorandum was an exhaustive account that neatly conformed to Appellees' allegations, especially with respect to the malicious prosecution, abuse of process, and civil conspiracy counterclaims. As is set forth in the margin, the memorandum depicted in great detail Appellees' view about the nature of USX's involvement in the AG's investigation of TIECO. [FN10] Furthermore, Judge Garrett did not mince words, as he found, "[T]he misconduct of the [AG] in this case far surpasses in both extensiveness and measure the totality of any prosecutorial misconduct ever previously presented

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

to or witnessed by this Court."

> FN10. The memorandum of fact described, *inter alia*: (1) cooperation between the AG and USX in reviewing TIECO's seized documents, (2) a meeting on November 8, 1995, where USX informed the AG that it intended to sue TIECO and would be providing the AG with copies of charts; (3) the coordination between the AG and USX in having TIECO's computer tapes reformatted and read; (4) USX's agreement to repay the AG for reformatting the tapes; (5) an implication that either USX's lead auditor, Mr. Wager, or the AG's investigator, John Mulligan, had lied about the repayment agreement; (6) legal advice given to the AG and USX that "USX should not be used as quasi government agency"; (7) cooperation between the AG and USX in conducting interviews of USX's employees; and (8) the AG's sending TIECO's records to USX in preparation for the interviews.

Judge Garrett's opinion was a significant portion of Appellees' case (as well as their brief on appeal). During the examination of witnesses, Appellees' counsel repeatedly referred to the proceedings before Judge Garrett, and on at least one occasion, counsel read verbatim an extensive portion of the opinion. In closing argument, Appellees' counsel told the jurors if they had any question about the credibility of Appellants' witnesses, they should read Judge Garrett's opinion.

Prior to trial, Appellants filed a motion *in limine* objecting to Judge Garrett's opinion, and they raised the objection again at trial. Appellants argued the opinion should be excluded pursuant to Fed.R.Evid. 401 and Fed.R.Evid. 403. We address solely the Rule 403 argument.

### 2. *Fed.R.Evid. 403*

[2][3] Rulings on the admission of evidence are reviewed for abuse of discretion. *See, e.g., United States v. Adair, 951 F.2d 316, 320 (11th Cir.1992)*. An error on an evidentiary ruling will result in the reversal of a jury's verdict only if a party establishes a substantial prejudicial effect or a manifest injustice. *See Anderson v. WBMG-42, 253 F.3d 561, 563 (11th Cir.2001)* (citing *\*1287Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1305 (11th Cir.1999)*).

As a preliminary matter, had Appellants lodged an objection pursuant to Fed.R.Evid. 801(c), the admissibility of Judge Garrett's opinion could be easily resolved. *See United States v. Jones, 29 F.3d 1549, 1554 (11th Cir.1994)*. In *Jones*, the district court admitted factual findings made in a separate case by another district court. *See id. at 1551*. We concluded such factual findings were hearsay, and they could not be either judicially noticed or admitted under the public records exception to the hearsay rule. *See id. at 1553-54* (citing Fed.R.Evid. 201 and Fed.R.Evid. 803(8)(C)); *see also Nipper v. Snipes, 7 F.3d 415, 417-18 (4th Cir.1993)*.

[4][5][6][7] Despite not being raised, the conclusion that Judge Garrett's opinion was inadmissible hearsay is not inconsequential to our analysis under Rule 403. [FN11] Rule 403 involves balancing, on the one side, the evidence's probative value and, on the other side, the evidence's dangers, including its unfairly prejudicial and misleading nature. By comparison, hearsay is disfavored because it is not subjected to the oath, the rigors of cross-examination, or the first-hand scrutiny of the jury. *See United States v. Parry, 649 F.2d 292, 294-95 (5th Cir.1981)* [FN12] (citing *McCormick on Evidence* § 245 (2d ed.1972)). As a result, hearsay can be unreliable; for instance, in the context of the Confrontation Clause, [FN13] hearsay that does not fall within a firmly-rooted exception is presumed unreliable. *See Idaho v. Wright, 497 U.S. 805, 818, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990)*. Due to its unreliability, hearsay can be misleading and unfairly prejudicial.

> FN11. Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, and needless presentation of cumulative evidence."

> FN12. In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

> FN13. Of course, the Confrontation Clause is not applicable to civil cases, but we refer to its jurisprudence to illustrate hearsay's unreliability.

[8][9] The hearsay in Judge Garrett's opinion--

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

which does not satisfy a firmly-rooted exception [FN14]--was particularly unreliable and misleading. Although the statement of facts was presented to the jury as Judge Garrett's finding, it was prepared entirely by Appellees' counsel. In effect, the admission of the statement of facts permitted counsel to testify on his client's behalf, without being cross-examined. Further, the statement of facts was intended to exculpate TIECO, and thus, it was self-serving and unreliable. *Cf. United States v. Reme,* 738 F.2d 1156, 1168-69 (11th Cir.1984).

> FN14. As we noted in *Jones,* the common law did not permit the admission of a judgment from another case. 29 F.3d at 1554. One court has found that judicial findings are admissible under the residual exception to the hearsay rule. *See Jones v. Wash. Metro. Area Transit Auth.,* 946 F.Supp. 1011, 1019-20 (D.D.C.1996). But that exception is not firmly rooted. *See Wright,* 497 U.S. at 817-18, 110 S.Ct. at 3147-48.

Of course, Judge Garrett accepted the statement of facts by incorporating it into his opinion. But this made the hearsay contained therein even more unfairly prejudicial and misleading. As the Fourth Circuit has stated, "[J]udicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice." *Nipper,* 7 F.3d at 418 (internal quotations omitted).

**\*1288** The Fourth Circuit's *Nipper* decision is particularly pertinent to the instant case. When we ruled in *Jones* that a judicial finding was inadmissible hearsay, we relied heavily on *Nipper. See Jones,* 29 F.3d at 1554. In *Nipper,* like here, the plaintiff introduced the factual findings of a state court to prove a civil conspiracy. *See Nipper,* 7 F.3d at 416. While reversing on the ground that the judicial findings were inadmissible hearsay, the Fourth Circuit also concluded that judicial findings, due to the danger of unfair prejudice, were inadmissible under Rule 403. *See id.* at 417-418; *see also Carter v. Burch,* 34 F.3d 257, 265 (4th Cir.1994); *United States v. DeSantis,* 134 F.3d 760, 770 (6th Cir.1998) (Nelson, J., concurring); *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 141 F.Supp.2d 320, 324, 325 (E.D.N.Y.2001); *Hariston v. Wash. Metro. Area Transit Auth.,* No. CIV. 93-2127, 1997 WL 411946 (D.D.C. April 10, 1997).

[10] The district court abused its discretion in admitting Judge Garrett's opinion. The jury, not Judge Garrett, was charged with making factual findings on Appellees' allegations in this case. Moreover, Appellants have shown they were substantially prejudiced by the admission of Judge Garrett's opinion, as Appellees relied on the opinion throughout the trial. Most notably, during closing argument, Appellees' counsel told the jury to use the opinion to make credibility determinations. Therefore, the district court's admission of the opinion constituted reversible error.

### *C. Judgment as a Matter of Law*

[11][12] A party is entitled to judgment as a matter of law "[i]f during a trial by jury [the opposing] party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for [the opposing] party on that issue." Fed.R.Civ.P. 50(a)(1). We review de novo the denial of a Rule 50 motion and apply the same standard as the district court. *See, e.g., Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 656 (11th Cir.1998). Furthermore, for those close claims based on state law, "we are bound to decide the [claim] the way it appears the state's highest court would." *E.g., Royal Ins. Co. of Am. v. Whitaker Contracting Corp.,* 242 F.3d 1035, 1040 (11th Cir.2001) (internal quotations and citation omitted).

[13][14][15] Under Rule 50, a court considers the evidence in the light most favorable to the non-movant and grants all reasonable inferences in favor of the non-movant. *See, e.g., Bogle,* 162 F.3d at 656. Nonetheless, a non-movant must present more than a mere scintilla of evidence. *See, e.g., Abel v. Dubberly,* 210 F.3d 1334, 1337 (11th Cir.2000). A court should deny a motion for judgment as a matter of law "only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* (internal quotations omitted). With this standard, we analyze for each of Appellees' counterclaims whether USX should have been granted judgment as a matter of law.

#### 1. Violation of 42 U.S.C. § 1983

[16][17] To violate 42 U.S.C. § 1983, a party must be acting "under color of state law." *Id.; e.g., Willis v. Univ. Health Servs., Inc.,* 993 F.2d 837, 840 (11th Cir.1993). Although USX is a private corporation, Appellees contend USX nonetheless violated § 1983 because it acted in concert with the AG, an arm of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

state of Alabama. Even if this assertion is true, it does not, by itself, establish liability under § 1983. To state a claim under § 1983, a party must also prove a violation of a particular constitutional or federal statutory provision. *See id.; Whiting v. Traylor,* 85 F.3d 581, 583, 584 n. 4, 586 (11th Cir.1996). In this case, Appellees claim a **1289 violation of (1) the Due Process Clause of the Fourteenth Amendment and (2) the Fourth Amendment as applied to states through the Fourteenth Amendment.

[18][19] As a preliminary matter, the district court's jury instruction on the Due Process Clause and the Fourth Amendment was inadequate. The charge merely stated the following:

Under the Fourth Amendment ..., every person ... has the right to be free from an unreasonable search and seizure. Under the Fourteenth Amendment ..., no state may deny to any of its citizens "due process of law." Notice of contemplated action and an opportunity to be heard are the two rights guaranteed by the due process clause of the Constitution.

This instruction was empty of any substance, as it does little more than restate the constitutional text. Like all causes of action, constitutional claims have elements which the claimant must prove. *See, e.g.,* Eleventh Circuit Pattern Jury Instructions (Civil Cases) § 2.2, at 198 (1999) (describing elements of Fourth Amendment claim). The hollow instruction in this case, however, effectively permitted the jury to usurp the district court's role as interpreter of the Constitution.

[20][21] Nevertheless, even if the jury had been properly instructed, it could not have reasonably found a constitutional violation. In arguing the Due Process Clause was violated, Appellees point to much of the same evidence they rely on for the state law malicious prosecution claim. [FN15] But TIECO has no right under the substantive component of the Due Process Clause to be free from criminal prosecution without probable cause. *See Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 810, 127 L.Ed.2d 114 (1994); *Whiting,* 85 F.3d at 584 nn. 3 & 4.

> FN15. While relying on the same evidence, Appellees state in their brief, "There is no assertion of a malicious prosecution claim under 42 U.S.C. § 1983." Appellees' Br. 33. This statement highlights the perplexing nature of Appellees' § 1983 claim. When asked at oral argument to

articulate the heart of the constitutional claim, Appellees' counsel was unable to do so.

Whether a malicious prosecution claim can be brought via the procedural component of the Due Process Clause is an open question in this circuit. [FN16] *See Whiting,* 85 F.3d at 584 n. 3 (citing *Perez-Ruiz v. Crespo-Guillen,* 25 F.3d 40, 43 (1st Cir.1994)). Justice Kennedy, joined by Justice Thomas, has suggested that such a claim would lack merit where, as here, state law provides a cause of action for malicious prosecution. *See Albright,* 510 U.S. at 283-86, 114 S.Ct. at 818-19 (Kennedy, J., concurring). We need not address this question today. Even if we were to accept the proposition that such a cause of action existed, the plaintiff would be required, at the very least, to establish the common-law tort of malicious prosecution, including the absence of probable cause. *See Albright,* 510 U.S. at 270 n. 4, 114 S.Ct. at 811 n. 4; *see also* **1290 *id.* at 292, 296-97, 300-02, 114 S.Ct. at 823, 825, 827-28 (Stevens, J., dissenting) (suggesting Due Process Clause is violated whenever prosecution is not predicated on probable cause). As discussed below, probable cause existed to prosecute TIECO, and thus Appellees have not established the common-law tort. *See infra* Part I.C.2. Thus, no violation of procedural due process could have occurred. [FN17]

> FN16. Allegations of malicious prosecution could plausibly constitute a violation of the Fourth Amendment. For instance, we observed in *Whiting:*
> Labeling ... a section 1983 claim as one for a "malicious prosecution" can be a shorthand way of describing a kind of legitimate section 1983 claim: the kind of claim where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to that seizure, follow as the prosecution goes ahead.
> 85 F.3d at 584; *accord Uboh v. Reno,* 141 F.3d 1000, 1002-03 (11th Cir.1998). But, in this case, TIECO, a corporation, was never arrested, detained, or seized in any way. Thus, the Fourth Amendment violation envisioned by *Whiting* could not have occurred in this case.

> FN17. Appellees also argue that TIECO's procedural due process right was violated because the AG and USX conspired to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

violate Alabama's ethics laws.    This contention lacks merit.

[22][23] Finally, we address Appellees' allegations concerning the search and seizure of TIECO's records.    Appellees must rely on the Fourth Amendment, the explicit constitutional text that protects citizens from searches and seizures.    *See Albright*, 510 U.S. at 274, 114 S.Ct. at 813.    A warrant, and its corresponding search, violates the Fourth Amendment if it fails to specify the place to be searched and the items to be seized, *see Steele v. United States*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); or if it is issued by an official who is not neutral and detached, *see Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), or if it is procured by a false statement made intentionally or recklessly, *see Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); or if it is not supported by probable cause, *see Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984).    None of the foregoing occurred here.    On the contrary, Appellees allege that USX agreed to delay its audit of TIECO "so the AG could produce probable cause for a search warrant."  Appellees' Br. 4;  *see also* Appellees' Am. Compl. ¶  2.a., at 5 (stating that "[i]n an effort to help the [AG] establish enough probable cause to obtain a search warrant, USX began supplying the [AG] with information").  Assuming that Appellees' allegation is true, an agreement to delay a search until there *is* probable cause could not possibly run afoul of the Fourth Amendment.    *See* U.S. Const. amend.    IV (stating that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation").

In sum, there is no evidence in the record to support a finding that Appellees' federal constitutional rights were violated.    The district court should have granted USX judgment as a matter of law on the §  1983 counterclaim.

2. *Malicious Prosecution*

[24][25]  Under Alabama law, to prevail on a malicious prosecution claim, a plaintiff (in this case, TIECO) must show:  (1) a prior judicial proceeding was instituted by the defendant (in this case, USX);  (2) the defendant acted without probable cause in the prior proceeding;  (3) the defendant acted with malice in instituting the prior proceeding;  (4) the prior proceeding ended in favor of the plaintiff;  and (5) the plaintiff was damaged.    *See Poff v. Hayes*, 763

So.2d 234, 240 (Ala.2000);  *S.S. Kresge Co. v. Ruby*, 348 So.2d 484, 487-88 (Ala.1977).    Appellants contend Appellees failed to establish the first, second, and third elements.    We address solely the second element, probable cause. [FN18]

> FN18.  Grand jury indictments are prima facie evidence of probable cause under Alabama law.  *See, e.g., Simpson v. Life Ins. Co. of Ga.*, 614 So.2d 994, 996 (Ala.1993).  This prima facie evidence is rebutted if the indictments were "induced by fraud, subornation, suppression of testimony, or other like misconduct of the party seeking the indictment."  *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133, 140 (Ala.1983).  Because we conclude probable cause was established as a matter of law even in the absence of an indictment, we need not decide whether the grand jury indictments in this case were rebutted.

*1291 [26][27][28] Probable cause is "a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged."  *Simpson v. Life Ins. Co. of Ga.*, 614 So.2d 994, 996 (Ala.1993) (internal quotations omitted);  *accord Eidson v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala.1988);  *see also Delchamps, Inc. v. Bryant*, 738 So.2d 824, 832 (Ala.1999);  *S.S. Kresge* 348 So.2d at 488.    In determining whether probable cause existed, the facts should not be viewed in hindsight, but rather at the time the prosecution is instituted.    *See Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133, 139 (Ala.1984).  Where material facts are disputed, the issue of probable cause is for the jury;  however, where the material facts are not disputed, the issue is one of law for the court.    *See S.S. Kresge*, 348 So.2d at 488.  Put another way, if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution. *See Eidson*, 527 So.2d at 1285.

[29] In this case, undisputed facts establish that, at the time of the grand jury's investigation, USX reasonably suspected TIECO of criminal activity.  As mentioned previously, TIECO's description of its accounting system essentially comported with the description given by USX to the grand jury.    Mr. Wager, USX's lead auditor, told the grand jury that TIECO billed USX in Pittsburgh for items not delivered to USX's tractor shop or golf course.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Similarly, Ms. Hackbarth, TIECO's employee in charge of accounting, testified at trial that TIECO was billing USX in Pittsburgh for one item while delivering a different item to the tractor shop and golf course. In other words, the item being billed was not being delivered. Although TIECO may have had an innocent explanation for this accounting system, the system, on its face, gave USX a reasonable ground for suspecting TIECO of fraud. Furthermore, even though USX may have had reason to question the credibility of TIECO's principal accuser (Mr. Colby), that did not denigrate the probable cause created by TIECO's accounting system. Therefore, the district court should have granted USX judgment as a matter of law on the malicious prosecution counterclaim.

### 3. Abuse of Process

[30][31] To state an abuse of process claim, one must allege the abuse of a judicial process. *See* W. Page Keeton, *Prosser and Keeton on Torts* § 121, at 898 (5th ed.1984) (cited in *Drill Parts and Serv. Co. v. Joy Mfg. Co.,* 619 So.2d 1280, 1288 (Ala.1993)). In this case, Appellees allege USX abused the process of a criminal search warrant. However, based on the Supreme Court of Alabama's decision in *Drill Parts,* Appellees have failed to establish an abuse of process claim. 619 So.2d at 1286-89.

The plaintiffs in *Drill Parts,* like Appellees here, alleged that the defendants had used a criminal search warrant to gather information for a civil suit against the plaintiffs. *See id.* at 1282, 1286. Noting that malice was an element of an abuse of process claim, [FN19] the Supreme Court of Alabama held, "[T]o establish malice in this case[,] the plaintiffs must show that the defendants *willfully caused* a criminal search warrant to issue for the wrongful purpose of obtaining discovery for a civil action against the plaintiffs." *Id.* at 1289 (emphasis added); *accord* Keeton, *supra,* § 121, at 898 (stating an essential element is "a wilful act in the use of the process not *1292 proper in the regular conduct of the proceeding"). In the instant case, the evidence is insufficient to show that USX "willfully caused" the search warrant for TIECO's premises.

> FN19. The other elements for an abuse of process claim under Alabama law are ulterior purpose and wrongful use of process. *See, e.g., Caldwell v. City of Tallassee,* 679 So.2d 1125, 1127 (Ala.1996).

[32] Granted, USX was cooperating with the AG both before and after the issuance of the search warrant, and USX used information from the seized records to prepare its settlement demand. To reiterate, however, the challenged process must be a judicial one, that is the search warrant--not the AG's investigation. [FN20] Nothing in the record indicates that USX controlled or influenced, or even participated in, the decision to seek and execute the warrant. No USX representative was present for either the procurement or execution of the warrant. Further, according to the AG's chief investigator (who sought and executed the warrant), all the information in the affidavit accompanying the warrant application was gained from the AG's own interviews of former TIECO employees. Most importantly, the chief investigator unequivocally denied that USX was involved in, or had knowledge of, procurement of the search warrant, and Appellees presented no evidence to rebut or impeach this sworn testimony. Therefore, the district court should have granted USX judgment as a matter of law on the abuse of process counterclaim.

> FN20. That does not mean evidence of USX's conduct after the warrant issued and during the AG's investigation was irrelevant. Such evidence was pertinent to establishing an ulterior purpose and a wrongful use of process. *See supra* note 19; *Shoney's, Inc. v. Barnett,* 773 So.2d 1015, 1024 (Ala.Civ.App.1999) (stating that "[t]he tort of abuse of process is concerned with the wrongful *use* of process *after it has been issued* " (internal quotations omitted)).

### 4. Tortious Interference With Business Relations

[33] To prove tortious interference with business relations in Alabama, a plaintiff must show: (1) the existence of a contract or business relation, (2) defendant's knowledge of the contract or business relation, (3) intentional interference by the defendant with the contract or business relation, (4) absence of justification for the defendant's interference, and (5) damage to the plaintiff as the result of the defendant's interference. *See Mut. Savs. Life Ins. Co. v. James River Corp. of Va.,* 716 So.2d 1172, 1180 (Ala.1998). In addition, a plaintiff must show "some evidence of fraud, force, or coercion [ ] on the defendant's part." *Joe Cooper & Assocs., Inc. v. Cent. Life Assurance Co.,* 614 So.2d 982, 986 (Ala.1992) (citing *Griese-Traylor Corp. v. First Nat'l Bank of Birmingham,* 572 F.2d 1039, 1045 (5th Cir.1978)); *accord Barber v. Business Prods. Ctr., Inc.,* 677 So.2d 223, 227 (Ala.1996).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

[34] TIECO's claim under this tort hinges on interactions between USX and TIECO's suppliers. Specifically, while USX was reviewing TIECO's seized records, two of TIECO's suppliers were also present and reviewing the documents; on one occasion, USX provided an invoice to a supplier. These minimal interactions, as a matter of law, did not constitute tortious interference with business relations. Appellees have presented no evidence that USX intentionally interfered with a contract or business relation between TIECO and its suppliers. Furthermore, Appellees have not pointed to any evidence indicating the use of fraud, force, or coercion by USX. The district court should have granted USX judgment as a matter of law on the counterclaim for tortious interference with business relations.

### 5. Defamation

As previously noted, unlike the other counterclaims, the defamation action *1293 sought relief for both Mr. Yielding and TIECO. Appellees contend that USX is liable for defamation because its outside counsel, Mr. Hayslip, compared TIECO and Mr. Yielding to Jeffrey Dahmer, the convicted mass murderer. [FN21]

> FN21. The allegedly defamatory statement is fully set forth above. See supra Part I.A.6.

[35][36][37][38][39] Under Alabama law, [FN22] whether a statement is reasonably capable of defamatory meaning is a question of law for the court. See Blevins v. W.F. Barnes Corp., 768 So.2d 386, 390 (Ala.Civ.App.1999) (citing Harris v. School Annual Publ'g Co., 466 So.2d 963, 964 (Ala.1985)); Drill Parts, 619 So.2d at 1289-90. A statement is defamatory if it "tends ... to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Blevins, 768 So.2d at 389-90 (internal quotations omitted) (citing Harris, 466 So.2d at 964). When analyzing an allegedly defamatory statement, a court must give the statement's language the "meaning that would be ascribed to the language by a reader or listener of average or ordinary intelligence, or by a common mind." Id. at 390 (internal quotations omitted) (citing Camp v. Yeager, 601 So.2d 924, 927 (Ala.1992)); see also Labor Review Publ'g Co. v. Galliher, 153 Ala. 364, 45 So. 188, 190 (1907). Furthermore, the "alleged defamatory matter must be construed in connection with other parts of the conversation or publication, and the circumstances of its publication

...." Marion v. Davis, 217 Ala. 16, 114 So. 357, 359 (1927); see also Drill Parts, 619 So.2d at 1289.

> FN22. To state a defamation claim in Alabama, a plaintiff must allege: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. McCaig v. Talladega Pub'g Co., 544 So.2d 875, 877 (Ala.1989) (citing Restatement (Second) of Torts § 558 (1977)).

[40] Equally well established is the rule that once a plaintiff has alleged that the statement defamed him in a certain manner, the plaintiff is thereafter bound by that construction of the statement. See Smith Bros. & Co. v. W.C. Agee & Co., 178 Ala. 627, 59 So. 647, 648 (1912) (citing Gaither v. Advertiser Co., 102 Ala. 458, 14 So. 788 (1894)); Labor Review, 45 So. at 190. In their amended complaint, Appellees averred that Mr. Hayslip's statement was an attempt by USX to compare TIECO to the "vile and evil" nature of Jeffrey Dahmer. Am. Compl. ¶ 2, at 33. Similarly, at trial, Appellees' counsel argued that, with Mr. Hayslip's statement, "[USX] said [Mr. Yielding] is like Jeffrey Dahmer." Trial Tr. 1759. Appellees are bound by these constructions of Mr. Hayslip's statement.

[41] In light of the circumstances and context of Mr. Hayslip's statement, no reasonable person could have construed it to be defamatory as alleged by Appellees. The context was USX's allegations concerning fraud by TIECO and Appellees' allegations concerning an unethical and illegal investigation by the AG and USX. Under these circumstances, any reasonable person who heard or read Mr. Hayslip's statement would have inferred the following: USX was strongly implying, through a distasteful metaphor, that Appellees were guilty of fraud and that Appellees' ethics complaint was without merit.

Such an implication was capable of having defamatory meaning in that Appellees' reputation could have been diminished if *1294 the community believed Appellees were committing fraud and filing frivolous complaints. But Appellees did not argue this construction of the statement to the jury. Rather, Appellees averred that their reputation was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

diminished because the community, after hearing Mr. Hayslip's statement, would believe they were comparable, in some fashion, to a convicted mass murderer. Considering the circumstances surrounding Mr. Hayslip's statement, no reasonable person could have thought Appellees were similar to a mass murderer. Therefore, the district court erred by not granting judgment as a matter of law to USX on the defamation counterclaim.

### 6. Civil Conspiracy

[42] Under Alabama law, civil conspiracy is not an independent action; rather, a plaintiff must have a viable underlying cause of action. *See Drill Parts, 619 So.2d at 1289.* As is evident from our discussion above regarding the other counterclaims, Appellees have failed to present sufficient evidence of any underlying cause of action. Therefore, the district court should have granted USX judgment as a matter of law on the civil conspiracy counterclaim.

## II. ATTORNEY'S FEES AND COSTS

Pursuant to 42 U.S.C. § 1988(b), Appellees were awarded $1,332,024.86 in attorney's fees. Section 1988(b) permits attorney's fees to the "prevailing party" for actions brought under various civil rights provisions, including 42 U.S.C. § 1983. As is evident from Part I.C.1 of our opinion, Appellees did not prevail on the § 1983 claim. Therefore, insofar as it awarded attorney's fees, the judgment must be vacated.

[43] Appellees were also awarded $110,744.4 in costs. Fed.R.Civ.P. 54(d) permits a court to award costs, other than attorney's fees, to the prevailing party. In light of our holdings, further proceedings are required in the district court, as it is no longer clear which party should be considered the prevailing party. *Cf. Terry Props., Inc. v. Standard Oil Co., 799 F.2d 1523, 1540 (11th Cir.1986).* Thus, insofar as it awarded costs, the judgment must be vacated and remanded for reconsideration by the district court. [FN23]

> FN23. "[A] court may only tax costs as authorized by statute." *EEOC v. W&O, Inc., 213 F.3d 600, 622-23 (11th Cir.2000)* (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987)*). The parties agree the award of costs is governed by 28 U.S.C. § 1920. Thus, if a cost is not enumerated in § 1920, Appellees should not have requested

reimbursement. Nevertheless, many of Appellees' requests for costs cannot be located in § 1920 (or any other statute). For instance, Appellees sought costs incurred in defending the AG's criminal prosecution, *see Loranger v. Stierheim, 10 F.3d 776, 782 (11th Cir.1994)*, and they sought fees for their expert witnesses beyond the amount prescribed by 28 U.S.C. § 1821, *see Duckworth v. Whisenant, 97 F.3d 1393, 1399 (11th Cir.1996)*. On remand, if the occasion to award costs arises again, the district court should closely scrutinize its award.

## III. CONCLUSION

We hold as follows: (1) We AFFIRM the judgment as a matter of law in favor of Appellees on Appellant Heatherwood's claims. (2) We AFFIRM the dismissal of Appellant USX's claims. (3) We REVERSE the denial of Appellants' motion for judgment as matter of law on Appellees' counterclaims for a violation of 42 U.S.C. § 1983, malicious prosecution, abuse of process, tortious interference with business relations, defamation, and civil conspiracy. (4) We REVERSE the judgment of the district court awarding $6.8 million to Appellee TIECO and $375,000 to Appellee Yielding. (5) We VACATE the judgment awarding $1,442,769.27 in attorney's fees and costs to Appellees and REMAND *1295 for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, VACATED and REMANDED in part.

261 F.3d 1275, 57 Fed. R. Evid. Serv. 1350, 14 Fla. L. Weekly Fed. C 1130

Briefs and Other Related Documents (Back to top)

• 2000 WL 33988233 (Appellate Brief) Reply Brief of Appellants USX Corporation and Heatherwood Golf Club, Inc. (Aug. 25, 2000)Original Image of this Document (PDF)

• 2000 WL 33988232 (Appellate Brief) Brief of Appellees (Aug. 15, 2000)Original Image of this Document (PDF)

• 2000 WL 33988234 (Appellate Brief) Brief of Appellants USX Corporation and Heatherwood Golf Club, Inc. (Jul. 12, 2000)Original Image of this Document (PDF)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

• 2000 WL 34004494 (Appellate Brief) Reply Brief of Appellants USX Corporation and Heatherwood Golf Club, Inc. (Jun. 21, 2000)Original Image of this Document (PDF)

• 2000 WL 34004498 (Appellate Brief) Brief of Appellees (Jun. 02, 2000)Original Image of this Document (PDF)

• _____00-12842_____(Docket) (Jun. 02, 2000)

• 2000 WL 34004489 (Appellate Brief) Brief of Appellants USX Corporation and Heatherwood Golf Club, Inc. (Apr. 26, 2000)Original Image of this Document (PDF)

• _____00-11309_____(Docket) (Mar. 16, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

J

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 OCT 24  PM 4: 59

.. D.STRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| USX CORPORATION, and HEATHERWOOD GOLF CLUB, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| TIECO, INC., ATOZ MANAGEMENT, INC., and FLETCHER YIELDING, | ) ) ) ) |
| Defendants. | ) |

Civil Action Number
95-C-3237-S

ENTERED

OCT 2 4 2002

**ORDER ON MOTION FOR COSTS AND ATTORNEYS' FEES**

The Report and Recommendation of the Magistrate Judge concerning costs are REJECTED.

The Court finds that the Defendants' counterclaims would not have been filed in the absence USX's lawsuit. USX's claims were dismissed based on its "egregious conduct," "bad faith misrepresentation both to opposing counsel and to the Court," and its intentional deception of the Court. Doc.310, pp. 9,10,12. Most of the trial time was consumed by the presentation of USX's evidence.

Under these circumstances, despite the failure of their counterclaims, the Court concludes that Defendants are the "prevailing parties" for purposes of F.R.Civ.P. 54 (b). *See, Terry Props., Inc. v. Standard Oil Co.,* 799 F.2d 1523. 1540 (11th Cir.1986). The Magistrate Judge's failure to consider these factors resulted in his clearly erroneous finding concerning the propriety of costs-shifting.

The Court APPROVES and ADOPTS the Magistrate Judge's Report and Recommendation concerning attorney's fees.

Defendants' renewed request for attorneys' fees is hereby DENIED.

In sum, **costs in the amount of $26,508.39 are hereby assessed against Plaintiff USX.**

Done this ___24th___ day of October, 2002.

Chief United States District Judge
U.W. Clemon

K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

FILED

02 OCT 25 AM 9:22

U.S. DI~ ~ . COURT
OF AL~BAMA

| | |
|---|---|
| USX COPORATION, et al., | ) |
| | ) |
|     **Plaintiffs/Counterdefendants,** | ) |
| | ) |
| v. | ) |
| | ) |
| TIECO, INC., et al., | ) |
| | ) |
|     **Defendants/Counterplaintiffs.** | ) |

**ORAL ARGUMENT REQUESTED**

**Civil Action No.  CV-95-C-3237-S**

### RULE 60(b) MOTION FOR NEW TRIAL

Because Plaintiff United States Steel, LLC ("USX") deliberately and diligently refused to produce evidence that would have permitted Defendant TIECO, Inc. to satisfy the evidentiary burden on its counterclaims, TIECO seeks relief from this Court's final judgment under Federal Rules of Civil Procedure 60(b)(3).  TIECO offers the following in support of this motion.

#### Salient Facts and Procedural History

1.      This case involves extreme misconduct during the discovery process by USX.  As the Court is aware, USX withheld material evidence, despite repeated requests and motion to compel, until the jury had begun its deliberations.  *See USX Corp. v. TIECO, Inc.*, 189 F.R.D. 674, 676-77 (N.D. Ala. 1999).  This evidence related to Plaintiffs' claims against TIECO as well as TIECO's counterclaims.  Plaintiffs' complaint alleged that TIECO had violated RICO and breached its contract with USX by submitting false invoices for Cushman vehicle parts that were never received.  *See USX v. TIECO*, 189 F.R.D. at 675.  USX also instigated a criminal investigation and along with its co-conspirators in the Alabama Attorney General's Office ("AG's Office"), sought an indictment of TIECO.  The indictment was ultimately dismissed upon the state court's finding



369

of prosecutorial misconduct by the AG's Office and citing the AG's joint conduct with USX. TIECO responded to Plaintiffs' civil complaint by maintaining that it had shipped entire Cushman vehicles and other property with a value equivalent to the parts listed in the invoices to accommodate the requests of USX's agents and employees. *Id.* As a result, TIECO filed counterclaims against USX alleging, among other things, violations of TIECO's constitutional rights under 42 U.S.C. § 1983 and malicious prosecution.

2.      In the course of discovery, TIECO repeatedly asked USX to produce records including but not limited to inventories concerning the Cushman vehicles. *USX v. TIECO,* 189 F.R.D. at 676–77. Had USX produced the requested documents, it would have not only enabled TIECO to better defend against USX's claim that TIECO had billed USX for items USX never received, but it would also have greatly improved TIECO's ability to prove its claim that USX had no basis for instituting criminal proceedings against TIECO. Nonetheless, USX withheld such material evidence despite repeated requests, a motion to compel, and a hearing at which counsel for USX misled the Court on the existence Cushman-related files. *USX v. TIECO,* 189 F.R.D. at 676.

3.      During trial, testimony revealed that USX had several boxes of Cushman-related documents that had never been produced to TIECO. *See, USX v. TIECO,* 189 F.R.D. at 677. By the time counsel for TIECO had an opportunity to review the documents, the jury had begun its deliberations. *Id.* The boxes revealed individual files on each Cushman vehicle that TIECO had provided to USX - evidence which explicitly rebutted USX's theory that it had never received such vehicles from TIECO and evidence which went to show that the criminal investigation of TIECO instigated by USX was baseless. *See, USX v. TIECO,* 189 F.R.D. at 677 n.3. These documents were additional evidence showing the conspiracy between USX and the Attorney General's Office to

2

violate TIECO's civil right. The boxes included (among other things):

    a.     Individual files on each Cushman vehicle maintained by the Tractor Shop, including vehicles made the basis of the indictments against TIECO and the basis of USX's civil damage calculation;

    b.     Additional summaries and computer-generated reports prepared by USX Audit Manager Jim Wager that were not provided prior to his deposition or trial testimony even though they were part of USX's investigation of allegations against TIECO and they went to the heart of TIECO's claim that USX's internal investigation did not produce sufficient probable cause to seek the civil and criminal prosecution of TIECO.

    c.     Documents relating to other vendor audits performed by USX pursuant to similar allegations of wrongful conduct on the part of USX employees (these other vendors were never civilly or criminally prosecuted by USX);

    d.     Documents seized from the desk of former Tractor Shop Coordinator Richard Autry, alleged by USX to be a conspirator with TIECO, however these records were not produced prior to Mr. Autry's trial testimony;

    e.     Additional documents relating to the lack of management controls at the Fairfield Tractor Shop; and

    f.     One document reflecting that computer files created by Jim Wager had been deleted from his index including a file described as "Summary of TIECO Activity with USS - 1982 - 1995."

    4.     As a sanction for USX's misconduct in connection with discovery, the Court dismissed USX's claims against TIECO. *See, USX v. TIECO*, 189 F.R.D. at 677 – 78. The Court

chose not to interrupt the jury's deliberations or declare a mistrial. *See, USX v. TIECO*, 189 F.R.D. at 679. Thereafter, the jury returned a verdict finding, among other things, that USX intentionally violated TIECO's federal constitutional rights and maliciously prosecuted TIECO. *See, USX v. TIECO*, 189 F.R.D. at 680 – 81. The Court entered final judgment on the verdict. *Id.*

5.      After the verdict, USX continued to disclose additional documents covered by TIECO's discovery requests. On May 11, 2000, more than six months after trial, USX produced another 100 pages of documents that had been located in USX's Engineering Department at Fairfield. The Engineering Department had assigned a Facility Redeployment group to handle the disposition of numerous used Cushman vehicles located behind the Tractor Shop. These documents were relevant to the analysis conducted in preparation for trial of Cushman vehicles on USX's premises at the time USX instigated its civil and criminal prosecution of TIECO. TIECO was denied the opportunity to conduct full and thorough discovery without the use of these records. Although some of the documents had been located as early as January of 2000, USX did not produce them until May of 2000.

6.      On appeal, the Eleventh Circuit affirmed the dismissal of USX's claims as a discovery sanction but reversed the judgment on the jury's verdict, finding USX was entitled to judgment as a matter of law on TIECO's claims. *See, USX Corp. v. TIECO, Inc.*, 261 F.3d 1275, 1294 (11th Cir. 2001). Specifically, the Eleventh Circuit held that TIECO's § 1983 claim and its claim for malicious prosecution failed because TIECO failed to prove the absence of probable cause. *USX v. TIECO*, 261 F.3d at 1290-91. Based on the evidence admitted at trial, the Eleventh Circuit concluded that "[a]lthough TIECO may have had an innocent explanation for [its] accounting system, the system, on its face, gave USX a reasonable ground for suspecting TIECO of fraud."

4

*USX v. TIECO*, 261 F.3d at 1291. This conclusion did not take and could not have taken into consideration the evidence USX withheld from TIECO which directly influenced the question of whether or not USX had probable cause to criminally and civilly prosecute TIECO. In addition, the Eleventh Circuit's decision did not consider the conclusive evidence that the "accounting system" was actually an internal inventory system created to comply with USX's (and other vendors') requests for materials and machinery. There is a difference between whether USX had "a reasonable ground for suspecting TIECO of fraud" for purposes of conducting its internal investigation and whether, after conducting such an investigation, USX still had "a reasonable ground for suspecting TIECO of fraud." The evidence withheld by USX was highly relevant to TIECO's ability to develop evidence during discovery and to present evidence at trial showing that USX's investigation did not provide sufficient probable cause.

      7.    The Eleventh Circuit's mandate reversed the denial of USX's motion for judgment as a matter of law on TIECO's counterclaim and remanded the case to this Court for recalculation of fees and costs allowable under 42 U.S.C. § 1988(b). *See, USX v. TIECO*, 261 F.3d at 1294-95. On September 18, 2002, United States Magistrate Judge Robert R. Armstrong, Jr., recommended that this Court "find that TIECO is not a prevailing party, and that TIECO should not be awarded costs or attorney's fees." On September 24, 2002, TIECO filed its objection to the Magistrate's Report and Recommendation. On October 7, 2002, TIECO requested oral argument on its objection. This Court entered final judgment pursuant to the Eleventh Circuit's mandate on October 25, 2002,. This Court denied Defendants' request for attorneys' fees and taxed costs against Plaintiff USX. This Court also found that

      "Defendants' counterclaims would not have been filed in the absence of USX's

5

lawsuit. USX's claims were dismissed based on its 'eggregious conduct,' 'bad faith misrepresentation both to opposing counsel and to the Court,' and its intentional deception of the Court.

"Under these circumstances, despite the failure of the counterclaims, the Court concludes that Defendants are the 'prevailing parties' for purposes of F.R.Civ.P. 54(b)."

### Rule Involved and Standards of Decision

8.     TIECO now moves the Court for relief from that judgment pursuant to Federal Rules

of Civil Procedure 60(b)(3) which provides:

"On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud . . . , misrepresentation, or other misconduct of an adverse party . . . . The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

9.     Relief under Rule 60(b)(3) rests in "the district court's sound discretion." *Anderson*

*v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988). The "rule is remedial and should be liberally

construed." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, (5th Cir. 1978). To obtain relief under Rule

60(b)(3), TIECO must (1) prove the fraud, misrepresentation, or misconduct in question by clear and

convincing evidence and (2) demonstrate that the misconduct prevented full and fair preparation or

presentation of its case. *Rozier*, 573 F.2d at 1339; *Anderson*, 862 F.2d at 923. *Accord,* 11 Wright,

Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2860, at 312-14 (1995).

### Argument

10.     This motion is timely. Because the Eleventh Circuit's decision resulted in a

substantive change to the judgment on the jury's verdict, the time for filing the motion "run[s] from

the substantially modified order entered on mandate of the appellate court." *Transit Cas. Co. v.*

6

*Security Trust Co.*, 441 F.2d 788, 791 (5th Cir. 1971). *Accord* 11 Wright, Miller & Kane § 2866, at 390-91 (collecting cases). TIECO filed its motion within 1 day of final judgment being entered against it, well within the one year limitation period set by Rule 60(b). There is no requirement that TIECO seek leave from the Eleventh Circuit for this motion and this Court is in a better position to judge whether "later events"merit relief under Rule 60(b). *Standard Oil Co. v. United States*, 429 U.S. 17, 18-19 (1976).

11.    USX's failure to produce documents in discovery is misconduct covered by Rule 60(b)(3). *See Rozier*, 573 F.2d at 1339; *Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 428 (6th Cir. 1996); *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994); *Anderson*, 862 F.2d at 923.

12.    There is clear and convincing evidence that USX is guilty of misconduct. This Court found USX's failure to produce material evidence so egregious that it imposed the "fatal sanction of dismissal." *USX v. TIECO*, 189 F.R.D. at 677. The Eleventh Circuit summarily affirmed that decision, finding it did "not warrant discussion." *USX v. TIECO*, 261 F.3d at 1280.

13.    Rule 60(b)(3) protects "the fairness and integrity of litigation in the federal courts," so there is no requirement that the information USX withheld "be of such a nature as to alter the result in the case." *Rozier*, 573 F.2d at 1339. *Accord Schultz*, 24 F.3d at 631; *Anderson*, 862 F.2d at 924 & n.10; 12 Moore's Federal Practice §§ 60.43[1][d] (3d ed. 2002) (collecting cases). The rule protects the fairness of the process, not the rectitude of the outcome. *See Lonsdorf v. Seefelt*, 47 F.3d 893, 897 (7th Cir. 1995). The victim of discovery misconduct is entitled to relief under Rule 60(b)(3) if the concealment of evidence closed off an avenue for discovery, hindered the examination of witnesses, or foreclosed a theory of the case. *See Rozier*, 573 F.2d at 1342, 1345; *Schultz*, 24 F.3d at 630; *Anderson*, 862 F.2d at 925.

7

14.     Now that Eleventh Circuit has determined that, as initially tried, TIECO presented insufficient evidence on its claims against USX, TIECO is entitled to a new trial since USX has disclosed even more, but yet not all, facts relevant to TIECO's counterclaims.  Needless to say, by withholding more than three boxes of documents directly relevant to TIECO's defenses and counterclaims, USX skewed the course of pretrial discovery, hindered TIECO's examination and cross-examination of witnesses at trial, and reshaped the theories of the case presented to the jury. Accordingly, TIECO is entitled to a new trial on the actual facts, not "the adjudication of a hypothetical fact situation imposed by [USX's] selective disclosure of information." *Rozier*, 573 F.2d at 1346.  To hold otherwise would allow the "person who hides the ball most effectively [to] win the case." *Abrahamsen*, 92 F.3d at 428-29.

## Relief Requested

For the reasons, TIECO respectfully requests the following relief:

1.     TIECO requests the Court grant it a new trial under Rule 60(b)(3);

2.     TIECO requests the Court hold an evidentiary hearing to determine what other documents or records are in the possession of USX and its counsel, past and present, that are relevant to this litigation; and to develop the record for this motion;

3.     TIECO requests the Court allow TIECO to take discovery of witnesses with knowledge of the documents and information wrongfully withheld from TIECO prior to and during the trial of this case, including but not limited to the taking of the depositions of Robert Hilton, James Wager, William Waudby, and any other individual determined to have such relevant knowledge;

4.     TIECO requests the Court compel the production of any and all documents related

to matters in this motion from USX and all of its counsel, past and present;

      5.    TIECO requests the Court, if the Court deems necessary, to appoint at USX's expense

an independent special prosecutor or master to assist in the discovery and investigation into this

matter; and

      6.    TIECO requests the Court grant it such other relief as the Court finds appropriate.

Respectfully submitted,

J. Mark White
Linda G. Flippo
Stephen R. Arnold

OF COUNSEL:
WHITE, DUNN & BOOKER
2025 Third Avenue North
Suite 600
Birmingham, Alabama 35203
Telephone:    (205) 323-1888
Facsimile:    (205) 323-8907

OF COUNSEL
Ralph D. Cook
Hare, Wynn, Newell & Newton
2025 Third Avenue North
Suite 800
Birmingham, Alabama 35203

9

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading on the following counsel of record by placing a copy in the United States Mail, properly addressed and postage prepaid, on this the _25TH_ day of _OCTOBER_____, 2002:

Warren B. Lightfoot, Esq.
Jere F. White, Jr., Esq.
William O. L. Hutchison, Esq.
Lightfoot, Franklin & White, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203

John B. Tally, Jr.
William L. Waudby
Todd M. Higey
Lange, Simpson, Robinson & Somerville, LLP
2100 Third Avenue North
Suite 1100
Birmingham, Alabama 35203

J. L. Chestnut, Jr.
Chestnut, Sanders, Sanders, Williams & Pettaway
P.O. Box 1305
Selma, Alabama 36701

H. Thomas Wells, Jr., Esq.
John A. Earnhardt, Esq.
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2602

_____
Of Counsel

10

**UNITED STATES DISTRICT COURT**
**Northern District of Alabama**
**Office of the Clerk**
**Hugo L. Black United States Courthouse**
**Room 140, 1729 5th Avenue North**
**Birmingham, Alabama 35203**
**(205) 278-1700**

September 14, 2004

Mr. Thomas K. Kahn, Clerk
U.S. Court of Appeals, 11th Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303                                      U.S.D.C. No. CV95-HS-3237-S
                                                       U.S.C.A. No.
                        IN RE: USX Corp Vs. Tieco, Inc. et al

Enclosed are documents regarding an appeal in this matter.  Please acknowledge receipt on the enclosed copy of this transmittal.

X        Certified copy of Notice of Appeal, Docket Entries and Judgment/Order and Opinion appealed from enclosed.  Please check
         if judgment was oral:

         Certified record  supplemental record on appeal consisting of:  volume(s) of pleadings, etc.;  volume(s) of transcripts;

x        First Notice of Appeal? No Dates of other Notices:

         The following materials **SEALED** in this court (order enclosed) consisting of:

         Original papers (court file) and certified copy of docket entries per USCA request.

         There was no hearing from which a transcript could be made.

         Copy of CJA Form 20 or District Court order appointing counsel.

x        The appellant docket fee has been paid.  Yes Date Paid: 9/13/04

         The appellant has been  leave to appeal in forma pauperis and  a request for certificate of appealability (order enclosed).

x        The Judge/Magistrate Judge appealed from is: Hon Virginia Emerson Hopkins

         The Court Reporter is:  205-252-6565.

         This is a **BANKRUPTCY APPEAL**.  Please send notice of final order and/or opinion to: Richard Mauk, Acting Clerk, U.S.
         Bankruptcy Court, 1800 5th Avenue North, Birmingham, Alabama 35203.

         This is a **DEATH PENALTY** appeal.

         Appellant having failed to cure procedural defects re: appeal fee, the appeal is due to be DISMISSED.

         Other:

xc: Counsel                    Perry D. Mathis, Clerk
                               By
                                  Deputy Clerk/ma

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

|                        |     |                              |
|------------------------|-----|------------------------------|
| USX Corporation et al  | }   |                              |
|         Plaintiff(s)   | }   |                              |
|         v.             | }   | Case Number: CV 95-HS-3237-S |
|                        | }   |                              |
| Tieco, Inc. et al      | }   |                              |
|         Defendant(s)   | }   |                              |

### NOTICE TO COUNSEL

A notice of interlocutory appeal was filed today in the above-entitled civil action. In accordance with the general direction of this court, counsel is requested to file a designation of the record in order to prepare a concise record needed for appellate review. You will be required to pay the expense of copying (at 50 cents per page) the necessary documents if the clerk's office does the copying, or you may provide the copies to the clerk. The court file may be checked out for a limited time if it is needed to prepare the copies. Counsel should serve that record on the court and on opposing counsel. Because the Eleventh Circuit 's Rule 11-2 of the Federal Rules of Appellate Procedure requires transmission of the appellate record within fifteen (15) days from the filing of the notice of appeal or within fifteen (15) days after the filing of a transcript of trial proceedings, please submit your designation or record to this office as soon as possible.

DONE on September 14, 2004.

PERRY D. MATHIS, CLERK

By_____
        Deputy Clerk

xc:    Appeals Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
04 SEP 10 PH 4:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| USX CORPORATION and<br>HEATHERWOOD GOLF CLUB, INC., | ) )<br>) |
| Plaintiffs, | ) |
| v. | )    CIVIL ACTION NO. CV-95-HS-3237-S<br>) |
| TIECO, INC., et al., | )<br>) |
| Defendants. | ) |

NOTICE OF APPEAL

Notice is hereby given that TIECO, Inc., ATOZ Management, Inc., and Fletcher Yeilding

(collectively referred to as "TIECO"), Defendants in the above-styled case, hereby appeal to the

United States Court of Appeals for the Eleventh Circuit from the Memorandum Opinion and Order

denying TIECO's Rule 60(b) Motion for New Trial entered in this action on the 2nd day of

September, 2004.

_____
One of the Attorneys for Defendants TIECO, Inc.,
ATOZ Management, Inc., and Fletcher Yeilding

OF COUNSEL:
J. Mark White
Linda G. Flippo
Stephen R. Arnold
**WHITE ARNOLD ANDREWS & DOWD, P.C.**
2025 Third Avenue North
Suite 600
Birmingham, Alabama 35203
(205) 323-1888 (telephone)
(205) 323-8907 (facsimile)

**OF COUNSEL:**
Ralph D. Cook
James R. Pratt, III
D. Leon Ashford
**HARE, WYNN, NEWELL & NEWTON, P.C.**
2025 Third Avenue North
Suite 800
Birmingham, Alabama 35203
(205) 328-5330 (telephone)
(205) 324-2165

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following counsel by placing a copy in the United States Mail, properly addressed and postage prepaid on this the _10th_ day of _September_____, 2004:

Warren B. Lightfoot
Jere F. White, Jr.
Sara Anne Ford
Sarah O. Warburton
Lightfoot Franklin & White, LLC
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700

John J. Dalton
June Ann Sauntry
Troutman Sanders, LLP
Bank of America Plaza
600 Peachtree Street, N.E., Suite 5200
Atlanta, Georgia  30308-2216
(404) 885-3000

John B. Tally, Jr.
William L. Waudby
Todd M. Higey
Adams and Reese / Lange Simpson
2100 3rd Avenue North
Suite 1100
Birmingham, AL  35203

2

J. L. Chestnut, Jr.
Chestnut, Sanders, Sanders, Williams & Pettaway
P.O. Box 1305
Selma, Alabama 36701

H. Thomas Wells, Jr., Esquire
John A. Earnhardt, Esquire
Maynard Cooper & Gale, PC
AmSouth Harbert Plaza,
Suite 2400
1901 6th Avenue North
Birmingham, AL 35203-2618

OF COUNSEL

3